**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**(Miami Division)**

| | |
|---|---|
| SURESH KUMAR KAKUMANI;<br>SIDDHARTHA RANGINENI;<br>SRAVANTHI MARELLA<br><br>  Plaintiffs,<br><br>  v.<br><br>ANDREW BERNARD DOVER, aka<br>ANDREW B. DOVER, aka ANDREW<br>DOVER, aka ANDY DOVER<br>  (Florida resident);<br>MARK JOSEPH BELLISSIMO, aka MARK J.<br>BELLISSIMO, aka MARK BELLISSIOMO<br>  (Florida resident);<br>ODLUM EQUESTRIAN LENDERS, LLC;<br>ODLUM EQUESTRIAN MANAGER LLC;<br>  (both Delaware companies)<br>ODLUM CAPITAL LLC;<br>  (Delaware company registered in Florida<br>  as a foreign LLC);<br>APPALACHIAN EB-5 LLC<br>  (a North Carolina company);<br><br>  Defendants. | ACTION No. 26-CV-…………..<br><br><br><br>**VERIFIED COMPLAINT** |

**NATURE OF ACTION.**

Plaintiffs Suresh Kumar Kakumani, Siddhartha Rangineni, and Sravanthi Marella, by and through their attorneys, The Lambert Law Firm P.C., bring this action against Defendants Andrew B. Dover, Mark J. Bellissimo, Odlum Equestrian Lenders, LLC, Odlum Equestrian Manager, LLC, Odlum Capital LLC, and Appalachian EB-5, LLC.  The Plaintiffs have sought U.S. status under U.S. immigration law, specifically through the United States Citizenship and Immigration Services (USCIS) EB-5 visa program, created in 1990.  The EB-5 program enables foreign investors to

obtain a U.S. Visa by investing in a business that benefits the U.S. economy and creates jobs. The defendants represented one individual and a web of companies that were set up to misuse the EB-5 visa program, thereby depriving the Plaintiffs of their investment by misrepresenting the EB-5 requirements. The Plaintiffs seek to apply the equitable remedy of piercing the corporate veil to impose liability when the corporate form has been abused. Evidence shows that Dover has been using at least four companies operating from his residence in Miami Beach. Three Odlum companies were registered in Delaware, and Appalachian EB-5 was registered in North Carolina. However, as their apparent sole operator, Dover has been, on information and belief, acting from his units at 125 Jefferson Ave., Apt. 122, Miami Beach, FL 33139 (sometimes listing Apt. 133 in the address) at all relevant times. On May 28, 2026, a webinar for investors in EB-5 Tryon was held, at which a businessman Mark J. Bellissimo made a presentation to the unit owners in EB-5 program, admitting essentially that he was in control of the investors' money but that, even after even more than 7 years wait, he will not return the investments until some uncertain time in the future, all in violation of the plaintiffs' rights.

## PARTIES.

1. Plaintiff Suresh Kumar Kakumani (also "Kakumani") is an individual residing at all times relevant to this action, at 4305 Blackwood St, Prosper, TX 75078.

2. Plaintiff Siddhartha Rangineni (also "Rangineni") is an individual residing at all times relevant to this action at the time of investment in 2018: 4709, Northwest 155th St., Edmond, Oklahoma, 73013. Rangineri's current address: 3453 Singer Ln. Frisco, Texas, 75034

3. Plaintiff Sravanthi Marella (also "Marella") is an individual residing, at all times relevant to this action, at 3116 Virginia Ave SE, Charleston, WV 25304.

4. Defendant Andrew B. Dover, aka Andrew Bernard Dover (also "Dover"), is an individual who, at all times relevant to this action, is a resident of the State of Florida, with address

125 Jefferson Ave., Apt. 122, Miami Beach, FL 33139 and/or 125 Jefferson Ave., Apt. 133, Miami Beach, FL 33139.  Dover is a proper defendant because he obtained over $1.5 million from the Plaintiffs on an account that he, on information and belief, controls, and then treated the funds as his own, without accounting for them or any intention to return them to their owners.  On information and belief, Dover has also maintained an address at Biltmore Park Town Square, One Town Square Blvd., Suite 315, Asheville, North Carolina 28803, but he does not reside there.

5.　　Defendant Mark Joseph Bellissimo, aka Mark J. Bellissimo, aka Mark Bellissimo ("Bellissimo"), is an individual who, on information and belief, is a resident of the State of Florida, with main residential address at 2930 Hurlingham Dr, Wellington, FL 33414.  At a webinar for the plaintiffs and other investors held on May 28, 2026, as mentioned above, Bellissimo essentially admitted that he was in control of the investments made through the Tryon EB-5 program, but that, even after more than 6-7 years, he would honor the contractual obligations, will not pay back the investments, at his discretion, promising to return funds, again, sometime in the future, which all plaintiffs rejected.

6.　　Defendant Odlum Equestrian Lenders, LLC ("Odlum Equestrian Lenders") is and has been a Delaware limited liability company. Odlum Equestrian Lenders maintains its principal mailing address c/o Appalachian EB-5, LLC, Attention: Andrew Dover and Dale Carroll, One Town Square Boulevard, Suite 315, Asheville, North Carolina 28803.  On information and belief, Odlum does not undertake any business in Delaware but has been doing business in Florida.  As Odlum's filing, signed by Dover, shows, its address is 125 Jefferson Ave., Apt. 122, Miami Beach, FL 33139.  On information and belief, Dover is its only principal and beneficiary.  Odlum is a proper defendant in this action because over $1.5 million was transferred from the plaintiffs' accounts to the account of Odlum Lenders that Dover, on information and belief, has controlled.  Odlum has been doing business in Florida, but the State of Florida's Secretary of State's database

3

does not show that the company is registered as a foreign company doing business in this State. The Plaintiffs assert that Odlum should be treated as Dover's corporate alter ego for not being registered to do business in this State and for other reasons.

7.     Defendant Odlum Equestrian Manager, LLC ("Odlum Equestrian Manager") is and has been a Delaware limited liability company and is the Manager of Odlum Equestrian Lenders. On information and belief, Odlum does not undertake any business in Delaware but does business in Florida.  The company's actual address is 125 Jefferson Ave., Apt. 122, Miami Beach, FL 33139.  On information and belief, Dover is the company's only principal, stakeholder, and beneficiary.  Odlum Equestrian Manager is a defendant in this action because the above-cited amount was wire transferred from the plaintiff's account to the account in that company name, which Dover, on information and belief, has controlled.   Odlum Equestrian Manager has been doing business in Florida, but the Secretary of State's database for the State of Florida does not show that company as registered as a foreign company doing business in this State.  The Plaintiffs assert that Odlum Manager should be treated as Dover's corporate alter ego.

8.     Defendant Odlum Capital LLC is a foreign limited liability company (Delaware), registered in Florida in July 2025, at 125 Jefferson Ave Apt 133, Miami Beach, FL 33139.  As another alleged alter ego of Dover, Odlum has been doing business in Florida, with the address disclosed in the company documents.

9.     Defendant Appalachian EB-5, LLC ("Appalachian EB-5") is and has been a North Carolina limited liability company that served as the Regional Center. Appalachian EB-5 maintains a principal mailing address at One Town Square Boulevard, Suite 315, Asheville, North Carolina 28803.  As the official record of the State of North Carolina indicates, its only member is Dover, with the same address as above, 125 Jefferson Ave #133. Miami Beach, FL 33139. Appalachian has been doing business in Florida, but Florida's Secretary of State's database does

not show the company registered as a foreign company doing business in this State.  The Plaintiffs assert that Odlum Manager should be treated as Dover's corporate alter ego for not being registered in Florida and for other reasons.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States, including the Securities Act of 1933, the Securities Exchange Act of 1934, and other applicable federal statutes, as outlined in the causes of action below.

11.     Venue is proper in this district because Defendant Dover has been residing in Miami-Dade County at all relevant times, and he has controlled the co-defendants' companies, Odlum, operating out of Miami Beach, Florida.

**STATEMENT OF FACTS RELEVANT TO ALL COUNTS**

**a.  Relevant Background to Defendant Andrew Dover's Creating EB-5 Services.**

12.     This case against Andrew Bernard Dover, Odlum Equestrian Lenders LLC, Odlum Manager LLC, Odlum Capital LLC, and Appalachian EB-5 LLC is not the only or the first one concerning the damages that these defendants caused to a victim of the securities fraud scheme, using an EB-5 component to lure investors.

13.     Plaintiffs are aware of one prior case in this Court, U.S. District Court for the Southern District of Florida, alleging similar claims based on the same or related scheme of luring investments from applicants for the status in the U.S. pursuant to the statutory requirements, that the defendants had no intention to satisfy.

14.     The central person for the securities fraud scheme described herewith has been the same, Mr. Andrew Dover, who has been running the same platform for investments by the applicants for EB-5 program benefits.

15.     Dover's track record includes bankruptcy at the beginning of his entrepreneurial activities.  In November 2002, Dover filed a bankruptcy petition in the U.S. Bankruptcy Court in the Southern District of Ohio (Columbus venue), bankruptcy Petition #: 2:02-bk-65518.  At the time, his address in the bankruptcy case was indicated as 3597 Chesapeake Dr, Zanesville, OH 43701.

16.     Dover did not disclose to the Plaintiffs at the relevant times that he had been adjudged bankrupt.  Had the Plaintiffs received such disclosure of a material fact, they would have turned down Dover's proposals.

17.     Public records show that Dover has been doing business in Florida since 2009, when it registered Odlum Capital, a Delaware company registered on April 24, 2009, under State ID 4680422.  As with Odlum and Odlum Manager companies, Dover registered later; the company's address is c/o Business Filings Inc., 108 West 13th Street, Wilmington, DE 19801.  On information and belief, Odlum Capital's actual address is 125 Jefferson Ave., Apt. 122, Miami Beach, FL 331399, or at the same house address, Apt. 133, cited above.  Dover has controlled Odlum.

18.     Despite doing business in Florida for years, as the public record shows, Dover did not register Odlum Capital in Florida until 2024.  Dover has maintained a website for that entity at the link odlumcapital.com.  Currently, the representations on that website show that Odlum Capital is an integral part of the scheme with Dover's Odlum companies.

19.     For example, that website says: "Odlum Capital is the majority shareholder of Appalachian EB-5 Regional Center, an impact investment company focused on creating jobs in Appalachia and profits for our global investment partners. The company currently has investments in hospitality, lending, and real estate."

20.     However, on information and belief, there is no such entity under the name Appalachian EB-5 Regional Center registered as a legal person, such as a corporation or LLC, raising questions about its legitimacy and compliance with registration requirements.

21.     Another statement is indicative that the group of Odlum companies is a part of the same scheme, run, on information and belief, by the same person, Dover.  The website says: "Odlum Tropaion is a wholly owned subsidiary of Odlum Capital."  Odlum Capital's address is openly stated: 125 Jefferson Ave. Miami Beach, FL 33139 (matching Dover's residential address). Thereby, Odlum Capital is not registered in Florida.

22.     As stated above, on October 13, 2011, Dover registered Appalachian EB-5 LLC as a North Carolina limited liability company, State ID 1225596.  Limited liability companies in that State are managed by their managers under N.C.G.S. 57D-3-20.  Dover is listed as its sole member, with the same address as above, 125 Jefferson Ave #133. Miami Beach, FL 33139.  Appalachian has been doing business in Florida, but the State of Florida's Secretary of State's database does not show the company registered as a foreign company doing business in this State.  The Plaintiffs assert that Odlum Manager should be treated as Dover's alter ego for not being registered in Florida and for other reasons.

23.     The Regional Center entity was established on October 13, 2011.  On the same day the company was registered, October 13, 2011, Dover applied to USCIS for approval as a regional EB-5 Center.  The application, which promised to create jobs, was approved.  Subsequently, Dover overinflated that fact.  In fact, USCIS lists 18 other EB-5 Centers in North Carolina and about 960 nationwide.

24.     Dover then registered in Florida in 2012 a company, ZRD Energy LLC, at the address subsequently used for the Odlum companies, 125 Jefferson Ave, Apt 133, Miami Beach, FL, 33139, on information and belief, his residential apartment.

7

25. In October 2015, American Express filed a case against Dover, alleging unpaid credit card debt of approximately $133,550, with the card issued under the name Odlum Tropaion LLC, which was used in a manner suggesting it was a fictitious or improperly registered entity, raising concerns about transparency and potential misconduct.

26. The Plaintiffs have found out that Odlum Tropaion is actually registered in Ohio since January 5, 2010, State docket Number 1906238, even though the statements came to Dover's Florida address, same as above. The Plaintiffs believe that American Express called Odlum Tropaion by a fictitious name, recognizing that it did not operate as a proper company.

27. The extracts from Dover's credit card statements, published with the above complaint, show that Dover's predominant use of that credit card was to make purchases from the Amazon online store, likely establishing a personal use of the credit card in a company name.

28. In January 2016, Dover settled the credit card debt with an American Express card in the 11th Judicial Circuit for Miami-Dade County, where Dover apparently paid off his debt.

29. Dover never disclosed to the Plaintiffs that he had been using a business company to make purchases on Amazon and that Dover had accumulated significant debts for his Amazon purchases. This omission should evoke a feeling of betrayal and concern about deceptive practices, undermining trust in Dover's representations.

30. Had the Plaintiffs been informed that Dover was using credit at least one company for personal purchases, Odlum Tropaion, the Plaintiffs would have turned down paying $540,000, $530,000, and $540,000, respectively, to any account under Dover's control.

31. As stated above, on October 27, 2016, Dover registered a Delaware company, Odlum Equestrian Lenders LLC, State ID 6194780. Odlum Equestrian's registered address is c/o Business Filings Inc., 108 West 13th Street, Wilmington, DE 19801.

32.     On approximately the same day, Dover registered another Delaware company, Odlum Equestrian Manager LLC, under a State ID nearly matching the previous Odlum company's State ID, 6194784, only with the last digit "4" in its ID, instead of "0", at the end.  It was also registered at the same address: c/o Business Filings Inc., 108 West 13th Street, Wilmington, DE 19801.

33.     However, on the presentation business proposal from Dover to the plaintiff, Odlum's address is indicated as though it is in North Carolina.  Despite the plaintiff's best efforts to locate it, a search of the Secretary of State's official database does not show a company under that name.

34.     On information and belief, like Odlum Lenders, Odlum Manager does not undertake any business in Delaware but does business in Florida through a one-person enterprise of several companies.  Odlum Manager's filing shows that its address is 125 Jefferson Ave., Apt. 122/133, Miami Beach, FL 331399, apparently Dover's apartment address.  There is no evidence that Odlum does business in North Carolina, where it is, likewise, not registered.

35.     Had the Plaintiffs known that Odlum Equestrian or Odlum Manager did business in Florida without the required registration with the Secretary of State's Department of Corporations, they would have turned down Dover's proposals.

36.     On October 24, 2017, Dover registered an entity under the name Odlum Equestrian Lenders LLC in Hong Kong, registered under local ID CR No.2595854.  That was also mentioned on Dover's website.  In light of a complete match with the Delaware company's company name, on information and belief, that entity in Hong Kong is also controlled by Dover.

37.     On December 21, 2017, Dover, as public records show, made a filing with the U.S. Securities and Exchange Commission (SEC) for Odlum Equestrian Lenders, LLC.  Namely, Dover

9

filed Form D, Notice of Exempt Offering of Securities.  It was amended on August 8, 2023, as an Amended Notice of Exempt Offering of Securities, item 06b

38.     Under the initial Notice that was published at the time Plaintiffs subscribed to that investment, Dover represented to the public and the SEC that Odlum Lenders anticipated revenue in excess of $100 million, which was, as evidence shows, an untrue representation intended to lure new unit owners, each paying $500,000  and an administrative fee of $50,000 (sometimes "discounted") to Dover or under its control.

39.     Dover's filing with the SEC stated that the total offering of securities was $192.5 million.

40.     According to that filing, Dover was obligated by the SEC regulations to make truthful representations.  For example, Dover EB-5 received regional certification from USCIS in October 2011.  However, as the evidence shows, Dover's Note D submission to the SEC indicates that, on information and belief, Dover did not provide truthful disclosure.  That dynamic is self-explanatory: Dover's December 2017 SEC filing was untruthful, stating that $192.5 million would be raised, thereby misleading investors, including the Plaintiffs.

41.     Dover's Note D was improper or illegal because the offering of the Odlum Equestrian Lenders LLC was published to the public, not a small circle of private investors.  As part of Dover's activities, he advertised the units through Odlum Equestrian Lenders in various promotional formats, including on his publicly accessible websites.

42.     When Dover obtained over $1.5 million from Plaintiffs in 2018-2019, none of the websites associated with him informed the public that the sale of the securities did not even remotely approach the announced target for the subscription.

43.     However, since Dover made an offering in 2019 to the plaintiff, he was obligated to file Note D again to reflect that offering.  The search of the SEC's database shows that Dover failed to file such a Note D for 2019.

44.     Dover's only filing with the SEC, from December 21, 2017, also reveals that Dover was not a broker and no underwriter for such security transactions other than Dover individually as a signer on the submission to the SEC.

45.     The SEC database contains no other Dover filings at any time.  After that, they do not appear in online searches for SEC documents.  While Dover was offering and selling capital inputs valued at $550,000 (sometimes with a discount), he and his counterpart, Bellissimo, were obligated to provide truthful information.  The lack of brokers allowed Dover to avoid providing factual information.

46.     FINRA's database shows that Dover has no broker's license registered with that organization, without which Dover impinged upon the regulatory prohibitions.

47.     In 2018-2019, Dover and others submitted to Kakumani, Rangineni, and Marella, through intermediaries, an Operating Agreement of Odlum Equestrian Lenders LLC, without a date.  That Operating Agreement should have contained a page with a dated signature, but it was missing.  Dover knew, or should have known, that the lack of a date was a serious defect in the company documents, potentially invalidating them or misleading subscribers about the entity's capital.

48.     Odlum Lender's Operating Agreement has no entries that have been filed in Delaware.  On information and belief, Dover failed to file that Operating Agreement with the Department of Corporations for the State of Delaware because it would have been rejected for lack of date, and to avoid transparency.

49.     Despite a large page volume, the Operating Agreement did not adequately set up the mechanism for calling general meetings of the unit holders.  That left Dover virtually unlimited room for organizational and managerial maneuvers affecting its assets, without transparency for the Plaintiffs or other unit members.  The Operating Agreement did not provide any mechanism for its participants, the so-called "unit owners" (contributors of up to $550,000 per unit), to obtain financial accounting from Dover.

50.     Any change of the original Operating Agreement required a meeting of all unit holders upon due notice to all unit owners of record.

51.     At no time did the Plaintiffs receive any notice of a meeting of the unit owners for amending or supplementing Odlum Lenders' Operating Agreement.  At no time were the Plaintiffs asked to vote for that amendment of the company's founding instrument, called a "Supplement."

52.     The said supplement pointed to Dover as the person responsible for any inquiries by the unit owners, with the language as follows: "Should you have any questions regarding the Offering, or the information contained in this Cumulative Supplement, please contact the Manager at the following address: Odlum Equestrian Manager, LLC c/o Appalachian EB-5, LLC, Attention: Andrew Dover, Biltmore Park Town Square, One Town Square Boulevard, Suite 315 Asheville, North Carolina 28803."

53.     The paragraph about questions and Dover's contact information was statutorily insufficient.  Again, the de facto amended Operating Agreement failed to provide information about general meetings and the unit owners' rights to accounting from Dover.

54.     The critical point and material omission for securities regulations is that Dover did not report to the plaintiffs with verifiable documents, how many units in Odlum Lenders he had sold, and how that affected the plaintiff's material rights, including voting rights.

55.      Furthermore, as mentioned above, as evidence shows, Dover has resided in Florida, not North Carolina, since at least 2009, avoiding registering any of the Odlum companies with the State's Secretary of State's sunbiz.org website, which requires listing directors, the president, the secretary, and the treasurer.  On information and belief, Dover avoided registering the Odlum companies in Florida to conceal that he was a one-person enterprise using different company names.

56.      Dover used for his letters a letterhead saying "EB5 Appalachian Regional Center", with the address: "1 Town Square Blvd., Suite 315, Asheville, NC 28803.  No real business has been identified under that entity name at that address, except for a promotional website https://www.eb5fast.com/.

57.      Dover misrepresented in his video presentation on that website, lasting 1 minute 47 seconds, about that equestrian business, among other things: "USCIS awarded this project special distinction."

58.      The plaintiff's research shows that there is no such thing as USCIS's awarding a "special distinction" to a private business, less so to startups in the equestrian sector.  Dover's video representation was untrue and was used to lure unsuspecting investors, like the plaintiff, into ultimately paying money to Dover or placing their money under his unchecked control.

59.      Dover also misrepresented in his video presentation that the equestrian project was "determined as in the U.S. national interest."  That was a misrepresentation, bordering on absurdity, as though any equestrian projects could be in the U.S. national interest.

60.      Dover explained in his video presentation what that means: that the foreign investors would "jump" to the front of the processing line for the EB-5 program of USCIS.  The plaintiff's research shows that USCIS acknowledges no such thing as "jumping" ahead in the EB-

program, that no public rules or regulations govern it, and that it is nearly certain to be nonexistent.

61.     In his video, Dover made another misrepresentation, introducing as a speaker Sharon Decker, who he claimed was the Secretary of Commerce for North Carolina, thereby implying that she had some authority from the State.  However, Decker held that position for less than 2 years, from January 2013 to December 2014, and did not qualify as a reference for the State authority.  Decker has merely served as a promotional speaker for Tryon International Equestrian Center in Mill Spring, North Carolina, without authority to imply the State's support for that private project.

62.     In addition to Decker, Dover, who is, on information and belief, the driving force for raising those investments, contains a video presentation of Bellissimo Bellissimo ("Bellissimo"), the CEO of Tryon Equestrian Partners.  Bellissimo's online video presentation seeks investments in a "premier lifestyle" opportunity.

63.     In Bellissimo's video presentation, it follows that about five families own the land. Bellissimo did not explain how Odlum Lenders fit into that project, nor how that company has any relationship with Tryon Equestrian Partners or the landowners in North Carolina.  Bellissimo's video presentation contained other oddities, such as promoting the equestrian site as a resort. Typically, resorts cannot be located near horse facilities due to the inevitable animal odors.

64.     Thereby, research on the Tryon equestrian facility shows that the equestrian center has existed since 2014-2015 and has been operational for years without any involvement of Dover. Based on publicly available information, it is unclear why the existing business, developed years ago, sought private investments from third parties rather than self-financing from operating revenues and, if necessary, bank loans.

65. On information and belief, Dover merely capitalized on the information concerning the equestrian center, with little impact upon anything done under the roof of the existing equestrian center in Mill Spring, North Carolina.

66. The Plaintiffs also received from Dover and other persons a promotional report, titled Economic Impacts of Development and Operations Through March 2020 of the Tryon International Equestrian Center and Resort, from Barnhart Economic Services LLC, created on information and belief in June 2020.

67. That promotional report or leaflet bears the names of three authors with PhDs, two of whom have the same last name. The promotional leaflet says it was "prepared for Tryon Resort LLC." On information and belief, the report was initially written for something else, not the EB-5 program, for which Dover was soliciting money from foreigners.

68. That promotional expert report said only on the last page: "Section 203(b)(5) of the Immigration and Nationality Act requires that each immigrant investor create at least 10 permanent jobs. Given that total applicable employment generated in the study area to date by the project was estimated at 4,859 jobs, this Regional Center project can support up to 485 individual EB-5 investors."

69. The promotional expert report went on to state at the end: "The project location qualifies as a Targeted Employment Area (TEA) by virtue of being located in a rural (non-metropolitan) county. This designation allows EB-5 investors to invest $900,000 individually (after the November 2019 Rule Change) rather than the $1.8 million normally required, thus providing a Bellissimoeting advantage for the project sponsors. Assuming that all EB-5 investors are recruited at the $900,000 investment level, the project has the potential to raise to $436.50 million in EB-5 investor capital."

70.     However, the promotional expert report indicates that the equestrian center is already a flourishing enterprise that does not need private investors from outsiders.  The expert report's inclusion of an EB-5 insert at the end was contradictory. On information and belief, Dover and Does 1-5 have obtained such a report to promote their program, making it appear that Dover and Does 1-5 are involved with the equestrian center.

71.     Specifically, the website of the equestrian center does not show any connection between that equestrian center and Dover.  Furthermore, it shows that the equestrian center is already a well-established conglomerate of services, including small hotels, motels, lodges, shops, restaurants, and cafes. See https://tryon.com/directory/List/group/1.

72.     That website seeking private investments was wrapped under the EB-5 program. A successfully running enterprise can typically obtain cash investments or loans from banks without seeking private investments, particularly given complications such as EB-5 requirements.

73.     The apparent omission in all of that promotional information was the lack of facts on exactly how the approximately up to $550,000 payments from EB-5 investors were used or were to be used.  No information was provided on what purchases or other use of the capital was intended in that scheme.

74.      Plaintiffs subscribed to a Confidential Private Placement Memorandum, updated on July 26, 2018, describing a scheme structured through Odlum Equestrian Lenders, LLC (a Delaware limited liability company), making a $192.5 million maximum offering (implying that it would have about 385 investors at that time, which later increased).

75.     That initial offering (the "Offering") for $192.5 million through 385 units (the "Units"), with each Unit consisting of a limited liability membership interest in the Company. Later, as evidence shows, that offering was expanded.

16

76.     However, the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or applicable state securities laws. The Units are being sold in reliance on exemptions from the registration requirements of the Securities Act provided by Regulation S … and/or Section 4(a)(2) … or Regulation D.

77.     All Capital Contributions and Expense Amounts received from Subscribers will be held in escrow with the Company, or a substitute entity that may be a financial institution (the "Escrow Agent"), in bank accounts with Iberia Bank, pursuant to an Escrow Agreement.

78.     The Loan was supposed to be secured by mortgages on the assets of the Project, but no information was provided on whether the mortgage was in place or, on information and belief, reformatted.

79.     Each Investing Member was to make a capital contribution to the Company for Five Hundred Thousand Dollars ($500,000) per Unit … and must pay the Expense Amount.

80.     Capital Contributions will be released to the Company upon the filing of the applicable Subscriber's I-526 Petition and the receipt of notice by USCIS of the filing … (Form I-797) (the "Escrow Release Conditions").

81.     Dover's proposal provided that "no portion of a subscriber's $500,000 per unit capital contribution shall be applied to offering costs or sales commission or for administering the company or for operating the regional center, including the payment of any management fees and other administrative fees.  Plaintiffs relied on these promises, unaware that they would later encounter stonewalling in disclosing the true financial circumstances of the equestrian projects.

**b. Defendants' Activities After Obtaining Suresh Kumar Kakumani's Funds.**

82.     On February 28, 2019, Kakumani was provided with the Private Placement Memorandum outlining the EB-5 loan terms. Dover and the Odlum companies were provided with

the PPM (Private Placement Memorandum), which outlined the loan terms, and were asked to sign those documents.

83.     On March 22, 2019, a "Subscription Booklet" was sent to Kakumani.

84.     On March 23, 2019, Kakumani executed his subscription documents for Odlum Equestrian Lenders, LLC.

85.     On that day, March 23, 2019, Kakumani also executed an Acknowledgment of Receipt of the Escrow Agreement. March 23, 2019.

86.     On March 24, 2019, Odlum Equestrian Lenders, LLC accepted Kakumani's subscription, with the notation: "The subscription for Subscriber Name: Kakumani was accepted on the part of Dover and Odlum companies."

87.     On March 25, 2019, Kakumani received his three countersigned agreements: the Subscription Agreement, the Operating Agreement, and the Escrow Agreement.

88.     On April 2, 2019, Kakumani informed the Appalachian project contacts that his attorney had approved the transfer of funds and that the documentation was ready. On April 2, 2019, an immigration attorney recommended moving the funds, as all the documentation was ready.

89.     On April 2, 2019, wiring instructions for the Subscription Booklet were confirmed and re-stated, directing funds from Kakumani to Iberia Bank for the account of Odlum Equestrian Lenders, LLC.  The Subscription Booklet had the wiring information: Iberia Bank, 200 W. Congress St., Lafayette, LA 70501; ABA#: 265270413; SWIFT CODE: IBEAUS44; Account Name: Odlum Equestrian Lenders, LLC; Account Number: 2152159785.

90.     On April 3, 2019, an email communication transmitted a wire receipt and a discount letter to Suresh Kumar Kakumani. On that date, Suresh Kumar Kakumani received the wire receipt and a letter of discount ($10,000 of the $50,000 administrative fee).

91.     As reflected in the Subscription Agreement, Kakumani subscribed for one Unit requiring a total payment of $540,000, consisting of a $500,000 Capital Contribution and a $40,000 Expense Amount, to be paid by wire to the designated Iberia Bank escrow account for Odlum Equestrian Lenders, LLC. Kakumani's total subscription was for 1 membership unit.

92.     Under the governing offering and escrow documents acknowledged by Kakumani, the Company was supposed to make a loan to Tryon Equestrian Partners, LLC, in connection with the development of the Tryon project through the Appalachian EB-5, LLC regional center.  The capital contributions were to be held at Iberia Bank and to be released to the Company upon USCIS notice of I-526 filing, with refund mechanisms triggered upon I-526 denial and a developer guaranty if refunds were not made within six months after notice of denial.

93.     Appalachian EB-5, LLC, a North Carolina limited liability company, was, according to that documentation, an approved regional center under the EB-5 program with the United States Citizenship and Immigration Service (USCIS). The company was to serve as the designated Escrow Agent under the Escrow Agreement, and escrowed funds will be maintained at Iberia Bank.  However, Kakumani never received any documents from Iberia Bank to corroborate that information or to find out how the funds were placed and used.

94.     Capital contributions were supposed to be released from escrow to the company's general operating account upon the filing of the applicable Subscriber's I-526 Immigrant Petition by Alien Entrepreneur and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber.

95.     Regardless of the progress with immigration status, the invested funds were supposed to be repaid with any surplus by January 2026, which has not happened.

96.     On July 27, 2021, in investor communications, a request was made to Dover and the Odlum companies for audited financials for year-end 2020.

97. On February 7, 2023, an investor inquiry noted a two-year extension of the five-year loan period, and on February 14, 2023, the response stated both extensions were expected to be utilized due to COVID-related construction delays.

98. The communications from the Odlum companies to Kakumani also summarized that the initial loan maturity was six years after the first advance in January 2018, i.e., January 2024, with two one-year extensions available. On February 7, 2023, the question was asked: "A 2-year extension of the 5-year loan period," without clarification as to the answer.

99. On February 14, 2023, Alexandra Loveless wrote: "Yeah, we expect both extensions to be utilized due to construction delays from COVID." That representative suggested that per the offering documents, the EB-5 loan is payable from available cash from operations and/or the sale or refinancing of the Project, but not later than five (5) years following the last advance made under the Loan, but no later than six (6) years after the first advance under the Loan, subject to two (2) one (1) year extensions (the Maturity Date).

100. According to those communications, the first advance of the loan was made in January of 2018, and the last advance has not yet been made, so the initial loan maturity date is six years after the first advance, which is January of 2024. The last advance of the loan had not yet been made, according to that correspondence.

101. On July 9, 2024, an email to Kakumani stated that the only possible way to receive his funding returned would be to find a replacement investor: "Hi Suresh, the only way to possibly receive your funding returned is if you find a replacement investor." That was obviously a complete breach of contract, leaving Kakumani in a difficult position by depriving him of access to his funds.

102. On numerous occasions, Kakumani raised the question of a return on his investment. Still, he received vague, uncommitted responses without any substantial financial

information about exactly where the money went, how it was invested, or why it could not be returned.

### c. Defendants' Actions Concerning Siddhartha Rangineni's Funds.

103.    As mentioned above, on July 12, 2017, the Escrow Agreement for Odlum Equestrian Lenders, LLC (described as the company and escrow agent for the EB-5 offering) is stated to be effective, to which Rangineni later subscribed.

104.    On the same day, the Operating Agreement of Odlum Equestrian Lenders, LLC is stated to be effective as of July 12, 2017, and to be entered into by the manager and persons who become investing members by executing a signature page.

105.    On June 30, 2018, the subscription agreement materials stated that the EB-5 offering would end on that date unless extended by the manager.

106.    July 12, 2018, Odlum Equestrian Lenders, LLC executed the Escrow Agreement signature page with a stated date of July 12, 2018.

107.    On July 12, 2018, Siddhartha Rangineni signed the operating agreement signature page for Odlum Equestrian Lenders, LLC, listing that he subscribed for one unit.

108.    On the same day, an attorney's letter stated that Siddhartha Rangineni was verified as an accredited investor (Rule 501 of Regulation D) after review of information provided through VerifyInvestor.com.

109.    On that day, Siddhartha Rangineni executed a subscription agreement for Odlum Equestrian Lenders, LLC, reflecting a total subscription payment of $530,000 ($500,000 capital contribution and $30,000 expense).

110.    Siddhartha Rangineni also executed an acknowledgment of receipt of the Escrow Agreement as part of the EB-5 investment documents.

111.    On the same day, Siddhartha Rangineni signed an investor information form certifying his identifying information for the EB-5 subscription materials.

112.    Odlum Equestrian Lenders, LLC (through its manager) accepted Siddhartha Rangineni's subscription for membership interests, with the acceptance dated July 12, 2018.

113.    Siddhartha Rangineni signed an IRS Form W-9 providing his taxpayer identification information in connection with the investment documents. The documentation included Siddhartha Rangineni's Indian passport (issued in 2013) and an investor information form used for the EB-5 investment materials.

114.    June 14, 2017, Siddhartha Rangineni's Oklahoma state driver's license issuance date is listed as June 14, 2017, in an investor information form used for the EB-5 investment materials.

115.    On October 10, 2018, the accredited investor verification for Siddhartha Rangineni was completed.

116.    On July 6, 2018, Rangineni emailed Andrew Dover to introduce himself and request a call to discuss the Tryon equestrian project EB-5 investment. Dover referred him to Dale Carroll, who would send subscription documents and a copy to attorney Anu Nair.

117.    On the same day, Dale Carroll emailed Rangineni about the attached subscription documents/forms and instructed Rangineni to complete IRS Form W-9, whereas Rangineni lived and worked in the USA.

118.    On July 8, 2018, Rangineni emailed questions after reviewing documents, including questions about the exit strategy/return-of-capital timeline after 5 years and provisions in the 'operating agreement of Odlum equestrian lenders LLC' relating to dissolution and liquidation, and liens/collateral.  Rangineni emailed to say he believed some documents were

missing from the attachments and that he could not find documents related to the loan agreement and USCIS expedited process approval.

119.    On July 9, 2018, Dale Carroll emailed Rangineni (copied to Andrew Dover and EB5 Fast), providing a cover letter and detailed attachments for the Appalachian Regional Center EB-5 program connected with the Tryon International Equestrian Center and offered to schedule a call if Rangineni had questions.

120.    On July 12, 2018, EB5 Fast stated that Rangineni acknowledged receipt of offering-document information when he signed the subscription documents.

121.    On September 15, 2018, EB5 Fast emailed an investor message about Tryon (cc'ing Andy Dover), referencing expedited I-526 approvals and asking recipients to update EB5 Fast on the petition submission status.

122.    On December 31, 2018, the subscription agreement materials state that the manager could extend the EB-5 offering period, and, in fact, it was.

123.    Siddhartha Rangineni's 2019 Schedule K-1 reflects a beginning and ending capital account of $500,000.

124.    On March 24, 2020, McLain, Hill, Rugg & Assoc., Inc. sent Siddhartha Rangineni a letter stating it had prepared his Schedule K-1 for Odlum Equestrian Lenders, LLC for the tax year ended December 31, 2019.

125.    On August 6, 2020, EB5 Fast sent Rangineni 'Tryon Update' email (cc Andrew Dover and Alexandra Loveless) with project status information, including COVID-related updates and attachments referenced as a jobs report and supplement.

126.    On December 31, 2020, Odlum Equestrian Lenders, LLC's tax year ended December 31, 2020, and Siddhartha Rangineni's 2020 Schedule K-1 reflects a beginning and ending capital account of $500,000.

23

127. On March 12, 2021, McLain, Hill, Rugg & Assoc., Inc. sent Siddhartha Rangineni a letter stating that it had prepared his Schedule K-1 for Odlum Equestrian Lenders, LLC for the tax year ended December 31, 2020.

128. On April 15, 2021, Rangineni emailed Dale Carroll (cc Andrew Dover and EB5 Fast) stating his conditional green card had expired, he had filed an I-829 petition, he attached the USCIS receipt notice, and he asked whether any Tryon investor had an approved I-829 petition, requested the latest job creation report, and asked about COVID effects.

129. On April 16, 2021, Alexandra Loveless emailed Rangineni congratulating him on filing his I-829, stating that the first Tryon investor had filed an I-829 the prior August, that I-829 adjudication was taking around two years, and that an investor portal would be launched soon.

130. On September 2, 2021, Rangineni emailed Alexandra Loveless to ask when the investment capital would be returned and whether the return was tied to I-829 approval. Alexandra Loveless emailed Rangineni stating that investor capital is returned when the loan matures and is paid back by Tryon between 5–7 years from the initial loan date, depending on whether the two one-year extensions are exercised, and that they could not return capital before the I-829 filing due to the at-risk requirement.

131. On November 24, 2021, Rangineni emailed Alexandra Loveless to ask whether there had been any I-829 adjudications and whether USCIS had already completed a site visit to Tryon.

132. On November 26, 2021, Alexandra Loveless emailed Rangineni stating that they did not yet have any Tryon I-829 adjudications and that USCIS had just completed a site visit to Tryon for I-829 purposes.

133.    On December 31, 2021, Odlum Equestrian Lenders, LLC's tax year ended December 31, 2021, and Siddhartha Rangineni's 2021 Schedule K-1 reflects a beginning capital account of $500,000 and an ending capital account of 500,001.

134.    On March 24, 2022, McLain, Hill, Rugg & Assoc., Inc. sent Siddhartha Rangineni a letter stating that it had prepared his Schedule K-1 for Odlum Equestrian Lenders, LLC for the tax year ended December 31, 2021.

135.    On August 14, 2023, EB5 Fast sent the Q2 2023 Tryon EB-5 Investor Update stating that the loan maturity date was January 2026 (referencing PPM repayment terms, noting that the first advance was in January 2018, and that both one-year extensions were exercised).

136.    On January 29, 2025, Rangineni emailed EB5 Fast stating he was an early investor, stated he received his permanent resident card after I-829 application approval, stated he referred additional investors, stated his investment was done in August 2018 and that he understood two one-year extensions, and stated he had discussions with Dover about the timeline and that Dover confirmed a September 2025 completion of seven years and capital return (including stated principal and interest terms).

137.    On January 29, 2025, EB5 Fast emailed Sid, stating that the loan term (including possible two one-year extensions) had been provided on July 9, 2018; that Rangineni acknowledged receipt when signing the subscription documents on July 12, 2018; and that they had no information that capital was returned for 'Sanjay.'

138.    On May 5, 2025, EB5 Fast emailed Sid, stating they were missing his I-829 receipt notice and requesting that he send a copy to complete their files. They noted it would be required before loan maturity in January 2026.

139.    On May 6, 2025, Rangineni emailed EB5 Fast, stating his understanding that the 7-year loan maturity should be fulfilled by August 2025 from the time of funds release in August

25

2018, asking why the maturity would be January 2026, asking about interest being added upon return, and asking EB5 Fast to check records for Sanjay Raikar. Rangineni emailed EB5 Fast, asserting that Sanjay Raikar was a good friend and that Rangineni knew Sanjay's capital had been returned.

140.   However, on that day, May 6, 2025, EB5 Fast emailed Sid, stating that Sanjay Raikar was still invested in Tryon and that EB5 Fast had no record of returning Sanjay's investment funds. In another email, EB5 Fast added a response: "Nope."

141.   On October 20, 2025, Rangineni emailed EB5 Fast (cc'ing Andrew Dover and Alexandra Loveless), stating that it had been seven years since he invested capital and asking when he could expect a return of capital.

142.   On the same day, October 20, 2025, EB5 Fast emailed Sid, stating that they would address the loan maturity in the Q3 investor update.

143.   On October 23, 2025, Rangineni emailed EB5 Fast to follow up on an earlier email about the loan repayment timeline and to request a response.

144.   On October 23, 2025, EB5 Fast emailed Sid, stating that, as Tryon had provided additional updates, EB5 Fast would pass the information to investors and that the developer had over $100M of equity invested in Tryon that could not be recouped until the EB-5 loan was repaid.

145.   On January 24, 2026, EB5 Fast emailed Rangineni an 'Eligible Investor Update' stating that the Tryon EB-5 loan between the lending company and Tryon matures at the end of the month, that a six-month loan extension was anticipated, and that investor property visits would be scheduled in the spring.

146.   On January 24, 2026, Rangineni emailed EB5 Fast, objecting to what he characterized as a unilateral six-month extension without investor consent, stating that repayment

in January had been assured and that this left investors no alternative but to move forward with legal action.

147.   Despite numerous attempts to obtain verifiable information about the cash flow, particulars of the investment, and anything more concrete, Siddhartha Rangineni was unable to obtain it.  That reinforced Siddhartha Rangineni's decision to seek the return of his investments.

**d.      Defendants' Activities Concerning Sravanthi Marella's Funds.**

148.   On March 22, 2019, Marella executed multiple subscription-related documents and acknowledgments. March 22, 2019: Sravanthi Marella executed an Acknowledgment of Receipt of the Escrow Agreement.  On the same date, Marella executed the Subscription Agreement to purchase one unit in Odlum Equestrian Lenders, LLC.

149.   Sravanthi Marella executed the Odlum Equestrian Lenders, LLC Subscription Agreement as Subscriber.  The Subscriber's Execution Total Subscription Payment constituted $500,000, plus a capital contribution of $40,000, for a total of $540,000.  Capital Contributions will be released to the Company upon the filing of the applicable Subscriber's I-526 Petition and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber (Form I-797).

150.   Also on March 22, 2019, Marella signed the Investor Information Form, which contained personal identifiers, and executed an IRS Form W-9. Sravanthi Marella signed the Investor Information Form.  Sravanthi Marella signed the Investor Information Form (Exhibit A to the Subscription Agreement).

151.   On March 22, 2019, the Appalachian Regional Center issued two letters to Marella confirming receipt of his wire funds and detailing bank and account information. March 22, 2019:

27

Appalachian Regional Center issued a letter to Sravanthi Marella confirming receipt of his wire transfer for $540,000.

152.     On March 22, 2019, Appalachian Regional Center issued a letter referencing "Appalachian EB-5 Regional Center RCW1631454520," confirming receipt of $540,000 as payment in full for Sravanthi Marella's investment.

153.     On March 23, 2019, Odlum Equestrian Lenders, LLC executed the Operating Agreement and the Escrow Agreement.

154.     The offering materials described the escrow release conditions and refund provisions relevant to investors like Marella. Capital Contributions will be released to the Company upon the filing of the applicable Subscriber's I-526 Petition and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber (Form I-797) (the "Escrow Release Conditions") and in no event later than the following approval of such Investing Member's I-526 Petition.

155.     The terms also included a condition: If an Investing Member receives an I-526 Petition Denial, the Company will refund $500,000 to the denied Investing Member and cancel such Investing Member's subscription.  The documents also state that an investor arranges counsel for the I-526 filing, subject to potential review by the company for consistency.

156.     The terms as to Marella included that the Subscriber, at their sole cost and expense, will arrange for an immigration attorney to file their I-526 Petition following acceptance of the subscription and admission as a member of the Company; provided that the Company may require that an immigration attorney selected by the Company review the Subscriber's I-526 Petition to ensure consistency with this Offering Memorandum.

157.     Project communications were sent to Marella in 2020. On August 7, 2020, EB5 Fast sent a "Tryon Update" email to Sravanthi Marella, which essentially amounted to a unilateral cutoff of certain rights of Marella and other investors.

158.     Marella's immigration status progressed to permanent residence after his investment. June 1, 2021: Sravanthi Marella became a U.S. permanent resident.  Marella's Form I-551 permanent resident card was approved.

159.     Marella was supposed to get a return on her investment, and her investment recovered.  However, given the defendants' refusal to return the funds, Marella has never received her money back, thereby becoming similarly situated to the two victims of securities fraud above.

160.     On August 14, 2023, an email from EB5 Fast (Odlum Capital) to Tryon investors reconfirms that the repayment date is January 2026 (citing PPM repayment terms; first advance in January 2018; developer exercised two one-year extensions).

161.     On January 24, 2026, an email from EB5 Fast to Tryon investors stated that the Tryon EB-5 loan matures at the end of the month and that a six-month loan extension is anticipated, citing delays (COVID, supply chain shortages, hurricanes, flooding).

162.     On February 23, 2026, Marella's husband, Raghu Mulinti, wrote to EB5 Fast (addressed to Dover), requesting specific repayment plan details (amounts and timeline) and noting investor concern and potential legal action if information is not provided.

163.     On that day, February 23, 2026, an email response from EB5 Fast/Karen (Executive Assistant) to Marella stated they are putting together FAQs to send out soon and want to provide all investors with the same information, but no specific repayment plan was described.

164.     On May 15, 2026, EB5 Fast to Tryon investors announced an informational Zoom meeting scheduled for May 22, 2026, with Tryon Managing Partner Mark Bellissimo to present a

proposed repayment plan and updated valuations/financials/project information; states investors will not be able to ask questions live; provides registration/invitation process and deadline.

165. On May 28, 2026, a Tryon EB-5 investor webinar/Zoom call hosted by Andy Dover (fund representative) and developer Mark Bellissimo took place. On June 8, 2026, a webinar summary was uploaded, with no concrete plan for repayments. Among other omissions, Dover and Bellissimo failed to disclose to the investors that there had been claims filed in the court against Dover and the Odlum companies.

### e. Generally: Defendants' Activities After Obtaining Investment Funds.

166. Plaintiffs received no transparent information from Dover or otherwise, in the name of Odlum companies, about what happened to the Plaintiffs' respective funds. At one point, USCIS requested supplemental documentation and information. Providing concrete accounting could be helpful in support of the petition, but Dover submitted no concrete financial information after he obtained control of the funds.

167. The Operating Agreement signature page reflected Andrew B. Dover as Managing Member of Odlum Equestrian Manager, LLC.

168. Before the subscription, on December 21, 2018, a third-party verification letter confirmed that Plaintiffs were verified as accredited investors under Rule 501 of Regulation D.

169. The governing documents required that payment per Unit be deposited into an Escrow Agent's bank account at Iberia Bank. They provided that Capital Contributions would be released upon the filing of the applicable Subscriber's Petition I-526 and receipt of USCIS notice (Form I-797).

170. The documents further provided that if an Investing Member received an I-526 Petition denial, the Company would refund the investment to the denied Investing Member and

cancel the subscription, subject to the availability of funds and the Company's efforts to find a Substitute Investing Member.

171.    The documents provided that an Expense Amount would be disbursed to the Manager and used for offering costs immediately upon the filing of the applicable I-526 Petition, with a partial refund upon denial, less $25,000, unless the investor's fault is found.

172.    The Manager was entitled to a Management Fee equal to 5.74% per annum of the outstanding loan amount, to be used to pay costs and fees.

173.    The Developer agreed to guarantee a full refund to any Subscriber who receives an I-526 Petition denial and has not received a refund of the entire Capital Contribution within six months of the Company receiving notice, as acknowledged by Tryon Equestrian Partners, LLC, through its COO.

174.    The structure communicated to investors provided that EB-5 investors hold an equity interest in the new commercial enterprise, which is the lender to the developer.

175.    On or about February 6, 2019, the Company was identified as Odlum Equestrian Lenders, LLC, managed by Odlum Equestrian Manager, LLC, executed by Andrew B. Dover.

176.    Company correspondence identified Odlum Equestrian Lenders, LLC, c/o Appalachian EB5 Regional Center, Attention: Andrew Dover, at One Town Square Boulevard, Suite 315, Asheville, NC 28803, with phone, fax, and email contact information for Andrew Dover.

177.    The repayment terms specify that repayment will come from available cash from operations or the sale or refinancing of the Project, not later than five years after the last loan advance and six years after the first, with two possible one-year extensions to maintain clarity and focus.

178.    The initial loan advance occurred in January 2018, with the developer exercising two one-year extensions, extending the maturity to January 2026 and aligning it with the stated EB-5 loan maturity date.

179.    On January 30, 2026, EB5 Fast emailed Plaintiff that the Tryon EB-5 loan matures at the end of January 2026 and anticipated a six-month extension, underscoring the loan's upcoming maturity.

180.    On February 17, 2026, EB5 Fast emailed a summary of an investor webinar, noting a short loan extension was granted and that both one-year extension options had been exercised by the developer, bringing maturity to January 2026.

181.    Investor communications stated that any further extensions are at the discretion of the Fund Manager under Section 8 of the Operating Agreement.

182.    On March 10, 2026, EB5 Fast informed investors that initial portal uploads included an appraisal of the main Tryon showgrounds and the lender's financials, and described Bank of America's 2021-ordered appraisal, along with plans for updated appraisals.

183.    On March 15, 2021, Integra Realty Resources - Charlotte issued an appraisal of the Tryon Equestrian Center to Bank of America, with an effective date of February 19, 2021.

184.    As of February 19, 2021, the value was allegedly about $78.3 million.

185.    As of September 1, 2021, the Prospective Value As Completed opinion was about $87.5 million.

186.    The appraisal identified owners of record for the subject parcels as Tryon Equestrian Properties No. 2, LLC; Tryon Showgrounds, LLC; Tryon Arena, LLC; and Tryon Lodging No. 2, LLC.

187.    As of February 19, 2021, the subject property improvements totaled 676,695 square feet of gross building area on 150.58 acres and were 100% owner-occupied.

188. A retail lease at the Tryon Equestrian Center for Dover Saddlery commenced on January 1, 2019, for a one-year term with three one-year renewal options, but the lease was terminated, and the owner now operates the space.

189. Recording records include a North Carolina Deed of Recombination executed on December 6, 2018, and related-party transfers among Tryon entities in December 2018 and April 2019.

190. The appraised property is located at Water Mill Dr and John Shehan Rd, Mill Spring, North Carolina 28756, in Polk County.

191. On March 3, 2021, Polk County tax receipts show payment by Tryon Showgrounds, LLC, Tryon Arena, LLC, Tryon Equestrian Properties No. 2, LLC, and Tryon Lodging No. 2, LLC for various parcels, all with paid status.

192. Defendant Andrew Dover appeared in investor materials alongside Sharon Decker and others identified as associated with the Tryon project.

193. Investor updates stated that the Tryon Equestrian Project received 325 Form I-526 approvals and 20 Form I-829 approvals, and that USCIS conducted a site visit in October 2021.

194. Investor communications claimed that the Tryon Equestrian Project received 325 Form I-526 approvals and 20 Form I-829 approvals, suggesting transparency. This should be emphasized to underscore the importance of truthful disclosures, prevent investor misguidance, and evoke a sense of accountability in the audience.

195. Financial materials were prepared for Odlum Equestrian Lenders, LLC. On December 11, 2025, financial statements as of September 30, 2025, were issued for Odlum Equestrian Lenders, LLC, cash was reported as $3,017,717, note receivable for the EB-5 project was reported as $208,832,283, total assets were reported as $212,2 million, notes payable for a bridge loan were reported as $2,100,000; members' equity was reported as $210,100,000,

management/commission income was reported as $950,001; management expenses were reported as $1,011,768; interest income was reported as $61,767; members' equity reconciliation as of September 30, 2025, showed purported capital $204,930,025, plus member contributions of $8,169,975, less member distributions at exit of $3,000,000, ending $210,1 million.

196.    On December 19, 2024, an accountant's disclaimer accompanied financial statements as of September 30, 2024.  As of September 30, 2024, cash was reported as $3,943,213, note receivable for the EB-5 project was reported as $219,971,683, total assets were reported as $223,914,896, notes payable for a bridge loan were reported as $18,984,871, and members' equity was reported as $204,930,025, management income was reported as $235,000, management expenses were reported as $459,784, and interest income $224,784; members' equity reconciliation as of September 30, 2024, showed purported capital $204,630,025, plus member contributions of $3,200,000, less member distributions at exit of $2,900,000, ending $204,930,025.

197.    The company principal mailing address was listed as c/o Appalachian EB-5, LLC, Attention: Andrew Dover and Dale Carroll, One Town Square Boulevard, Suite 315, Asheville, NC 28803, but this address was misleading because Dover has been residing in Miami Beach, Florida, and has been in control of all documents, raising questions about jurisdiction and service of process.

198.    The Escrow Agreement stated that the Escrow Agent had no duty or responsibility for determining whether the Interests or their offer and sale conformed to the requirements of applicable federal or state securities laws, including the Securities Act of 1933 and the Securities Exchange Act of 1934.

199.    The company agreed to indemnify the Escrow Agent and hold it harmless from claims and losses arising from or in connection with its service as Escrow Agent, the investor accreditation referenced Rule 501 of Regulation D of the Securities Act of 1933.  The offering

34

materials referred to the EB-5 Program, USCIS requirements, including I-526 and I-829 Petitions, and the Sustainment Period.  Tryon Equestrian Partners, LLC, a Delaware and North Carolina limited liability company, was identified as the Developer/Borrower in the EB-5 loan structure.

200.    The Defendants' above disclosures were statutorily insufficient or misleading on numerous issues, violating securities laws and underscoring the need for accountability to uphold justice and deter misconduct.

201.    Dover has exploited the limited liability of co-defendants to mislead creditors, underscoring the court's vital role in ensuring accountability and protecting stakeholders' interests, thereby reassuring the public of the court's commitment to justice.

202.    The court should pierce the veil of limited liability that Dover has used to perpetrate fraud, emphasizing the need to hold him accountable for his misconduct and uphold justice, which reinforces the importance of accountability for the audience.

**e. Reneging Obligation to Pay Back Investments in Violation of All Promises, and Culmination at the May 28, 2026, Webinar Conducted by Dover and Bellissimo.**

203.    On January 24, 2026, defendants, who concealed their true names, and acting as "EBTFast", circulated to investors a new "Eligible Investor Update." EB5Fast advised that the Tryon EB-5 loan matures at the end of the month, but due to delays caused by COVID, supply chain issues, two hurricanes, and historic flooding, repayment was postponed. EB5Fast anticipates a six-month loan extension. They stated that the developer remains committed to the project, investors' immigration outcomes, and repayment.

204.    In a typical response, on February 23, 2026, one of the plaintiffs expressed concern that investors are consulting law firms and asking for specifics about the proposed repayment plan.

205.    On May 15, 2026, the defendants announced a "Tryon Informational Meeting" (EB5Fast to investors): EB5Fast schedules a Zoom informational meeting for May 22, 2026, at

10:00 a.m. ET. Invitations were to come from an anonymous kpassistanteb5fast@gmail.com; investors must register and will be manually approved to verify investor status. The announcement promised that Tryon Managing Partner Bellissimo would present a proposed repayment plan. Investors could not ask questions live, but were allowed to email questions to info@eb5fast.com.

206. On May 28, 2026, after another delay, Dover and Bellissimo conducted a Zoom presentation to investors, called a "webinar". Dover and Bellissimo did not allow any participating investors to have their images shown or their voices heard, thereby preventing EB-5 investors from raising questions or objections.

207. Dover said that subject-matter assets (without specifying which ones) are driving $30 million in core-business revenue, but repayment depends on the monetization of real estate.

208. According to the participants' notes, Dover said that 411 EB-5 investors and $207 million in EB-5 capital (as heard) were invested.

209. Without any specifics, Dover stated that they (without naming them) were negotiating compensation for delayed repayment, with an agreement in principle but no final representations yet. The ultimate message was that no investments were to be returned, at least immediately or on any schedule.

210. In his turn, Bellissimo claimed that $165 million in equity capital has been invested and that they continue to invest; the figures conflict with Dover's (the information is cited as heard, which may not be accurate).

211. Markedly, the statements of both speakers, that $207 million was invested (according to Dover) and $165 million (according to Bellissimo), leave an unaccounted gap of $42 million, a conflict with the presenters' numbers, which became the most troubling new information for the investors.

212.	Bellissimo referenced past revenue growth of 23% and projected 10.5% growth, as well as new amenities, including an indoor track and horse shows.

213.	Bellissimo described a $10 million amenity commitment, whatever he meant, and an increase to 1,247 units, reserving 411 units for Odlum.   Bellissimo spoke as someone in control of all investments and repayments.

214.	Bellissimo's message was to disregard all contractual obligations and wait longer, without any repayment schedule.  The plaintiffs concluded that after 5-7 years of waiting, they were victims of grand-scale financial fraud, in which their investors were taken and controlled without their permission.

215.	Dover and Bellissimo, who exercised a dominion over the investors' funds, did not ask for any vote of the unit owners whatsoever, making the Zoom connection, both verbal and image, one-way, and cutting off the investors from voicing their objections and protestations against a new round of delays. Such conduct conflicted with the rights of the holders of the securities under numerous statutes.

## CAUSES OF ACTION

**COUNT 1. Manipulative and Deceptive Devices (15 U.S.C. § 78j(b);
17 C.F.R. § 240.10b-5) (stated against All Defendants, except Mark Bellissimo)**

216.	Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 215 above as if fully set forth herein.

217.	Dover's Note D of December 21, 2017, was improper or illegal because the offering of the Odlum Equestrian Lenders LLC securities was essentially to the general public, not a small circle of private investors, and Dover advertised the units through various promotional formats, including on his publicly accessible websites, misleading investors.

218. Dover and Odlum Equestrian Lenders improperly avoided proper registration of the securities with the SEC by filing, on December 21, 2017, a claim of exemption under Note D. The securities that Dover was offering were ultimately offered to the public. Dover's filing claimed that the exemption provided an objective of raising $192 million.

219. Dover obtained over $1 million from the Plaintiffs at a time when none of the websites associated with him informed the public that the sale of the securities did not even remotely approach the announced subscription target.

220. However, since Dover made an offering to the Plaintiffs and other victims, he was obligated to file Note D again to reflect that offering. The search of the SEC's database shows that Dover failed to file such a Note D for 2019.

221. Instead, Dover was required to register his offerings with the SEC and seek $192 million from the public without exemptions, which was later increased to $207 million, according to the webinar on May 28, 2026.

222. Plaintiffs invoke their rights under the Securities Act of 1933 (Securities Act), which protects investors by ensuring that companies issuing securities (known as issuers) make full and fair disclosure of information relevant to a public offering (15 U.S.C. §§ 77a to 77aa).

223. The misrepresentations that Dover and his entity Odlum Lenders made satisfy all elements of the cause of action for a private suit based on securities fraud: 1) a material misrepresentation or omission by the defendants, Dover and Odlum Lenders; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) the Plaintiffs ' reliance upon the misrepresentation or omission; (5) resulting economic loss; and (6) the loss causation. Furthermore, In some instances, those investments represented lifetime savings, and this represented a highly negative turn of events for investing, causing the members of the affected families severe emotional distress.

224.     Defendants, directly and indirectly, used manipulative and deceptive devices in connection with the offer and sale of securities, including making material misrepresentations and omissions regarding escrow and refund mechanics, job-creation sufficiency, maturity and repayment terms, guarantees, manager compensation, side letters, and conflicts of interest, all of which were material to Plaintiff's investment decision. These misstatements and omissions were made in offering and operating documents and investor communications and were tied to the purchase or retention of Units by Plaintiff. Defendants acted with scienter in making these misrepresentations and omissions, and Plaintiffs relied on them to their detriment, thereby suffering damages.

225.     The relief sought by the Plaintiffs is grounded in Section 12, which permits a private action against a security seller who passes title for value, with rescission as a primary remedy (15 U.S.C. § 77l(a)). This legal basis underscores the plaintiff's entitlement to rescind the transaction or seek damages.

226.     According to Section 12(a)(2), Dover and his instrumentality, Odlum Equestrian Lenders, offered and sold security ("units" in that LLC) through a prospectus and an oral communication containing a material misstatement or omission.  Dover and Odlum Equestrian should be found to the purchasers, the plaintiff, and the rescission of the purchase or damages. Thereby, the Plaintiffs were unaware of Dover's misstatements and omissions.

227.     Namely, the Plaintiffs seek that Dover be ordered to return over $1 million, in exchange for a "unit" in Odlum Equestrian Lenders, as an alternative or in addition to the damages.

228.     The Plaintiffs also rely on Section 15, which permits a private Plaintiff to bring a suit under control-person liability (15 U.S.C. § 77o(a)).

229.    The Plaintiffs assert that Dover controlled Odlum Equestrian Partners LLC, as he retained control of most units and the LLC itself, on information and belief, thereby establishing a basis for control-person liability under securities law.

230.    Accordingly, Dover failed to convene general meetings of the unit owners at all relevant times or to establish a procedure for convening them.  Dover did not disclose who the other "unit" owners were or how many there were, undermining transparency and fairness in the process.

231.    The Plaintiffs seek relief under Section 15, which aids investors by making "control persons," or persons who "control" defendants, jointly and severally liable under Sections 11 and 12 by owning stock or by acting as an agent for a principal.

232.    Plaintiffs are entitled to relief based on the defendants' violation of the securities laws, particularly under Sections 11, 12, and 15 of the Securities Act, without limitation.

### COUNT 2.  S 78t. Liability of Controlling Persons and Persons Who Aid and Abet Violations (15 U.S.C. § 78t(a)) (stated against all defendants except Mark Bellissimo)

233.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

234.    Defendant Dover, as Chairman and Managing Member of the relevant entities, exercised control over the primary violators of Section 10(b) and Rule 10b-5, including Odlum Equestrian Lenders, LLC and Odlum Equestrian Manager, LLC, and had authority over management and investor communications.

235.    If a primary violation is established, Dover is liable as a control person for the acts and omissions of the controlled entities.

//

//

**COUNT 3.  S 77k. Civil Liabilities on Account of False Registration Statement (15 U.S.C. § 77k) (stated against all defendants except Mark Bellissimo)**

236.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

237.    Defendants issued or were responsible for a registration statement containing untrue statements of material fact or omissions necessary to prevent the statements from being misleading to investors, including statements about escrow, refunds, job creation, maturity, repayment, and guarantees.

238.    Plaintiffs acquired securities traceable to the defective registration statement and did not know of the untruths or omissions at the time of acquisition.

**COUNT 4.  S 77l. Civil Liabilities Arising in Connection with Prospectuses and Communications (15 U.S.C. § 77l(a)(2)) (stated against all defendants, except Mark Bellissimo)**

239.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

240.    Defendants, as statutory sellers, offered and sold securities to Plaintiffs by means of prospectuses and oral communications that contained untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading, including misstatements regarding escrow, refunds, job creation, maturity, repayment, and guarantees.

241.    Plaintiffs did not know of the untruths or omissions at the time of purchase, and the information that was provided by Dover to them was construed to avoid the necessary disclosure as required by the applicable statutes.

**COUNT 5. S 77o. Liability of Controlling Persons (15 U.S.C. § 77o) (stated against all defendants, except Mark Bellissimo)**

242.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

41

243.     Defendant Dover exercised control over entities that committed primary violations of Sections 11 and 12 of the Securities Act, including Odlum Equestrian Lenders, LLC and Odlum Equestrian Manager, LLC, and is therefore jointly and severally liable to Plaintiffs for such violations.

**COUNT 6. Prohibitions Relating to Interstate Commerce; Civil Liabilities
(15 U.S.C. § 77e; 15 U.S.C. § 77l(a)(1)) (stated against all defendants, except Mark Bellissimo)**

244.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

245.     Defendants offered and sold securities to Plaintiffs in interstate commerce without an effective registration statement and without qualifying for an exemption, in violation of Section 5 of the Securities Act. Plaintiffs are entitled to rescission or damages as provided by Section 12(a)(1).

**COUNT 7. Registration of Brokers and Dealers; Validity of Contracts
(15 U.S.C. § 78o(a)(1); 15 U.S.C. § 78cc(b)) (stated against all defendants, except Mark Bellissimo)**

246.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

247.     Defendants engaged in unregistered broker-dealer or investment advisor activity and entered into contracts with Plaintiffs in violation of the Exchange Act.

248.     Plaintiffs are entitled to void such contracts under Section 29(b) of the Exchange Act, as well as other statutes and regulations governing the activities of broker-dealers and investment advisors, which Dover unlawfully carried out without registration.

//

//

**COUNT 8.  S 78cc. Validity of Contracts (15 U.S.C. § 78cc(b))**
**(stated against defendants Andrew Dover and Odlum Equestrian Lenders)**

249.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

250.    The contracts between Plaintiffs and Defendants involved prohibited transactions under the Exchange Act, Plaintiffs are in contractual privity with Defendants, and Plaintiffs are within the class of persons the Act was designed to protect. The violations are inseparable from the making or performance of the contracts, thereby entitling Plaintiffs to have them voided.

**COUNT 9.  S 80b-15. Validity of Contracts (15 U.S.C. § 80b-15(b))**
**(sagainst defendants Andrew Dover and Odlum Equestrian Lenders)**

251.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

252.    Defendants entered into investment adviser contracts with Plaintiffs that were made or performed in violation of the Investment Advisers Act of 1940, entitling Plaintiffs to rescission and restitution of consideration paid.

**COUNT 10.  S 702. Right of Review (5 U.S.C. §§ 702, 704, 706)**
**(stated against defendants Andrew Dover and Odlum Equestrian Lenders)**

253.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 232 above as if fully set forth herein.

254.    Plaintiffs have suffered legal wrong and are adversely affected by agency action or inaction within the meaning of the relevant statutes and seek judicial review of final agency action for which there is no adequate alternative remedy in court.

**COUNT 11.  Fraudulent Inducement.**
**(against Defendants Andrew Dover and Odlum Equestrian Lenders LLC)**

255.    Plaintiffs incorporate by reference the allegations in the prior Paragraphs 1 to 215 and further state as follows.

256.    The alleged facts meet the elements of the cause of action for fraudulent inducement, namely showing (1) Dover's false statement of a material fact, made on his own behalf and behalf of his Odlum companies; (2) Dover knew or should have known was false; (3) Dover's statements were made to induce the Plaintiffs to enter into a contract and wire transfer of up to $550,000 under Dover's control; and (4) that proximately caused injury to the Plaintiffs when acting in furtherance of Dover's proposals to wire transfer that amount under Dover's control.

257.    On numerous occasions, Dover and his companies, whose letterhead was used for the representations, misled the plaintiff.

258.    For example, Dover represented, on behalf of his companies (e.g., Odlum Lenders, Odlum Capital, Appalachian EB5), that there was a profit-generating plan for the foreign investors. In real life, the Tryon Equestrian Center was built in 2014-2015 and received substantial infrastructure support.

259.    However, as a self-sufficient business, it did not need any infusion of foreign investors' investments into the EB-5 program created by USCIS.  It could quickly secure bank loans if additional funds were needed.  That was a misrepresentation, whereas a viable business could obtain capital at the bank's interest rate rather than commit to a higher rate with private investors.

260.    Dover's portrayal of Odlum Investors as having ties to Tryon Equestrian Center in Mill Spring, North Carolina, was deceptive and used to lure investors, causing Plaintiffs to feel the urgency of rectifying the fraudulent conduct and securing appropriate remedies.

261.    Among other facts, Dover, acting directly or through his Odlum companies, did not disclose his contractual relationship with Tryon Equestrian Partners, if any existed at all, and there is no evidence that such contracts have existed.

262.   The Plaintiffs are entitled to damages under the Count of fraudulent inducement, stated against defendants Andrew Dover, Equestrian Lenders, and Appalachian EB-5.

**COUNT 12.  Misrepresentation.**
**(against Andrew Dover, Mark Bellissimo, Odlum Equestrian Lenders LLC)**

263.   Plaintiffs incorporate by reference the allegations in the prior Paragraphs 1 to 215 and further state as follows.

264.   The alleged facts satisfy all four elements of a cause of action for misrepresentation. Namely, (1) Dover made false statements to the Plaintiffs concerning material facts on his behalf and behalf of his Odlum companies; (2) Dover knew that his representations to the Plaintiffs were false; (3) Dover had the intention that those representations induced the Plaintiffs to act on those, namely to wire transfer of up to $550,000 under Dover's control; and (4) consequential injury was inflicted on the Plaintiffs acting in reliance on Dover's misrepresentations, depriving the Plaintiffs of over $1 million.

265.   Dover created or caused the creation of a group of websites that contain misleading information about the viability of the proposed investment under the Appalachian EB-5 program. Those misrepresentations online, such as https://www.eb5fast.com/ and https://www.odlumcapital.com/about, were designed to deceive the public, including the plaintiff. This manipulation aims to evoke concern about investor trust and the importance of accountability, underscoring the need for court intervention.

266.   Dover devised an unusual, creative, and fraudulent method to circumvent accounting for the number of jobs his project generated. By classifying Odlum Equestrian as "lenders" rather than "operators," Dover shifted responsibility for employment figures at Tryon Equestrian Center. This deception highlights the need for justice and reinforces the urgency for court action to address such misconduct.

267.    The undated Subscription Agreement in the name of Odlum Equestrian Lenders, proposed to the plaintiff, contained numerous false statements about the viability of the equestrian investment project. It falsely suggested the investment was legitimate, concealing Dover's prior misconduct, which should evoke a sense of betrayal and the necessity for legal redress to protect investors.

268.    After Dover induced the Plaintiffs to pay over $1 million, Dover and his companies, on numerous occasions, misled the Plaintiffs by using the Plaintiffs' letterhead in their representations.  Dover's series of misrepresentations was always intended to gain time and avoid accountability at all costs.

269.    On May 28, 2026, Bellissimo made a statement, according to the notes taken, that only $165 million was obtained for his equestrian business.  However, Dover represented that $207 million was obtained, meaning that one of the two speakers made a misrepresentation. Plaintiffs believe Bellissimo understated the amount he had received from EB-5 investors.

270.    The plaintiffs are entitled to damages under the Count of misrepresentation, stated against the defendants Dover, Odlum Equestrian Lenders, and Appalachian EB-5.

**COUNT 13.  Fraudulent Omission.**
**(against Defendants Andrew Dover, Odlum Equestrian Lenders LLC,**
**and Appalachian EB-5 LLC)**

271.    Plaintiffs incorporate by reference the allegations in the prior Paragraphs 1 to 215 and further state as follows.

272.    The alleged facts satisfy all elements necessary to establish the plaintiff's significance in this case, underscoring the importance of the fraudulent omission claim.

273.    Dover concealed or failed to disclose a material fact that the investment proposals, in the "national interests," were bogus and had no legitimate business purpose. While offering securities, Dover knew the material facts should be disclosed but intentionally failed to do so.

274. For example, in promoting the proposed Appalachian EB-5 Center (one of 19 currently registered by USCIS), Dover omitted to disclose that the goal of attracting investment was unattainable and that the operation was a business disaster, except for supporting Dover's lifestyle.

275. Dover made a material omission in his informational materials addressed to the plaintiff: he failed to disclose that he had been declared bankrupt and that he had been adjudged a debtor to a credit card company for paying personal expenses in the name of a business company.

276. On numerous occasions, Dover and his companies, whose letterhead was used to make representations, failed to provide truthful information to the plaintiff.

277. The Plaintiffs seek damages, declarations, and injunctions based on material omissions that influenced the investment decision.

**COUNT 14.  Breach of Contract.**
**(against all Defendants Andrew Dover and Odlum Equestrian Lenders LLC)**

278. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 215 above as if fully set forth herein.

279. The present cause of action is stated as an alternative to other Counts, including the Count of Declaratory Relief and equitable causes of action, e.g., money had and received and unjust enrichment.

280. The subscription agreement's violations of securities laws threaten public trust and render it invalid for failing to be properly registered with the SEC.

281. The Plaintiffs also believe that validating any portion of the fraudulent subscription agreement will be against public policy.  However, if the Court leaves any portion of the subscription agreement in force, the cause of action for breach of contract is stated in the alternative.

282.     The alleged facts satisfy all elements required to state a cause of action for breach of contract, thereby justifying the alternative claim if the Court finds the subscription agreement valid.

283.     Valid and enforceable contracts existed between Plaintiffs and Defendants, including the Operating, Subscription, and Escrow Agreements. Defendants owed contractual duties to Plaintiff, including but not limited to proper escrow holding and release, refund sequencing, capital deployment, and repayment at maturity. Defendants breached these duties, causing Plaintiffs to suffer damages.

### COUNT 15. Breach of Fiduciary Duty
### (against Defendants Andrew Dover and Odlum Equestrian Lenders)

284.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 215 above as if fully set forth herein.

285.     A fiduciary relationship existed between Plaintiffs and Defendants by virtue of Defendants' control over investor funds, records, communications, and repayment processing. Defendants breached their fiduciary duties by prioritizing other interests, mishandling investor funds, and failing to act in Plaintiffs' best interests, causing Plaintiffs' damages.   Like with the breach of contract, the present Count is asserted in the alternative to the extent that the Court leaves any portion of the subscription agreement in force.   In that case, the fiduciary duties of a Limited Liability Company manager to the unit owners are governed by Delaware law.

286.     The alleged facts meet all the elements of a cause of action for breach of fiduciary duties by Dover, and his alter ego, Odlum Equestrian Lenders.   As a self-appointed manager of Odlum Lenders, Dover was required to act in the best interests of Odlum Lenders' shareholders.

287.     Thereby, Dover did not disclose who the other unit owners are in Odlum Lenders, constituting a prima facie violation of Delaware and other state corporate law.

288. Dover violated the fiduciary duty accompanying his role as a limited liability company manager when he failed to serve the best interests of the unit holders and acted in his own self-interest by obtaining over $1 million from the plaintiffs.

289. While holding a managerial position that carried fiduciary obligations, Dover did not act in good faith, did not uphold the duties of loyalty, or act in the best interests of unit owners, such as the Plaintiffs here.

290. The breach of fiduciary duty occurred whether it is interpreted under the laws of Delaware, where Odlum Lenders was registered, or under the laws of Florida, where Dover, in fact, engaged in its entrepreneurial activities. The court's intervention is necessary to prevent ongoing harm and uphold justice for Plaintiffs.

291. Plaintiffs are entitled to relief based on the breach of fiduciary duties by defendants Dover and Odlum Lenders.

### COUNT 16. Declaratory Relief (Annulling Subscription)
### (against Defendants Andrew Dover and Odlum Equestrian Lenders LLC)

292. Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 215 and further state as follows.

293. The Count satisfies all legal elements for declaratory relief because the subscription violated securities laws, rendering it null and void.

294. The requested declaration of annulment of the purported subscription agreement concerns a present, ascertained, or ascertainable state of facts or present controversy as to a state of facts. The plaintiff's immunity, power, privilege, or right depends upon the facts or the law applicable to the facts.

295. The Plaintiffs have, or reasonably may have, an actual, present, adverse and antagonistic interest in the subject matter, both in fact and law. The antagonistic and adverse

interest(s) are all before the court by the proper process, and the relief sought is not merely giving legal advice or the answer to questions propounded for curiosity.

296.     Unless the subscription agreement is annulled, in addition to the plaintiff's rights being redeemed, Dover will continue to lure new victims of the securities frauds using the same or a similar subscription agreement.

297.     The alleged facts meet all the elements for granting declaratory relief, and the claim for injunctive relief is stated.  Namely, Dover, acting through its Odlum and Appalachian entities, caused harm to the Plaintiffs and others by taking over $1 million under pretenses.  Dover misrepresented as though he invested that money in the purported equestrian project for their EB-5 application.  However, due to the lack of bona fides of that enterprise, which was supposed to support that application.

298.     The Plaintiffs had a clear right to have their money returned.  There is an inadequate remedy at law in the present set of facts.  The public interest will be served if the subscription agreement entered into by Dover and his Odlum is declared null and void, forcing Dover to disgorge the funds he obtained through an illegal securities fraud scheme.

299.     The Plaintiffs are entitled to declaratory relief against Defendants Andrew Dover and Odlum Lenders that the purported subscription agreement was nil and void because of its illegality, in violation of the securities laws of the United States and the SEC's regulations.

**COUNT 17. Money Had and Received.**
**(stated against Defendants Andrew Dover, Odlum Equestrian Lenders LLC, and**
** Mark Bellissimo)**

300.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 215 and further state as follows.

301.     The facts alleged herewith show that all elements for equitable relief of money had and received are met.  (1) The defendant, Dover, received money belonging to the plaintiff; (2)

Dover benefited from the receipt of the money; and (3) under principles of a good conscience, the said defendant, Dover, should not be allowed to retain that money, regardless of which company account he put the plaintiff's money in.

302.    Dover's actions should be treated as subject to the relief of money had and received. Otherwise, the over $1 million taken by Dover for the unlawful representations concerning an EB-5 application will be unfairly left under Dover's control or used for his personal needs.

303.    Dover was already declared bankrupt in 2002.  In 2015, Dover was adjudged liable for a sizeable credit card debt.  Due to the enterprise's lack of bona fides in supporting that application, Dover should be adjudged liable to return the money.  Unless the money is returned, there is an inadequate remedy at law in the present set of facts.

304.    Plaintiffs are entitled to the equitable relief of money had and received to recover their funds, with interest and damages.

**COUNT 18.  Unjust Enrichment.**
**(against all Defendants).**

305.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 215 and further state as follows.

306.    The facts alleged herewith show that all elements of equitable relief for unjust enrichment are present, consistent with the tests for relief under the equitable theory of money had and received. Dover should not be allowed to enrich himself at the expense of misusing the plaintiff's money.

307.    Dover's actions should be treated as subject to relief under the unjust enrichment theory.  Otherwise, the over $1 million taken by Dover for the unlawful representations concerning an EB-5 application will be unfairly left under Dover's control or used for his personal needs.

308.    Dover was declared bankrupt in 2002 and adjudged liable for a sizeable credit card debt in 2015.  Due to the lack of bona fides of the enterprise he led, which comprised four limited liability companies under his control, he was supposed to support the plaintiff's EB-5 application. Instead, Dover's enterprise was found after seven years to be still a startup that did not generate jobs on its own, merely a financial intermediary.

309.    At the conference on May 28, 2026, Wolff and Bellissimo provided conflicting dollar figures.   According to notes, Dover said that 411 EB-5 investors and $207 million in EB-5 capital were invested.   According to the notes, Bellissimo, in turn, claimed that $165 million in equity capital has been invested and that they continue to invest; the figures conflict with Dover's information.

310.    In any event, Bellissimo, who has not concluded formal contracts with the investors, appears to have been unjustly enriched by an extraordinary amount of money he has withheld from them, without any express deadline to return it.

311.    Unless the money is returned under the theory of unjust enrichment, there is an inadequate remedy at law in the present set of facts.

312.    Plaintiffs are entitled to equitable relief for unjust enrichment, including recovery of over $1 million with interest and damages.

**COUNT 19. Accounting.**
**(against Defendants Andrew Dover and Odlum Equestrian Lenders LLC)**

313.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 215 and further state as follows.

314.    The essential elements of a cause of action for accounting are met in this action. The required tests are met here: (1) the relationship between the Plaintiffs and the defendants, Dover and Odlum Lenders, and other circumstances demonstrate that the Plaintiffs ' legal remedies

are inadequate; and (2) given that Dover has failed, across the board, to account to the Plaintiffs on whether the money has been held in escrow, as promised, or how their money has been used, the Plaintiffs have no alternative but to seek relief of accounting.

315.    Relief from accounting is necessary to shed light on the fact that Dover has been using up to 6 entities under his control for his EB-5 securities enterprise, including Odlum Equestrian Lenders LLC in Hong Kong.

316.    While Hong Kong is out of reach, the proper remedy against Dover is to require Dover to account for all transactions involving over $1.5 million from three plaintiffs, including any transactions involving Hong Kong.

317.    The relief of accounting is necessary after Dover, acting through his Odlum entities, caused the Plaintiffs harm by taking $540,000, $530,000, and $540,000, respectively, into his control and using them without disclosing them to the Plaintiffs.

318.    Under the accounting cause of action, it is imperative to determine if Dover and other defendants have any contractual connection to the Tryon Equestrian Center in North Carolina and, if so, what it is.  Alternatively, they have no connection to the Tryon equestrian center and used its images as complete outsiders merely to lure unsuspecting foreign investors.

319.    Plaintiffs are entitled to an accounting stated against Dover and Odlum Equestrian Lenders.  If the discovery shows that Dover transferred the plaintiff's money to other company defendants, the scope of accounting relief should be adjusted accordingly.

**COUNT 20.  Breach of Implied Contract**
**(against defendant Mark Bellissimo only).**

320.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 215 and further state as follows.

321.    As mentioned above, even though Bellissimo had no direct contracts with the investors, only apparently with Dover and/or his Odlum companies, he must be held liable under the theory of implied contract with the owners of the capital that he has gotten under his control.

322.    As shown above, Bellissimo took the floor on May 28, 2026, at the webinar he and Dover organized for investors, held in one-way Zoom mode, in which all participants known to them were allowed only to watch the presentation, not to ask questions or raise concerns.

323.    All elements of an implied contract with Bellissimo are met here.  That included mutual assent, an offer and acceptance, the investors providing value in money or services, and the other party accepted those benefits knowing that the other side, the owners of the capital, should be repaid; it is a legal remedy imposed by a court to prevent injustice, even if the parties never had an actual agreement.

### COUNT 21. Injunctive Relief
### (against all Defendants)

324.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 215 and further state as follows.

325.    Even though Plaintiff's I-526 petition was approved, Dover has not returned the funds. Dover asked for proof of the same in January 2026, as though he was unaware.  The alleged facts meet all four elements for claiming injunctive relief.  Namely, 1) Dover, acting through its Odlum entities, caused the Plaintiffs irreparable harm when it lost the $540,000, $530,000, and $540,000, respectively, taken by Dover due to the lack of bona fides of the enterprise. In contrast, the Plaintiff's petition was approved without evidence of Dover's involvement. 2) The Plaintiffs qualified to have their money returned; 3) there is an inadequate remedy at law in the present set of facts; and 4) The public interest will be served if Dover and his Odlum entities are enjoined

from defrauding, at a minimum, the Plaintiffs here, and are ordered to return the $1 million that Dover obtained from the Plaintiffs under his control.

326.     The Plaintiffs will suffer irreparable damages unless injunctive relief is granted. Dover, controlling four co-defendants, namely his limited liability companies, could have shifted the funds among his companies' accounts at any time.

327.     Dover should be ordered to freeze all funds arising from the plaintiffs' $540,000, $530,000, and $540,000 investments, respectively, until this matter is resolved at trial.

328.     Injuncting only Dover and Odlum Equestrian Lenders is insufficient. Three more limited liability companies under Dover's control should also be enjoined from transferring or using the $540,000, $530,000, and $540,000, respectively, that Dover took from the Plaintiffs upon a purported Subscription Agreement.

329.     Pursuant to F.R.Civ.P. 65, the Plaintiffs have an opportunity and the right to seek injunctive relief.  The Plaintiffs are entitled to injunctive relief stated against all the defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Kakumani, Rangineni, and Marella respectfully request that this Court:

A. Declare that Defendants Andrew B. Dover, Odlum Equestrian Lenders, LLC, Odlum Equestrian Manager, LLC, Appalachian EB-5, LLC, and Tryon Equestrian Partners, LLC violated the federal securities laws, including 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, 15 U.S.C. §§ 77k, 77l(a)(1), 77l(a)(2), 77o, 78t(a), 78o(a)(1), 78cc(b), and 80b-15(b), as well as committed common law fraud, negligent misrepresentation, breach of contract, and breach of fiduciary duty, as outlined in the Complaint, including award of damages.

B. Enjoin Defendants Andrew B. Dover, Odlum Equestrian Lenders, LLC, Odlum Equestrian Manager, LLC, Appalachian EB-5, LLC, and Tryon Equestrian Partners, LLC from further violations of the federal securities laws and from engaging in any further acts of misrepresentation, omission, or breach of fiduciary or contractual duties with respect to Plaintiffs or similarly situated investors, including award of damages.

C. Award Plaintiffs Kakumani, Rangineni and Marella rescission of the investment contracts and all related agreements, direct or implied, with Defendants Andrew B. Dover, Mark J. Bellissimo, Odlum Equestrian Lenders, LLC, Odlum Equestrian Manager, LLC, Appalachian EB-5, LLC, and Tryon Equestrian Partners, LLC, and direct said Defendants to return to Plaintiffs the full amount of his investment, including but not limited to a total of over $1.5 million, or such other amount as proven at trial, together with interest as allowed by law.

D. Award Plaintiffs Kakumani, Rangineni, and Marella compensatory damages against Defendants Andrew B. Dover, Mark J. Bellissimo, Odlum Equestrian Lenders, LLC, Odlum Equestrian Manager, LLC, Appalachian EB-5, LLC, and Tryon Equestrian Partners, LLC, in an amount to be determined at trial, over $1.5 million, plus all consequential and special damages resulting from Defendants' conduct.

E. Award Plaintiffs Kakumani, Rangineni, and Marella restitution and/or disgorgement of all ill-gotten gains, including but not limited to management fees, commissions, and expense amounts wrongfully retained by Defendants Andrew B. Dover, Mark J. Bellissimo, Odlum Equestrian Lenders, LLC, Odlum Equestrian Manager, LLC, Appalachian EB-5, LLC, and Tryon Equestrian Partners, LLC.

F. Award Plaintiffs Kakumani, Rangineni, and Marella pre-judgment and post-judgment interest as permitted by law.

G.  Award Plaintiffs Kakumani, Rangineni, and Marella their reasonable attorneys' fees, expert witness fees, and costs of suit as permitted by statute or contract.

H.  Grant such other and further relief as the Court deems proper.

Dated: June 25, 2026

Respectfully submitted,

_____/George Lambert/
George Lambert, Esq.
The Lambert Law Firm
FL bar 1022697
421 Poinciana Drive, #1422,
Sunny Isles Beach, FL 33160;
Email: office.law.323@gmail.com
Tel. (305) 938 0600
Attorney for Plaintiffs Suresh Kumar Kakumani,
Siddhartha Rangineni and Sravanthi Marella

**VERIFICATION**

I, Plaintiff SURESH KUMAR KAKUMANI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June 25, 2026

_K. Suresh kumar_

Suresh Kumar Kakumani

**VERIFICATION**

I, Plaintiff SIDDHARTHA RANGINENI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: May…, 2026

Siddhartha Rangineni

**VERIFICATION**

I, Plaintiff SRAVANTHI MARELLA, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June…, 2026

Sravanthi Marella

57

**VERIFICATION**

I, Plaintiff SURESH KUMAR KAKUMANI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June 25, 2026

Suresh Kumar Kakumani

**VERIFICATION**

I, Plaintiff SIDDHARTHA RANGINENI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June…, 2026

Siddhartha Rangineni

**VERIFICATION**

I, Plaintiff SRAVANTHI MARELLA, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June…, 2026

Sravanthi Marella

58

## VERIFICATION

I, Plaintiff SURESH KUMAR KAKUMANI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: May…, 2026

_____

Suresh Kumar Kakumani

## VERIFICATION

I, Plaintiff SIDDHARTHA RANGINENI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: May…, 2026

_____

Siddhartha Rangineni

## VERIFICATION

I, Plaintiff SRAVANTHI MARELLA, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June 25, 2026

_____

Sravanthi Marella

57

## VERIFICATION

I, Plaintiff SURESH KUMAR KAKUMANI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June..., 2026

_____

Suresh Kumar Kakumani

## VERIFICATION

I, Plaintiff SIDDHARTHA RANGINENI, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June..., 2026

_____

Siddhartha Rangineni

## VERIFICATION

I, Plaintiff SRAVANTHI MARELLA, verify under the penalties of perjury under the laws of the United States that the foregoing Complaint, to the extent it alleges facts concerning me, is true and correct on the facts, to the best of my knowledge.

Dated: June 25, 2026

_____

Sravanthi Marella

57

## INDEX OF REPRESENTATIVE COMPOSITE EXHIBITS
## TO THE VERIFIED COMPLAINT

**Description of document**                                                    **Page**

Private Placement Memorandum………………………………………………………..1

Escrow Agreement………………………………………………………………………14

Operating Agreement of Odlum Equestrian Lenders……………………………………47

Letter of accreditation……………………………………………………………………91

Odlum Equestrian Lenders LLC, Subscription Agreement………………………………96

Confirmation of receipt of funds by Appalachian EB5 …………………………………114

Excerpt from the Operaging Agreement…………………………………………………115

Schedule 2, EB-5 Job Allocation………………………………………………………117

**(Loan Program)**

## <u>CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM</u>

Updated as of July 26, 2018

### ODLUM EQUESTRIAN LENDERS, LLC
(a Delaware limited liability company)
$192,500,000 Maximum Offering (385 Investors)



### THE TRYON INTERNATIONAL EQUESTRIAN CENTER,
a new economic cluster centered around a world class equestrian destination in Tryon, NC

### <u>Project Contacts</u>:

c/o Appalachian EB-5, LLC
Attention: Andrew Dover and Dale Carroll
Biltmore Park Town Square
One Town Square Boulevard, Suite 315
Asheville, NC 28803
Phone (Andrew): (740) 704-3256
Phone (Dale): (919) 665-7932
Emails:  andydover@odlumcapital.com and dcarroll@appalachianeb5.com

113578214.9

CJD 61965239v3  77740-0001 7/26/18

**ODLUM EQUESTRIAN LENDERS, LLC** (the "**Company**") has been organized to provide a loan (the "**Loan**" or "**EB-5 Loan**") to **TRYON EQUESTRIAN PARTNERS, LLC**, a North Carolina limited liability company (or its affiliates) (the "**Borrower**" or "**Developer**"), who is creating a new economic cluster centered around the continued development of a world class equestrian destination in Tryon, North Carolina.  The 1,600 acre development site is designed to become the premiere Equestrian Lifestyle Destination ("**ELD**") in the world, as evidenced by being unanimously chosen on November 4, 2016 as the host venue for the FEI World Equestrian Games™ 2018("**FEI WEG**", administered by the Fédération Equestre Internationale ("**FEI**"), the worldwide governing body of equestrian sport.

The new economic cluster is centered around a world class equestrian competition venue, the Tryon International Equestrian Center ("**TIEC**") and will include a wide array of lodging options (i.e. hotels, rental cabins, inns, and recreational vehicles), restaurants, retail centers, golf courses, spa, sporting clay complex, animal import center, manufacturing, and a sports complex that will include a tennis complex, fitness center, and wide array of pool and water features.  The project includes an inventory of over 800 building lots and will also include hundreds of condominium and custom homes for sale (collectively, the "**Project**" or "**Equestrian Center**").

The Project also includes the acquisition and redevelopment of neighboring manufacturing facilities.  Since manufacturing has the highest multiplier effect of any economic sector in the US economy and is a priority for EB-5 and other economic development programs.  The Developer acquired the vacant All American Homes 160,000 sq. ft. facility approximately 8-miles away from the Equestrian Center in economically distressed Rutherford County, NC and approximately 12-miles from economically distressed Cherokee County, a neighboring rural community in SC.  Restoring manufacturing jobs in this industrial facility is an integral part of this new Economic Cluster (meaning when various industry sectors work together in a collaborative way to strengthen competitiveness and accelerate job creation it is referred to as an "**Economic Cluster**").  Examples of economic clusters are Silicon Valley or the Auto Industry in Detroit. Harvard Business School Professor Michael Porter is the worlds leading authority on economic clusters and has proven them to be a differentiated way to accelerate and sustain economic growth especially in rural regions. The Developer has established US Precision Construction, LLC, a subsidiary, in this building that will produce wall, floor, ceiling and roof precision engineered sections for final assembly in construction at the Equestrian Center site. This involves a $7 million investment to acquire the industrial building on 47-acres, retrofit the facility, and make investments in equipment and machinery. The state of the art facility has started hiring and is expected to employ 100-persons in manufacturing, technician, etc. roles and establish a significant supply chain for the materials required at the plant. Both Rutherford and Cherokee Counties have under-employed citizens with manufacturing experience that can fill these new roles. The vision for US Precision Construction, LLC is to expand its output to external customers for their construction projects once needs are met at the Equestrian Center and other parts of the new Economic Cluster.

The new US Precision Construction LLC facility is an example of the Developer's commitment to make purchases from businesses and acquisition of services locally.  This is another illustration of the power of spillovers and linkages in economic clusters that Dr. Porter emphasizes. To date, the Developer has made payments to local contractors in the border region totaling over $80 million for earth grading, infrastructure installations, site work, construction and landscaping. Equipment

purchases from local dealers represent another $8 million. By far most of the contractors and suppliers are located within a 20-mile radius of the Equestrian Center in Mill Spring and were severely impacted by the Great Recession.

In addition to the major investments in the new Economic Cluster to date for US Precision Construction and the Equestrian Center consisting of the competition and training rings, stables, shops, restaurants, etc., the Developer has also acquired the Lodge at Lake Lure, Cleghorn Plantation Golf & Country Club and developed a gun club to provide lodging and recreation opportunities for guests. These hospitality investments to date represent another $7.9 million in building the new economy. This infusion in the regional economy will continue with improvements planned for both the Lodge at Lake Lure and Cleghorn.

The Company will be administered by **ODLUM EQUESTRIAN MANAGER, LLC**, a Delaware limited liability company (the "**Manager**"), which is affiliated with the Regional Center and is not affiliated with the Developer.

**APPALACHIAN EB-5, LLC**, a North Carolina limited liability company (the "**Regional Center**"), is an approved regional center under the EB-5 program (the "**EB-5 Program**") with the United States Citizenship and Immigration Service ("**USCIS**") authorized under The Immigration Act of 1990 (IMMACT 90), effective November 29, 1991 ("**Immigration Act**"), for purposes of authorizing foreign investors in the Company to include indirect job creation from investment in participating businesses toward qualification for the EB-5 Program, and it will be granting the Project the rights to utilize the EB-5 program to raise capital for the development of the Tryon Economic Cluster.  The Regional Center has agreed to sponsor the Project for participation in the EB-5 Program pursuant to a Memorandum of Understanding with the Company and Developer to utilize the EB-5 Regional Center designation in connection with the Loan to the Borrower, whereby the Project will, in turn, create jobs (the "**Memorandum of Understanding**").

**The Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or applicable state securities laws.  The Units are being sold in reliance on exemptions from the registration requirements of the Securities Act provided by Regulation S (pursuant to which the Units may not be offered or sold in the United States or to U.S. persons, as described below) and/or Section 4(a)(2) of the Securities Act or Regulation D, and may not be transferred or resold except as permitted under such laws.  Hedging transactions involving the securities may not be conducted, unless in compliance with the Securities Act and the documents governing the Company.**

**Neither the Securities and Exchange Commission nor any state securities regulatory authority has approved or disapproved the offer and sale of these Units or determined if this confidential private placement memorandum (the "Offering Memorandum") is accurate or complete.  Any representation to the contrary is a criminal offense.**

**Investment in the Units involves a high degree of risk (See "V. RISK FACTORS") and there are substantial restrictions on transferability of the Units.  Investing Members should not invest in the Units unless such Investing Members can bear the complete loss of their investment.  See "V. C. 2. and 3. RISK FACTORS – Risks Related to the Offering."**

113578214.9

7/26/18

3

**NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THIS OFFERING MEMORANDUM, AND NO OTHER PARTY EXCEPT AUTHORIZED SALES AGENTS WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THIS OFFERING MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS. NEITHER OF THE DEVELOPER NOR THEIR PRINCIPALS ASSUMES ANY RESPONSIBILITY FOR THIS OFFERING MEMORANDUM EXCEPT FOR THE INFORMATION PROVIDED BY IT PURSUANT TO THIS OFFERING.**

This is an offering (the "**Offering**") of up to $192,500,000 (385) units (the "**Units**") with each Unit consisting of a limited liability membership interest in the Company ("**Membership Interest**").

| | |
|---|---|
| Offering Price: | $500,000 per Unit |
| Maximum Offering Amount: | $192,500,000 *or* 385 Units |
| Minimum Subscription: | $500,000 *or* 1 Unit |

The overall Project will be developed in up to three (3) phases (each a "**Phase**") with only Phases 1 and 2 being developed with EB-5 funding pursuant to this Offering. Phase 3 will not involve EB-5 funding and will be developed at a later time. A detailed description of the Phases will follow.

The Company reserves the right to limit the Offering to an amount that funds less than the entire Project based upon the maximum allowable Loan amount for Phases 1 and 2 funded pursuant to this Offering. The Regional Center therefore reserves the right to limit the Offering amount to the funding of Phase 1 and/or Phase 2 and form an additional entity under the EB-5 Program to raise capital for the funding of Phase 2 pursuant to terms and conditions that are expected to be similar to the provisions of this Offering. The collateral to be provided to secure the Loan for either Phase will be described hereafter.

IN THE EVENT THAT THERE IS A CHANGE IN THE LEGISLATION THAT RESULTS IN AN INCREASE IN THE PER UNIT MINIMUM INVESTMENT AMOUNT THAT WOULD BE REQUIRED FOR THE EB-5 PROGRAM, THEN THOSE SUBSCRIBERS AFFECTED BY THE INCREASE IN THE REQUIRED MINIMUM INVESTMENT AMOUNT SHALL BE REQUIRED TO INVEST THE REQUIRED INCREASED AMOUNT IN ORDER TO QUALIFY UNDER THE EB-5 PROGRAM. THE NUMBER OF UNITS TO BE OFFERED BY THE COMPANY WILL BE REDUCED PROPORTIONATELY TO TAKE INTO ACCOUNT THE INCREASED PER UNIT AMOUNT FOR THOSE INVESTORS THAT ARE SUBJECT TO THE HIGHER UNIT PRICE, AND THE MAXIMUM OFFERING AMOUNT SHALL REMAIN THE SAME, EXCEPT FOR ANY INCREASE IN THE MAXIMUM OFFERING AMOUNT TO AVOID THE ISSUANCE OF A FRACTIONAL UNIT.

The offering price ("**Offering Price**") does not include the amount of up to Fifty Thousand Dollars ($50,000) per Unit payable by a subscriber for Offering costs and administrative expenses ("**Expense Amount**"). The Offering Price and Expense Amount must be paid by wire transfer upon subscription for a Unit.

The Economic Analysis (as defined below) anticipates that sufficient jobs should be created to meet the requirements of the EB-5 Program with respect to the Maximum Offering Amount (5,000 jobs required and an estimated 6,972 jobs to be created). (Approximate job cushion of 81%).

_____

The Company is making the Offering only to a limited number of individual persons who are (i) not "U.S. persons," as such term is defined in Rule 902(k) of the Securities Act, in compliance with Regulation S, on a limited and private basis, or (ii) "accredited investors," as defined in Rule 501 under the Securities Act and pursuant to Regulation D of the Securities Act ("**Accredited Investors**").  Such Units shall be described in the Operating Agreement of the Company (the "**Operating Agreement**") to be entered into by and among the Manager and each of the subscribers for Units (each, a "**Subscriber**," or, once such subscription has been accepted, an "**Investing Member**") whose subscriptions are accepted by the Company pursuant to the Subscription Agreement between each Investing Member and the Company (the "**Subscription Agreement**"). See "II. A. THE OFFERING - General," "VII. SUBSCRIPTION AGREEMENT" and the form of Subscription Agreement attached hereto as **Exhibit A**.

Each Investing Member must make a capital contribution to the Company in the amount of Five Hundred Thousand Dollars ($500,000) per Unit (the "**Capital Contribution**"), and must pay the Expense Amount.  Investing Members, in the aggregate, will own one hundred percent (100%) of the membership interests in the Company, and each Investing Member shall be issued a Unit that represents a limited liability company membership interest in the Company, as more fully described in the Operating Agreement.

A detailed description of the Project, including, without limitation, the construction budget, scheduled timetable and financial projections, is set forth in "III. DESCRIPTION OF THE PROJECT."

The Company is being formed to provide financing in connection with the Project.  The terms and conditions of the financing are set forth in this Offering Memorandum.

The Offering has been structured so that each Investing Member, by subscribing for a Unit and becoming a member of the Company, will have made an investment that qualifies as the investment component required for an I-526 Immigrant Petition by Alien Entrepreneur ("**I-526 Petition**") that entitles the Investing Member to seek permanent United States residency and, ultimately, to apply for U.S. citizenship, provided that the Investing Member otherwise satisfies the non-investment criteria for an EB-5 visa ("**EB-5 Visa**").  For further information, see "IV. IMMIGRATION MATTERS" and "V. E. RISK FACTORS - Immigration Risk Factors."  The Investing Member, at his or her sole cost and expense, will arrange for an immigration attorney to file his or her I-526 Petition following acceptance of the subscription and admission as a member of the Company; provided that the Company may require that an immigration attorney selected by the Company review the Investing Member's I-526 Petition to ensure consistency with this Offering Memorandum, in which case the Investing Member will be required to pay such immigration attorney's fee for performing such review.

The Offering will end on December 31, 2018 at 5:00 p.m. EST, unless extended by the Manager in its sole discretion ("**Offering Period**"). Notwithstanding the foregoing, the Company reserves the right, following the end of the Offering Period, to substitute an Investing Member who receives an I-526 Petition Denial with a Substitute Investing Member (as hereafter defined), as long as substitution occurs prior to the completion of the Project and in accordance with USCIS guidelines.

The Units are being offered for sale on a "best efforts" basis. All Capital Contributions and Expense Amounts received from Subscribers will be held in escrow with the Company, or a substitute entity that may be a financial institution (the "**Escrow Agent**"), in bank accounts with Iberia Bank, pursuant to an Escrow Agreement entered into by the Company (the "**Escrow Agreement**"), until the Escrow Release Conditions (as hereafter defined) have been met.  After the Escrow Release Conditions have been satisfied the Investing Member's Capital Contribution will be utilized to fund the Loan before the I-526 Petition approval has been received.  The Subscriber's Expense Amount shall likewise be held in escrow and released to the Manager immediately upon the filing of the applicable Subscriber's I-526 Petition.  If the Investing Member's I-526 Petition is denied by USCIS (an "**I-526 Petition Denial**"), without certification of the denial to the USCIS Administrative Appeals Office (AAO) or upon denial by the AAO upon certification, and if the Investing Member demands return of his or her Capital Contribution and Expense Amount, then the Company shall use reasonable efforts to obtain a substitute Investing Member ("**Substitute Investing Member**") promptly following such demand, as provided below. The denied Investing Member's Membership Interest shall be repurchased by the Company upon the return of his or her Capital Contribution, using available cash. See "I. OFFERING SUMMARY – Escrow Accounts," below.  The Company may offer and close subscriptions for Units until either (i) the Offering Period (as defined below) expires or is terminated; or (ii) three hundred eighty-five (385) Units, representing Capital Contributions of One Hundred Ninety-Two Million Five Hundred Thousand Dollars ($192,500,000) or as may be necessary to account for a change in legislation that necessitates an increase in the Maximum Offering Amount to avoid the issuance of a fractional Unit (the "**Maximum Offering Amount**") have been subscribed for.  The Escrow Agreement will be substantially in the form of **Exhibit B** attached hereto.

**IN FURNISHING THIS OFFERING MEMORANDUM, THE MANAGER RESERVES THE RIGHT TO SUPPLEMENT, AMEND OR REPLACE THIS OFFERING MEMORANDUM AT ANY TIME, BUT HAS NO OBLIGATION TO PROVIDE THE RECIPIENT WITH ANY SUPPLEMENTAL, AMENDED, REPLACEMENT OR ADDITIONAL INFORMATION.**

## NOTICES TO INVESTORS

THIS OFFERING MEMORANDUM IS BEING PROVIDED TO EACH PROSPECTIVE INVESTOR ("**PROSPECTIVE INVESTOR**") IN CONNECTION WITH SUCH PROSPECTIVE INVESTOR'S INTEREST IN PURCHASING ONE OR MORE UNITS.  THE PURPOSE OF THIS OFFERING MEMORANDUM IS TO FURNISH PROSPECTIVE INVESTORS WITH CERTAIN INFORMATION REGARDING A PROSPECTIVE INVESTMENT IN THE UNITS AND CERTAIN OF THE RISKS ATTENDANT THERETO. THE INFORMATION CONTAINED AND PLANS DESCRIBED IN THIS OFFERING MEMORANDUM ARE BASED ON CURRENT MARKET CONDITIONS.  INFORMATION REGARDING THE COMPANY CONTAINED IN THIS OFFERING MEMORANDUM IS BASED ON INFORMATION AVAILABLE TO THE COMPANY AND THE REGIONAL CENTER AS OF THE DATE HEREOF AND BELIEVED BY THE COMPANY AND THE REGIONAL CENTER TO BE ACCURATE.  CAPITALIZED TERMS USED IN THIS OFFERING MEMORANDUM BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS SET FORTH IN THE COMPANY'S OPERATING AGREEMENT (ATTACHED HERETO AS **EXHIBIT C**) OR THE SUBSCRIPTION AGREEMENT (ATTACHED HERETO AS **EXHIBIT A**).

ANY AND ALL INFORMATION, STATISTICS, BUDGETS AND GRAPHICS RELATING TO THE PROJECT, THE SOURCES AND USES OF CAPITAL TO COMPLETE THE PROJECT, THE CONSTRUCTION BUDGET, AND CONSTRUCTION TIMELINE DESCRIBED HEREIN HAVE BEEN COMPILED BY THE DEVELOPER AND DELIVERED TO THE COMPANY AND THE MANAGER. THE DEVELOPER AND PRINCIPALS OF THE DEVELOPER EACH CONFIRMED TO THE COMPANY AND THE MANAGER THAT SUCH INFORMATION ACCURATELY DESCRIBES THE DEVELOPMENT OF THE PROJECT. NEITHER THE COMPANY, THE MANAGER NOR ANY OF THEIR RESPECTIVE AFFILIATES HAVE UNDERTAKEN ANY INDEPENDENT INVESTIGATION TO CONFIRM THE ACCURACY OR COMPLETENESS OF SUCH FINANCIAL INFORMATION, ALTHOUGH THEY HAVE NO REASON TO BELIEVE THAT SUCH INFORMATION CONTAINS ANY UNTRUE INFORMATION OF A MATERIAL FACT OR OMITS TO STATE ANY MATERIAL FACT REQUIRED TO BE STATED OR NECESSARY TO MAKE ANY STATEMENT MADE HEREIN NOT MISLEADING.

AN INVESTMENT IN THE UNITS OFFERED HEREBY IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK.  PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THE INFORMATION SET FORTH HEREIN UNDER "RISK FACTORS."  PROSPECTIVE INVESTORS MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD AND BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT.

THE UNITS ARE RESTRICTED SECURITIES UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.  ACCORDINGLY, THE UNITS MAY NOT BE SOLD, TRANSFERRED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE

113578214.9

7

CJD 61965239v3  77740-0001 7/26/18

STATE SECURITIES LAWS OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED. ADDITIONALLY, THE TRANSFER OF UNITS WILL BE RESTRICTED UNDER THE OPERATING AGREEMENT.  ACCORDINGLY, INVESTORS WILL BE REQUIRED TO HOLD THE UNITS INDEFINITELY.

NEITHER THE DELIVERY OF THIS OFFERING MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAVE BEEN NO CHANGES IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF OR THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS OFFERING MEMORANDUM.  THIS OFFERING MEMORANDUM SUPERSEDES AND REPLACES ANY AND ALL INFORMATION DELIVERED OR MADE AVAILABLE BY OR ON BEHALF OF THE COMPANY TO THE RECIPIENTS OF THIS OFFERING MEMORANDUM PRIOR TO THE DATE HEREOF.

WITH RESPECT TO THE UNITS AND THIS OFFERING MEMORANDUM, ONLY THE REGIONAL CENTER AND THE COMPANY HAVE BEEN AUTHORIZED TO MAKE REPRESENTATIONS OR GIVE INFORMATION OTHER THAN AS CONTAINED HEREIN; AND, IF GIVEN BY THEM, SUCH REPRESENTATIONS AND INFORMATION ARE NOT TO BE RELIED UPON UNLESS GIVEN IN A WRITTEN MEMORANDUM FURNISHED BY THE REGIONAL CENTER OR THE COMPANY.  NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHOULD BE RELIED UPON IN CONNECTION WITH THIS OFFERING EXCEPT FOR THIS OFFERING MEMORANDUM, AND ANY OTHER INFORMATION FURNISHED BY THE REGIONAL CENTER OR THE COMPANY IN RESPONSE TO A PROSPECTIVE INVESTOR'S REQUEST.  NO BROKER, DEALER, SALESMAN OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION (WHETHER ORAL OR WRITTEN) NOT CONTAINED IN THIS OFFERING MEMORANDUM (WHETHER ORAL OR WRITTEN), AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE REGIONAL CENTER OR THE COMPANY.

THE COMPANY WILL, UPON WRITTEN REQUEST, MAKE AVAILABLE TO A PROSPECTIVE INVESTOR'S OFFSHORE AGENT, LICENSED BROKER-DEALER OR "FINDER" ALL DOCUMENTS RELATING TO THIS OFFERING AND ANY ADDITIONAL INFORMATION REGARDING THE COMPANY AND THIS OFFERING TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.  REQUESTS FOR SUCH DOCUMENTS OR INFORMATION SHOULD BE MADE IN WRITING TO **ODLUM EQUESTRIAN LENDERS, LLC, C/O APPALACHIAN EB-5, LLC; ATTENTION: ANDREW DOVER AND DALE CARROLL, BILTMORE PARK TOWN SQUARE, ONE TOWN SQUARE BOULEVARD, SUITE 315, ASHEVILLE, NC 28803; PHONE (ANDREW): (740) 704-3256 PHONE (DALE): (919) 665-7932; EMAILS: ANDYDOVER@ODLUMCAPITAL.COM; DCARROLL@APPALACHIANEB5.COM.**

.

113578214.9

7/26/18

8

PROSPECTIVE SUBSCRIBERS WILL BE REQUIRED TO ACKNOWLEDGE AND AGREE THAT (I) THE MANAGER, THE REGIONAL CENTER AND THE DEVELOPER HAVE NOT GIVEN, AND HAVE NO AUTHORITY TO GIVE, ANY INVESTMENT ADVICE WITH RESPECT TO THE PURCHASE OF A SECURITY; AND (II) A PROSPECTIVE SUBSCRIBER HAS NOT REQUESTED OR OTHERWISE SOUGHT ANY SUCH INVESTMENT ADVICE FROM THE MANAGER, THE REGIONAL CENTER AND/OR THE DEVELOPER.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS OFFERING MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATION FROM THE COMPANY OR PROFESSIONALS ASSOCIATED WITH THIS OFFERING AS LEGAL OR TAX ADVICE.  EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH HIS OR HER OWN PERSONAL ATTORNEY, ACCOUNTANT AND OTHER ADVISORS, AT HIS OR HER OWN EXPENSE, AS TO THE LEGAL, TAX, ECONOMIC, AND OTHER CONSEQUENCES AND RISKS OF AN INVESTMENT IN THE UNITS AND THE SUITABILITY OF SUCH INVESTMENT FOR HIM/HER.

THIS OFFERING MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DOCUMENTS RELATING TO THIS INVESTMENT AND VARIOUS PROVISIONS OF RELEVANT STATUTES AND APPLICABLE REGULATIONS THEREUNDER; HOWEVER, SAID SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE ORIGINAL DOCUMENTS, STATUTES AND REGULATIONS.

EACH PROSPECTIVE INVESTOR WHO SUBSCRIBES TO INVEST WILL BE REQUIRED TO REPRESENT AND WARRANT TO THE REGIONAL CENTER AND THE COMPANY IN HIS OR HER SUBSCRIPTION AGREEMENT THAT AMONG OTHER THINGS HE/SHE: (1) IS BUYING THE UNITS FOR HIS OR HER OWN ACCOUNT AND NOT WITH ANY VIEW TO THEIR DISTRIBUTION OR RESALE IN THE FORESEEABLE FUTURE; (2) POSSESSES SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS SO THAT HE/SHE IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN THE UNITS; (3) IS ABLE TO BEAR THE ECONOMIC RISKS OF SUCH AN INVESTMENT; (4) COULD AFFORD A COMPLETE LOSS OF SUCH AN INVESTMENT; (5) UNDERSTANDS THE TERMS, RIGHTS, DUTIES, OBLIGATIONS, AND RESTRICTIONS CONTAINED IN THIS OFFERING MEMORANDUM, THE OPERATING AGREEMENT AND THE SUBSCRIPTION AGREEMENT; AND (6) HAS BEEN AFFORDED AN OPPORTUNITY TO REQUEST AND REVIEW ALL ADDITIONAL INFORMATION DETERMINED BY HIM OR HER TO BE NECESSARY TO REVIEW THE ACCURACY OF THE INFORMATION CONTAINED HEREIN AND TO OTHERWISE MAKE AN INFORMED INVESTMENT DECISION.  AT THE OPTION OF THE MANAGER, A SUBSCRIPTION MAY BE CANCELED AND MADE VOID IF ANY REPRESENTATIONS MADE BY THE PROSPECTIVE INVESTOR IN HIS OR HER SUBSCRIPTION AGREEMENT OR OTHERWISE MADE TO THE REGIONAL CENTER ARE UNTRUE.

113578214.9

7/26/18

Exhibits to Complaint  p.  9

THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANY PERSON RESIDING IN A JURISDICTION WHERE SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING THE OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

113578214.9

10

7/26/18

**FOR ALL NON-U.S. INVESTORS GENERALLY**

IT IS THE RESPONSIBILITY OF ANY PERSONS WISHING TO SUBSCRIBE FOR THE PURCHASE OF UNITS OFFERED HEREBY TO INFORM THEMSELVES OF AND TO OBSERVE ALL APPLICABLE LAWS AND REGULATIONS OF ANY RELEVANT JURISDICTIONS. PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF THE UNITS OFFERED HEREBY, AND ANY FOREIGN EXCHANGE OR OTHER NON-U.S. RESTRICTIONS THAT MAY BE RELEVANT THERETO.

IF THE INVESTOR IS (I) A PURCHASER IN A SALE THAT OCCURS OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT OR (II) A "DISTRIBUTOR," "DEALER" OR PERSON "RECEIVING A SELLING CONCESSION, FEE OR OTHER REMUNERATION" IN RESPECT TO SECURITIES SOLD, PRIOR TO THE EXPIRATION OF THE APPLICABLE "DISTRIBUTION COMPLIANCE PERIOD" (AS DEFINED BELOW), IT ACKNOWLEDGES THAT (A) UNTIL THE EXPIRATION OF SUCH "DISTRIBUTION COMPLIANCE PERIOD" ANY OFFER OR SALE OF THE SECURITIES SHALL NOT BE MADE BY IT TO A U.S. PERSON OR FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON WITHIN THE MEANING OF RULE 902(K) OF THE SECURITIES ACT AND (B) UNTIL THE EXPIRATION OF THE "DISTRIBUTION COMPLIANCE PERIOD," IT MAY NOT, DIRECTLY OR INDIRECTLY, REFER, RESELL, PLEDGE OR OTHERWISE TRANSFER A SECURITY OR ANY INTEREST THEREIN EXCEPT TO A PERSON WHO CERTIFIES IN WRITING TO THE COMPANY THAT SUCH TRANSFER SATISFIES, AS APPLICABLE, THE REQUIREMENTS OF THE LEGENDS DESCRIBED HEREIN AND THAT THE SECURITIES WILL NOT BE ACCEPTED FOR REGISTRATION OF ANY TRANSFER PRIOR TO THE END OF THE APPLICABLE "DISTRIBUTION COMPLIANCE PERIOD" UNLESS THE TRANSFEREE HAS FIRST COMPLIED WITH THESE CERTIFICATION REQUIREMENTS. THE "DISTRIBUTION COMPLIANCE PERIOD" MEANS THE ONE-YEAR PERIOD FOLLOWING THE ISSUE DATE FOR THE UNITS.

IF THE UNITS ARE IN BEARER FORM OR FOREIGN LAW PREVENTS THE COMPANY FROM REFUSING TO REGISTER SECURITIES TRANSFERS, THE COMPANY SHALL IMPLEMENT OTHER REASONABLE PROCEDURES (SUCH AS A LEGEND DESCRIBED IN PARAGRAPH (B)(3)(III)(B)(3) OF RULE 903 OF THE SECURITIES ACT) TO PREVENT ANY TRANSFER OF THE UNITS NOT MADE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE SECURITIES ACT OR OTHER AVAILABLE EXEMPTION FROM REGISTRATION.

## CONFIDENTIALITY AND UNDERTAKINGS

The information contained in this Offering Memorandum is confidential and proprietary to the Company.  By accepting delivery of this Offering Memorandum, the Investing Member is deemed to have acknowledged and agreed to the following:

(i)      The information contained in this Offering Memorandum will be used by the Investing Member solely for the purpose of deciding whether to proceed with a further investigation of the Company;

(ii)     This Offering Memorandum or information derived from this Offering Memorandum will be kept in strict confidence by the Investing Member and will not, whether in whole or in part, be released or discussed by the Investing Member for any purpose other than an analysis of the merits of an eventual investment in the Units by the Investing Member, nor will recipient make any reproductions of such information; and

(iii)    Upon the written request of the Company, this Offering Memorandum, and any other documents or information furnished to the Investing Member and any and all reproductions thereof and notes relating thereto will be promptly returned to the Company.

## NOTICE REGARDING NATIVE LANGUAGE TRANSLATION

Subscriber hereby agrees that it is the sole responsibility of Subscriber to ensure proper translation of this Offering Memorandum into their native language if necessary for Subscriber's understanding of the rights and obligations contained herein. Any language translation of this Offering Memorandum provided by any of the parties hereto is not a binding legal document and is provided solely for the Subscriber's convenience. None of the parties hereto are liable for any inaccuracies in any language translation or for any misunderstandings due to differences in language usage or dialect.  In the event of any inconsistencies between this Offering Memorandum as set forth in English and any language translation, this Offering Memorandum as set forth in English and as executed shall govern.  The Subscriber assumes the responsibility for fully understanding the nature and terms of the rights and obligations under this Offering Memorandum.

## FORWARD-LOOKING STATEMENTS - IMPORTANT FACTORS AND ASSOCIATED RISKS

This Offering Memorandum contains certain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, and Company intends that such forward-looking statements be subject to the safe harbors created thereby. These forward-looking statements include the plans and objectives of management for future operations, including plans and objectives relating to the future economic performance of the Project. The forward-looking statements and associated risks set forth in this Offering Memorandum include or relate to the successful implementation and operation of the Developer's investment strategies and the Project business plan (the "**Project Business Plan**"), available upon request.

The forward-looking statements included herein are based on current expectations that involve a number of risks and uncertainties. These forward-looking statements are based on various assumptions regarding the Developer and its proposed operations. Such assumptions involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Developer. Although the Company believes that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate and, therefore, there can be no assurance that the results contemplated in forward-looking information will be realized. In addition, as disclosed elsewhere and under "Risk Factors," the business plans of the Developer are subject to substantial risks, which increase the uncertainty inherent in such forward-looking statements. In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should **not** be regarded as a representation by the Developer, the Company or any other person that the objectives or plans of the Developer will be achieved.

THE WORDS "ESTIMATE," "APPROXIMATE", "PLAN," "INTEND," "EXPECT," "PROPOSED," AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS INVOLVE AND ARE SUBJECT TO KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS WHICH COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE (FINANCIAL OR OPERATING) OF THE COMPANY OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM THE OUTCOMES, EXPRESSED OR IMPLIED, BY SUCH FORWARD-LOOKING STATEMENTS OR THE PROJECTIONS SET FORTH HEREIN. PROSPECTIVE INVESTORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS, WHICH SPEAK ONLY AS OF THE DATE HEREOF. THE REGIONAL CENTER AND THE COMPANY SPECIFICALLY DISCLAIM ANY OBLIGATION TO RELEASE ANY REVISIONS TO THESE FORWARD-LOOKING STATEMENTS TO REFLECT EVENTS OR CIRCUMSTANCES AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

## **TABLE OF CONTENTS**

I. OFFERING SUMMARY ........................................................................................................ 23

II. THE OFFERING.............................................................................................................. 34

    A.     General.................................................................................................... 34
    B.     The I-526 Petition ................................................................................ 35
    C.     The Project............................................................................................ 35
    D.     Economic Analysis ............................................................................... 35
    E.     The Subscription Procedure.................................................................. 35
    F.     Closings.................................................................................................. 35
    G.     Risk Factors .......................................................................................... 36
    H.     Senior Indebtedness and Bridge Financing.......................................... 36
    I.     Payment of Company Expenses and Administration............................. 36
    J.     Formation.............................................................................................. 36
    K.     Regional Center-Related Responsibilities ............................................ 37
    L.     Transfer Restrictions; Suitability Standards ......................................... 37
    M.     How to Subscribe.................................................................................. 38
    N.     Miscellaneous ...................................................................................... 40
    O.     Conflicts of Interest.............................................................................. 40

III. DESCRIPTION OF THE PROJECT.............................................................................. 42

    A.     Project Overview .................................................................................. 42
    B.     Development Overview ......................................................................... 45
    C.     Sources and Uses .................................................................................. 46
    D.     Summary of Current and Planned Capital Investment ......................... 46
    E.     Overall Project Cost Summaries........................................................... 47
    Summary of Projected Financial Results........................................................... 48

IV. IMMIGRATION MATTERS ......................................................................................... 49

    A.     Overview............................................................................................... 49
    B.     The I-526 Petition Process ................................................................... 49
    C.     Regional Centers................................................................................... 50
    D.     Economical and Statistical Analysis...................................................... 50
    E.     Consular Processing or Adjustment of Status........................................ 52
    F.     Consular Processing.............................................................................. 52
    G.     Visa Issuance Not Guaranteed .............................................................. 53
    H.     Admission After Immigrant Visa Issued Not Guaranteed..................... 53
    I.     Adjustment of Status............................................................................. 54
    J.     Travel During Adjustment of Status Processing.................................... 54
    K.     Employment During The Adjustment of Status Processing ................... 55
    L.     Adjustment of Status Cannot Be Guaranteed ....................................... 55
    M.     Removal of Conditions ......................................................................... 56
    N.     Removal of Conditions Not Guaranteed............................................... 57
    O.     Preservation of Eligibility for Removal of CLPR Status....................... 57

V. RISK FACTORS.................................................................................................................... 61

    A.    Risks Related to Company's Proposed Business-General .................................... 61
    B.    Special Risks Associated with the Project ........................................................... 62
    C.    Risks Related To The Offering .............................................................................. 68
    D.    Tax Risks ............................................................................................................... 72
    E.    Risks Related to Immigration ............................................................................... 74
    F.    Risks Related to the Escrow Agreement ............................................................... 85
    G.    Risks Related to the Loan ..................................................................................... 85

VI. SUMMARY OF THE OPERATING AGREEMENT .......................................................... 89

VII. SUBSCRIPTION AGREEMENT ...................................................................................... 97

VIII. ESCROW AGREEMENT ................................................................................................ 101

IX. TAX MATTERS ................................................................................................................ 102

X. ADDITIONAL INFORMATION ........................................................................................ 110

113578214.9

15

7/26/18

Exhibits to Complaint  p.  15

**LIST OF EXHIBITS**

Exhibit A   -   Subscription Agreement

Exhibit B   -   Escrow Agreement

Exhibit C   -   Operating Agreement

Exhibit D   -   Confidential Prospective Investor Questionnaire

Exhibit E   -   Background of Principals of the Developer, its Management, the Manager and the Regional Center

Exhibit F   -   Executive Summary, Description of Project, the Construction Budget and Financial Projections

Exhibit G   -   TEA Letter

Exhibit H   -   Phasing Schedule and Information

Note:

Other documents as listed below will be made available to Prospective Investors upon request (if available).

1. Copies of Title Information for Project
2. Certificate of Formation for the Company, the Manager, the Developer and the Regional Center
3. Regional Center Letter of Approval from USCIS
4. Zoning and Site Plan Information
5. Economic Analysis prepared by Barnhart Economic Services, LLC
6. Business Plan prepared by Baker Tilley
7. Feasibility Studies, marketing studies and appraisals (when available)
8. General Contractor Agreement
9. Zoning Information
10. Governmental Support Letters and Grant Information

## DEFINED TERMS INDEX

The meanings of the following defined terms set forth in this Offering Memorandum appear on the following pages:

| | |
|---|---|
| 1940 Act ................................................. 70 | Manager ....................................................... 3 |
| Accredited Investors ................................. 5 | Manager Parties ....................................... 90 |
| Advisers Act ............................................ **72** | Maturity Date .......................................... 26 |
| AILA ........................................................ 21 | Maximum Offering Amount ...................... 6 |
| Alternate Investments .............................. 26 | Membership Interest ................................. 4 |
| AOS .......................................................... **54** | Memorandum of Understanding ............... 3 |
| Baker Tilly Capital .................................. 21 | non-U.S. Investor .................................... **106** |
| Borrower ................................................... 2 | NVC .......................................................... **53** |
| Bridge Financing ..................................... 24 | OFAC ........................................................ 93 |
| BSA .......................................................... **100** | Offering ..................................................... 4 |
| Capital Contribution ................................. 5 | Offering Memorandum .............................. 3 |
| CLPR ........................................................ **26** | Offering Period .......................................... 6 |
| Company .................................................... 2 | Offering Price ............................................ 4 |
| Delaware Act ........................................... 36 | Operating Agreement ................................. 5 |
| Developer ................................................... 2 | Original Issue Discount ......................... 104 |
| EB-5 Loan .................................................. 2 | Phase .......................................................... 4 |
| EB-5 Program ............................................ 3 | Policy Manual .......................................... 27 |
| EB-5 Visa ................................................... 5 | Priority Date ............................................ 79 |
| Economic Analysis .................................. 21 | Project ........................................................ 2 |
| Economic Cluster ....................................... 2 | Project Business Plan ............................... 13 |
| Economist ............................................... 21 | Prospective Investor .................................. 7 |
| ELD ............................................................ 2 | Regional Center ......................................... 3 |
| Equestrian Center ....................................... 2 | Securities Act ............................................. 3 |
| Escrow Agent ............................................. 6 | Securities Laws ....................................... **97** |
| Escrow Agreement ..................................... 6 | Senior Indebtedness ................................. 24 |
| Escrow Release Conditions ..................... 30 | Side Letter ............................................... 32 |
| ESP ........................................................... 44 | Subscriber .................................................. 5 |
| Expense Amount ........................................ 4 | Subscription Agreement ............................. 5 |
| FEI ............................................................. 2 | Substitute Investing Member ..................... 6 |
| FEI WEG ................................................... 2 | Sustainment Period .................................. 58 |
| I-525 Petition Denial ................................. 6 | TEA ........................................................... **49** |
| I-526 Petition ............................................. 5 | TIEC ........................................................... 2 |
| Immigration Act .................................. 3, **49** | Total Subscription Payment ..................... 28 |
| IMPLAN .................................................. 50 | U.S. Investor .......................................... 103 |
| Investing Member ...................................... 5 | Units ........................................................... 4 |
| IRS ........................................................... **73** | USA Freedom Act ................................... **100** |
| Loan ........................................................... 2 | USCIS ......................................................... 3 |
| Loan Agreement ....................................... 25 | USEF ......................................................... 45 |
| Management Fees ..................................... 25 | WEF .......................................................... 44 |

113578214.9

7/26/18

Exhibits to Complaint  p.  17

## OVERVIEW STRUCTURE
## FOR MAXIMUM OFFERING[1]



---

\*       The Regional Center will enable the Company to utilize its regional center approval to create jobs pursuant to the Memorandum of Understanding.

\*\*      The Manager will administer the Company and is affiliated with the Regional Center.

\*\*\*     The Company that will raise capital to make the Loan to the Borrower.

\*\*\*\*    The main principal of the Developer is Mark Bellissimo.

\*\*\*\*\*   It is intended that initially the total senior bridge loans of approximately $71,225,000 (including the Member Funding, the Golden Leaf loan, the Vendor Note and a portion of the Bank of America loan) will be paid down, in part, with the EB-5 Loan proceeds and the equity will remain, such that the total senior bridge loans estimated to equal approximately $50,633,000. Of that pay down amount, it is intended that the Member Funding senior bridge loans will be paid first, since they command a higher interest rate. (See "I. Offering Summary – Senior Indebtedness" and "I. Offering Summary - Project Capitalization Summary" below.)

---

[1] The Project is scheduled in three Phases, provided however; Phase 3 will not involve EB-5 funding. Phase 1-Q1-2015 through Q3-2017 with all EB-5 investors funds scheduled for use in the Project over a two year period, Investments in the form of EB-5 Bridge Financing (defined below) have been made in Phase 1 and will be repaid as part of the EB-5 funding. Phase 2 will be implemented between Q4 2017 thru Q3-2019. The full requisite employment need for EB-5 investors (3,850) jobs will be achieved before I-829 Petitions will be submitted.

## DEVELOPER ORGANIZATIONAL CHART



## DEVELOPMENT TEAM

The Developer has assembled a world-class development team:

**Development Team:**

*Mark Bellisimo, President & CEO*
Tryon Resort Development Corporation
mbellissimo@tryon.com

Sharon Decker, Chief Operating Officer
Tryon Equestrian Partners
Carolinas Operations

**REGIONAL CENTER - APPALACHIAN EB-5, LLC** received approval from USCIS on July 11, 213.  The principal of the Regional Center is Andrew Dover and the Chief Executive Officer is Dale Carroll.  The Regional Center has an Advisory Board that includes John "Jack" Cecil, General Larry Ellis, and Dr. Peter Salovey.

**Regional Center:**

*Andrew Dover, Chairman*
Appalachian EB5 Regional Center
Odlum Capital (Managing Partner) Biltmore Park Town Square
One Town Square Boulevard, Suite 315
Asheville, NC 28803
Phone: (740) 704-3256
Fax:    (305) 400-0679
Email: abdover@odlumcapital.com

*Dale Carroll, CEO*
Appalachian EB5 Regional Center
Biltmore Park Town Square
One Town Square Boulevard, Suite 315
Asheville, NC 28803
Phone: (919) 665-7932
Email: dcarroll@appalachianeb5.com

Please refer to **Exhibit E** for detailed background information on the Developer, Regional Center and Management.

**Land Planning: Architecture / Land Planning:**

*Ed Linquist, ASLA, Principal*
EDSA
Century Plaza
135 W. Central Boulevard
Suite 400
Orlando, FL 32801
Phone: (407)387-1451
Email: elinquist@edsaplan.com

*David Odom, Civil Engineer, Principal*
Odom Engineering, PLLC
152 E. Main Street
Forest City, NC 28043
Phone: (828) 247-4495
Email: davidodom@odomengineering.com

*Frank Kelsch, Architect, Principal*
Homesmith Architecture
224 S. Grove Street
Suite D
Hendersonville, NC 28792
Phone: (828) 687-5985
Email: fkelsch.homesmitharch@gmail.com

**EB-5 CONSULTANTS AND ATTORNEYS**

**Immigration Counsel**

Klasko Immigration Law Partners, LLP is nationally renowned for providing creative solutions to many of the most complex issues in immigration law to multinational corporations, small businesses, hospitals, universities, research institutions and individual clients. All four (4) founding partners have been selected by their peers as "Best Lawyers in America." The firm's Chairman, H. Ronald Klasko, was rated by the International Who's Who of Business Lawyers in the 2007 and 2008 editions as the most respected corporate immigration lawyer in the world. This rating was based upon nominations from both clients and other immigration lawyers. The firm's partners include a past and current president of the American Immigration Lawyers Association ("**AILA**"), the former Chairman of the board of trustees of the American Immigration Law Foundation, current members of AILA's Board of Governors, and current chairs of AILA committees. Additional information can be found at www.klaskolaw.com.

**Economic Analysis**

Barnhart Economic Services, LLC (the "**Economist**") prepared an economic impact analysis (the "**Economic Analysis**") of the Offering described in this Memorandum.

Barnhart Economic Services, LLC, founded in 2008, is an economic consulting firm specializing in economic impact analysis, EB-5 job creation analysis, business plan preparation services and EB-5 project consultation. The group has conducted economic studies for a variety of industries, including basic infrastructure development, construction, manufacturing, agriculture, sports stadiums, deep water container ports, chain as well as luxury resort hotels, office buildings, restaurants, health care facilities and hospitals, assisted living facilities, real estate development, education, entertainment, mining, retail stores and shopping malls. In addition, the group provides job creation feasibility studies as well as full economic reports for EB-5 Regional Center projects.

The group has experience with the USCIS EB-5 approval process including new Regional Center establishment, hypothetical, exemplar and actual Regional Center projects, Targeted Employment Area (TEA) determination, and agency Requests for Evidence (RFE).

**Business Plan Writer**

The Business Plan was initially prepared by Mark B. Windfeldt, Chief Financial Officer, Tryon Equestrian Partners and Wellington Equestrian Partners; and Sharon Allred Decker, Chief Operating Officer, Tryon Equestrian Partners, Carolina Operations and was further revised by Baker Tilly Capital.

**Baker Tilly Capital, LLC** ("**Baker Tilly Capital**") has expanded its EB-5 service offering with the strategic combination of Wright Johnson LLC. The addition of Wright Johnson's consulting practice—specializing in economic studies, business plans and regional center operation plans-adds to the depth of the Baker Tilly Capital's EB-5 services. Together, Baker Tilly Capital has successfully prepared hundreds of economic studies to evaluate and summarize the job-creation and economic impact attributed to regional center designation and individual EB-5 projects. Baker Tilly Capital's methodologies and economic research are well-vetted and

113578214.9

21

CJD 61965239v3  77740-0001 7/26/18

Exhibits to Complaint  p.  21

considered to be in accordance with the best practices and standards of professional economists nationwide. The economic study conducted by Baker Tilly Capital is referenced throughout this business plan and will be submitted along with this business plan. Baker Tilly Capital, wholly-owned by Baker Tilly Virchow Krause, LLP, is a broker-dealer member of FINRA and is approved to offer EB-5 investments

# I.  OFFERING SUMMARY

*This Offering Summary should not be considered comprehensive or complete and is qualified by the more detailed information appearing elsewhere in this Offering Memorandum, including the Exhibits hereto. Prospective Investors should carefully read this entire Memorandum, especially the matters discussed under "V. RISK FACTORS".*

| | |
|---|---|
| ***The Company:*** | **ODLUM EQUESTRIAN LENDERS, LLC**, a Delaware limited liability company. |
| ***The Manager:*** | **ODLUM EQUESTRIAN MANAGER, LLC**, a Delaware limited liability company. |
| ***The Borrower/ Developer:*** | **TRYON EQUESTRIAN PARTNERS, LLC**, a North Carolina limited liability company (or its affiliates).  (See background information in **Exhibit E** attached hereto). |
| ***Regional Center:*** | **APPALACHIAN EB-5, LLC**, a North Carolina limited liability company.  (See background information of the Regional Center Principals in **Exhibit E** attached hereto). |
| ***Subscriber Investment Objective:*** | To provide financing for the Project in the form of making a Loan to the Borrower in a form and manner allowing for an investment in the Company to be a "qualifying investment" under the EB-5 Program. |
| ***Maximum Offering Amount:*** | $192,500,000 *or* 385 Units. |
| ***Minimum Subscription:*** | $500,000 *or* 1 Unit, plus up to $50,000 Expense Amount. |
| ***Offering Price:*** | $500,000 per Unit as the Capital Contribution, plus up to $50,000 Expense Amount per Unit, payable by wire transfer upon subscription. |

***Senior Indebtedness and Funding to Date:***

The Developer has commenced construction and, through June 30, 2017, has obtained financing (the "**Senior Indebtedness**") in an amount of approximately $119,689,000 for the Project. To date, the following loans have been funded:

**DEBT AND EQUITY**

| | | | |
|---|---|---|---|
| Member loans (incl accr interest) | 50,975 | 50,975 | - |
| Golden Leaf (interest current) | 9,500 | 9,500 | - |
| Bank of America | 46,363 | 4,000 | 42,363 |
| Purchase money financing (Equipment) | 2,260 | | 2,260 |
| Seller Notes - (Land and buildings) | 2,134 | | 2,134 |
| Vendor Note | 6,750 | 6,750 | - |
| Mortgage | 1,706 | | 1,706 |
| **EB5** | | | 192,500 |
| Total Long Term Debt | 119,689 | 71,225 | 240,964 |
| Net Other Liabilities | 2,169 | | 2,169 |

| (In $k's) | | As of 6/30/2017 | EB-5 | After EB-5 |
|---|---|---|---|---|
| *Capitalized Costs thru 6-30-2017* | | | | |
| TIEC | Main showgrounds, food service, lodging | 144,219 | | 144,219 |
| USPC | Manufacturing homes, building component | 9,664 | | 9,664 |
| Fairways | 18 hole golf and sports club | 4,461 | | 4,461 |
| Lodge on Lake Lure | Historic luxury lodge | 3,691 | | 3,691 |
| Sporting Clays | Sport shooting course | 1,030 | | 1,030 |
| Total Capitalized Assets | | 163,065 | | 163,065 |
| Net Other Assets | | 2,825 | | 2,825 |
| **Total Assets** | | 165,890 | | 165,890 |

\*It is intended that the total senior bridge loans of approximately $71,225,000 (including the Member Funding, the Golden Leaf loan, the Vendor Note and a portion of the Bank of America loan) will be paid down, in part, with the EB-5 Loan proceeds and the equity will remain, such that the total senior bridge loans and amortized loan are estimated to equal approximately $50,633,000. (See "Project Capitalization Summary" below.) Of that pay down amount, it is intended that the Member Funding senior bridge loans will be paid first, since they command a higher interest rate.

***Senior Bridge Loans:***

Bank of America, Roger B. Smith, SCF Tryon LLC, Lisa Lourie, Mark Bellissimo, NRNS, LTD Silver Scout LLC Mitlou LLC, and Golden Leaf a/k/a Arc Impact Fund, LLC have funded senior bridge funding.

The Bank of America interest rate is LIBOR plus 2.25% and the member funding interest rate is 5%. Collectively, these loans are secured by first mortgages on the Project, subject to the provisions of "Bridge Financing" below.

***Bridge Financing:***

To commence predevelopment and construction activities, the Borrower has provided bridge equity financing until the EB-5 funds become available ("**Bridge Financing**"). The EB-5 Loan proceeds may in part be utilized to repay all or a portion of this Bridge Financing. The Borrower may also obtain a line of credit to cover general operating costs in the ordinary course of business.

When the senior Bridge Financing is retired, the Company will hold a first mortgage on the Project, provided that the Maximum Offering Amount is funded. Otherwise, the first mortgage will be secured by only a portion of the Project.

***Phasing of Project:***   The Project is scheduled in three Phases, provided however; Phase 3 will not involve EB-5 funding.  Phase 1- Q1-2015 through Q3-2017 with all EB-5 investors funds scheduled for use in the Project over a two year period, Investments in the form of EB-5 Bridge Financing (defined below) have been made in Phase 1 and will be repaid as part of the EB-5 funding. Phase 2 will be implemented between Q4 2017 thru Q3-2019. The full requisite employment need for EB-5 investors (3,850) jobs will be achieved before I-829 Petitions will be submitted.

The total projected costs of Phases 1 and 2 are approximately $287,164,000.  (See "III. DESCRIPTION OF THE PROJECT" and **Exhibit H** attached hereto.

The allocation of the Phases of the Project are subject to variation, and the components of this Project will be developed in accordance with the Maximum Offering Amount", and if the Maximum Offering Amount is not attained, then the development of only certain of the above components will be undertaken. The Developer reserves the right to vary the scope of each component, although the cost of the maximum development is not expected to materially vary from the above estimate unless it will generate more jobs, and the components of each Phase are intended by the Developer to be developed in a manner to generate sufficient jobs under the EB-5 Program.  In addition, the Developer reserves the right to add additional developments in the general vicinity of the above-referenced Phases, especially if same is necessary to increase the number of direct and indirect jobs created.

Further, the Developer reserves the right to undertake development of Phase 1 and/or Phase 1 and Phase 2 or a portion of Phase 2 provided that all the EB-5 capital is expended and the necessary jobs are created with sufficient job cushion. In the event that Phase 2 is not undertaken and if the Developer is not successful in raising the Maximum Offering Amount, the Developer reserves the right to proportionately reduce its equity contribution.

***Leverage and Loan Terms:***   The Company will be providing financing to the Borrower by making a loan to the Borrower in connection with the construction of the Project.  It is contemplated that the Company will make such Loan in order to fund ongoing construction costs related to the development of the Project and replacing all or a portion of the Bridge Financing:

(1)   Loan Amount: Up to $192,500,000 (i.e., the Maximum Offering Amount).  The Loan proceeds under the Loan shall be released to the Borrower at such times and in such amounts as requested by the Borrower in accordance with the terms as will be set forth in the proposed loan agreement governing the terms and conditions of the Loans (the "**Loan Agreement**").

(2)   Interest Rate: 5.99% of the outstanding Loan amount per annum, of which up to 5.74% interest per annum shall be distributed to the Manager for services rendered (the "**Management Fees**").  The balance of 0.25%

interest per annum shall be retained by the Company and allocable to the Investing Members as distributions after the payment of all operating costs of the Company; provided, however, that costs or expenses in excess of 0.05% will be paid from the 5.74% Management Fees.

(3)   Repayment Terms: Payable from available cash from operations and/or the sale or refinancing of the Project, but not later than five (5) years following the last advance made under the Loan, but no later than six (6) years after the first advance under the Loan, subject to two (2) one (1) year extensions (the "**Maturity Date**").

Notwithstanding the foregoing, the Loan may be prepaid prior to or upon the Maturity Date, subject to all EB-5 Program requirements being satisfied including the creation of adequate jobs to satisfy all investors in the Company, even if all Investing Members have not satisfied the Sustainment Period (i.e., the 2 year period of conditional resident status during which investors must maintain their capital investment); provided, that the Manager shall have the right, on behalf of the Company, to reinvest the remaining Capital Contribution amounts of the Investing Members who have not satisfied the Sustainment Period in alternate investments ("**Alternate Investments**") that qualify under the EB-5 Program for the purpose of preserving the Investing Members' "at risk" investment and eligibility for removal of conditional lawful permanent residents ("**CLPR**") status, subject to the provisions of "IV. O. IMMIGRATION MATTERS - Preservation of Eligibility for Removal of CLPR Status," below.

Alternate Investments may include investments or loans to other real estate projects, which may or may not be affiliated with the Developer, or such other investment opportunities consistent with USCIS guidelines.  If applicable, the Manager shall attempt to redeploy funds in investments that are subject to USCIS guidelines in effect from time to time.  The most current USCIS guidance is summarized in IV. P. IMMIGRATION MATTERS – New USCIS Changes to the Policy Manual," below.  (Also see Redeployment of Funds below).

(4)   Collateral:  The Loan will be secured by a second mortgage on the assets of the Project while bridge loans are in place and a first mortgage after the Senior Indebtedness is satisfied.  In view thereof, the Borrower shall have the right to request advances under the Loan in tranches in order to allocate the appropriate collateral as security for the applicable advance under the Loan.

To the extent that the aggregate amount of the Loan is less than the Maximum Offering Amount, the Borrower reserves the right to obtain further mortgage financing that is senior and superior in status to the Loan to bridge the difference in total funding available.

(5)   Guaranty of Completion:  The Borrower will provide a Completion Guarantee for the Project that would cover any cost overruns or funding shortfalls.

(6)   Early Loan Repayment and Maintenance of Investment At Risk. Based upon the new USCIS policy manual guidelines published on June 14, 2017 (the "**Policy Manual**"), Investors are no longer required to maintain the investment at risk beyond the two years of conditional residence, removing the requirement that the investment be maintained at risk throughout the entire I-829 adjudication period (i.e., the Sustainment Period as hereafter defined).  Until such time as an applicable Investing Member has reached the end of the Sustainment Period, repayment of the Loan attributable to such Investing Member must be maintained "at risk" (See IV. P. IMMIGRATION MATTERS – New USCIS Changes to the Policy Manual," below). The new guidance is subject to change and Manager shall in all cases attempt to redeploy funds required to be maintained at risk based on USCIS policy then in effect.

All allocable interest received from the Loan net of the Management Fees, as well as the principal payment amount, will be distributed by the Company to the Investing Members in proportion to their Capital Contributions to the Company, subject to the payment of all operating costs.  However, principal payments shall not be distributed to an Investing Member prior to the fulfillment by such Investing Member of the Sustainment Period.

| *Management Fee:* | The Manager will use a substantial portion of the Management Fee to pay marketing costs and other brokerage fees of up to approximately 5.74% per annum of the outstanding Loan amount over the Loan term.  The Manager will use substantially all of the Management Fee to pay marketing costs and fees. Any balance remaining after payments of marketing costs and other brokerage fees will be allocated to the Manager and the Regional Center. |
|---|---|

The Management Fee shall not be paid from the Investing Member's $500,000 Capital Contribution.

*Project Capitalization Summary:*

| Sources | Approx. Percent | Approx. Dollar Amount |
|---|---|---|
| Senior Loans* | 18% | $  50,633,000 |
| EB-5 Financing | 67% | $ 192,500,000 |
| Developer Equity Contribution* | 15% | $  44,031,000 |
| **Total Sources** | **100%** | **$ 287,164,000\*\*\*** |

\*      Senior Loan financing is provided in part by Bank of America.

**      Developer equity is reflective of $63,250,000 of contributed equity minus approximately $19,219,000 of non-capitalized startup costs and operating expenses in excess of revenues to date.

***      Total Capitalized Project Costs and Sources of Funding includes $2,825,000 of "Net Other Assets".

**The total development costs as shown below and in the economic analysis are approximately $284,339,000**.

*Maximum Offering Proceeds:*

| | Purchase Price | Expense Amount[1] | Net Proceeds to Company |
|---|---|---|---|
| Per Unit | $500,000[2] | $50,000 | $500,000[2] |
| Maximum Total Offering[3] | $192,500,000 | $19,250,000 | $192,500,000 |

(1)      From the gross proceeds of up to $550,000 per Unit paid by each Subscriber (sometimes hereinafter referred to as the "**Total Subscription Payment**"), the Subscriber will incur an Expense Amount of up to $50,000. Although the Company may pay from the Expense Amount fees to certain licensed securities brokers and/or non-licensed "finders," the Company does not anticipate paying fees on certain subscriptions.

(2)      NO PORTION OF A SUBSCRIBER'S $500,000 PER UNIT CAPITAL CONTRIBUTION SHALL BE APPLIED TO OFFERING COSTS OR SALES COMMISSIONS OR FOR ADMINISTERING THE COMPANY OR FOR OPERATING THE REGIONAL CENTER, INCLUDING THE PAYMENT OF ANY MANAGEMENT FEES AND OTHER ADMINISTRATIVE FEES.

(3)      Assumes all Membership Interests are sold.

*I-526 Petition:*      The Offering has been structured with the goal that a Subscriber will have made an investment that qualifies for an EB-5 Visa entitling such Subscriber, assuming the Subscriber otherwise satisfies the personal criteria for an EB-5 Visa, to conditional permanent U.S. residency and, ultimately, to unconditional U.S. permanent residency, which itself ultimately gives rise to eligibility for U.S. citizenship. The Project is located within a territory of the Regional Center which has obtained USCIS designation as an approved regional center. Accordingly, assuming the Project is approved by USCIS, the factors that will lead to approval or denial of the EB-5 Visa will include personal facts and circumstances of each Subscriber.

The Investing Member, at his or her sole cost and expense, will arrange for an immigration attorney to file his or her I-526 Petition following acceptance of the subscription and admission as a member of the Company; provided that the Company may require that an immigration attorney selected by the Company review the Investing Member's I-526 Petition to ensure consistency with this Offering Memorandum, in which case the Investing Member will be required to pay such immigration attorney's fee for performing such review.

If the I-526 Petition is approved, the Subscriber will remain an Investing Member of the Company. Upon an I-526 Petition Denial, the Subscriber may demand the Company repurchase his or her Membership Interest in the Company and a return of his or her subscription amount, as provided in "VI. 15. SUMMARY OF

OPERATING AGREEMENT – Mandatory Repurchase," below.

In the unlikely event that new EB-5 legislation is enacted on a retroactive basis which would increase the $500,000 minimum investment amount, notwithstanding the fact that a Subscriber may have filed an I-526 Petition and such new EB-5 legislation requires such Subscriber to increase his or her $500,000 minimum investment amount (*i.e.*, the Subscriber is not "grandfathered" under existing USCIS guidelines), the Company will provide such Subscriber with written notice of the following:  Such Subscriber shall have 30 days following the date of such notice (unless a longer period of time is required by applicable law) to notify the Company in writing of the Subscriber's election to either (i) confirm that the Subscriber will contribute and pay to the Company the required additional investment amount within a reasonable time required by the Company; or (ii) revoke his or her subscription in the Company. If the Subscriber fails to properly and timely elect one of the two foregoing options, (A) the Company will be required to notify USCIS that such Subscriber's I-526 Petition (if filed) is no longer approvable by USCIS; and (B) the Subscriber will be deemed to have revoked his or her subscription hereunder. Upon any revocation or deemed revocation of a Subscriber's subscription hereunder, the Company will refund such Subscriber's Capital Contribution subject to the provisions of "I. OFFERING SUMMARY – Escrow Accounts," but in no event later than four months following such revocation.

Regardless of any required increase in such Subscriber's minimum investment amount, if such new EB-5 legislation otherwise causes such Subscriber's I-526 Petition (if or when filed) to no longer be approvable by USCIS, the Company will refund such Subscriber's Capital Contribution subject to the provisions of "I. OFFERING SUMMARY – Escrow Accounts," but in no event later than four months following such revocation.

Additionally, each Subscriber agrees and acknowledges that, as a result of such new EB-5 legislation, even if existing Subscribers are not required to increase their minimum investment amount (*i.e.*, they are "grandfathered" under existing USCIS guidelines), there may be new Subscribers under this Offering who will be required to make a higher minimum investment amount.

***Escrow Agent:*** The Escrow Agent is the Company.  The Escrow Agent will hold and administer the Capital Contributions and Expenses Amounts.  The Manager has the right to substitute the Escrow Agent for a substitute entity that may be a financial institution.

***Escrow Accounts:*** E. Pursuant to the Subscription Agreement executed by a Subscriber, Five Hundred Fifty Thousand Dollars ($550,000) per Unit, subject to a potential increase in the Capital Contribution amount per Unit as described herein, is due to be paid to the Escrow Agent upon subscription and will be held in escrow with the Company in bank accounts with Iberia

Bank pursuant to the Escrow Agreement. Capital Contributions will be released to the Company upon the filing of the applicable Subscriber's I-526 Petition and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber (Form I-797) (the "**Escrow Release Conditions**") and in no event later than following approval of such Investing Member's I-526 Petition.

B.      Subscriber recognizes and agrees that the Company will commence operations and has a need for the Capital Contributions of Investing Members before Investing Members' I-526 Petitions are approved by USCIS. Therefore, all of an Investing Member's Capital Contribution will be released from escrow prior to I-526 Petition approval as follows:

Upon satisfaction of the Escrow Release Conditions, all of the Investing Member's total Capital Contribution shall be funded to the Company's general operating account by the Escrow Agent to fund the Investing Member's Capital Contribution so the Company can commence operations.

C.      If an Investing Member receives an I-526 Petition Denial (without appeal or after denial of any appeal, as provided herein), then the Company shall seek to refund the denied Investing Member's Capital Contribution on a first priority basis and solely to the extent of available cash flow (such that each denied Investing Member shall be refunded his or her Capital Contribution in full in an order of priority based on the timing of when each such Investing Member's I-526 Petition was ultimately denied), as follows:

        (i)      subject to the availability of funds, the Company will (A) refund $500,000 to the denied Investing Member and (2) cancel such Investing Member's subscription; and

        (ii)     if, following the application of clause (i) above, there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members, the Company shall use commercially reasonable efforts to substitute the denied Investing Member with a Substitute Investing Member at which time a refund of the Capital Contribution shall be made to the Investing Member, as long as substitution occurs prior to the completion of the Project and in accordance with USCIS guidelines. If a Substitute Investing Member has not been found, within three (3) months of the Investing Member receiving I-526 Petition denial, the provisions of Section D below shall apply.

D.      If (i) there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members; and (ii) a Substitute Investing Member has not otherwise subscribed for Membership

113578214.9

30

CJD 61965239v3  77740-0001 7/26/18

Interests hereunder (as described above), then such refund will be made to the denied Investing Member as of the date that adequate funds are available for the payment of the refund; provided, however, that the Developer agrees to guaranty the full refund of any Subscriber who receives an I-526 Petition denial and has not received a refund of his or her entire Capital Contribution within six (6) months of the Company receiving notice of such I-526 Petition denial (See Guaranty Acknowledgment attached as Appendix I to the Operating Agreement).

E.      Each Subscriber's Expense Amount shall be paid directly to the Escrow Agent and will be disbursed from escrow to the Manager and used for Offering costs immediately upon the filing of the applicable Subscriber's I-526 Petition; provided, however, that if a Subscriber's I-526 Petition is denied (without appeal or after denial of any appeal, as provided herein), the Company shall attempt to find a Substitute Investing Member as set forth above; provided however, if a Substitute Investing Member has not been found, then the Manager shall refund the Subscriber's Expense Amount, less a Twenty-Five Thousand Dollar ($25,000) charge to cover certain Offering costs (subject to the Company's ability to recoup from its marketing agents and other intermediaries their proportionate share thereof), within 90 days after the time period set forth for the Company to find a Substitute Investing Member; provided further, however, that if the Investing Member is at fault in providing incorrect information related to the I-526 Petition or lies or misrepresents information on his or her I-526 Petition, then the full Fifty Thousand Dollars ($50,000) shall be retained by the Manager for costs incurred on behalf of an individual Subscriber.

If an Investing Member receives an I-526 Petition Denial and elects to appeal that denial to the USCIS Administrative Appeals Office at his or her own expense and the Manager consent to such appeal, the cancellation of such Investing Member's Unit shall be deferred as more fully set forth in Section 12.8 of the Operating Agreement.

**Withdrawal of I-526 Petition:** Except as otherwise provided above, an Investing Member that withdraws his or her I-526 Petition from review by USCIS prior to adjudication by USCIS may request that the Company return such Member's Capital Contribution. In such event, the Company shall submit such request from the Investing Member to the Manager and the Manager may determine, in its sole discretion, whether to cause the Company to return the Capital Contribution prior to the Company's termination. If the Manager elects to return such Capital Contribution, the Capital Contribution will be returned without interest at such time as the Manager deems appropriate (which would include the Company and the Manager causing the Escrow Agent to return any portion of such Capital Contribution still held in escrow), but no portion of the Expense Amount will be returned.

**Transfer Restrictions:** The Units may not be offered or sold unless the Units are registered under the Securities Act or an exemption from the registration requirements of the Securities Act is available. Hedging transactions in the Units may not be conducted except in compliance with the Securities Act. If the Investing Member is (i) a purchaser in a sale that occurs outside the United States within the

113578214.9

31

CJD 61965239v3  77740-0001 7/26/18

meaning of Regulation S or (ii) a "distributor," "dealer" or person "receiving a selling concession, fee or other remuneration" in respect of Units sold, prior to the expiration of the applicable "distribution compliance period" (as defined below), it acknowledges that (A) until the expiration of such "distribution compliance period" any offer or sale of the Units shall not be made by it to a U.S. Person or for the account or benefit of a U.S. Person within the meaning of Rule 902(k) of the Securities Act and (B) until the expiration of the "distribution compliance Period," it may not, directly or indirectly, refer, resell, pledge or otherwise transfer a Unit or any interest therein except to a person who certifies in writing to the Company that such transfer satisfies, as applicable, the requirements of the legends described herein and that the Units will not be accepted for registration of any transfer prior to the end of the applicable "distribution compliance period" unless the transferee has first complied with certification requirements described in this Section.   The "distribution compliance period" means the one-year period following the issue date for the Units.

***Operating Agreement:***   The Operating Agreement will be entered into by and among the Manager and each of the Investing Members whose subscriptions are accepted by the Company pursuant to the Subscription Agreement. Agents of the Manager will administer the operations of the Company, subject to the provisions described below and in the Operating Agreement.

***Exit Strategies:***   The primary exit strategy for the Company would be the repayment of the Loan through operations and/or the refinancing or sale of the Project in whole or in part, with funds disbursed to the Investing Members, as more fully set forth in the Operating Agreement and elsewhere in this Memorandum.

***Side Letters:***   Notwithstanding any provisions of the Operating Agreement or of any Subscription Agreement to the contrary, it is hereby acknowledged and agreed that the Manager on its own behalf may, without the approval of any other Member, enter into a side letter or similar agreement (each, a "**Side Letter**") with an Investing Member pursuant to which the Manager may modify the amount of the Expense Amount to be paid by the Investing Member and/or pay such Investing Member a portion of its management fees; provided, that: (i) such payment does not otherwise adversely affect the rights or benefits of any other Investing Member; and (ii) any such Side Letter shall expressly provide that the Manager's discretionary right to make such payment shall be non-binding, and shall not be made to return any Investing Member Capital Contributions or otherwise be contrary to USCIS guidelines.  The parties hereto agree that any terms contained in a Side Letter shall govern with respect to such Investing Member notwithstanding the provisions of the Operating Agreement or of any Subscription Agreement.  Except as required by law, the Manager and the Company shall not be required to deliver the Side Letter or disclose the existence of any Side Letter or the terms and agreements contained therein to any Member, but, if requested, will provide such side letter to USCIS along with the I-526 Petition of any such Investing Member.

***The Migration Agents:***  Offshore migration agents may be engaged to find and solicit prospective investors and to assist Subscribers and their U.S. immigration counsel in processing exit and entry documentation for the EB-5 immigration process for Subscribers.  In addition to utilizing a portion of the Management Fee to pay marketing costs and fees, a described above, the Manager may pay a portion of the Expense Amount to such offshore agents for completing subscriptions and for documentation services.

THE MANAGER MAY, ON A CASE BY CASE BASIS, USE ALL OR A PORTION OF ANY MANAGEMENT FEES AND OTHER ADMINISTRATIVE FEES AND EXPENSE AMOUNT TO PAY MIGRATION AGENTS FOR SERVICES RENDERED, AND IN NO EVENT FROM ANY INVESTING MEMBER'S $500,000 CAPITAL CONTRIBUTION.

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "**Agreement**") effective as of July 12, 2017, by ODLUM EQUESTRIAN LENDERS, LLC, a Delaware limited liability company (the "**Company**" and "**Escrow Agent**") and acknowledged by each investor subscribed under the Offering (defined below) (the "**Subscribers**" or "**Investing Members**") (collectively, the "**Parties**").

## W I T N E S S E T H:

**WHEREAS**, the Company proposes to offer for sale (the "**Offering**") three hundred eighty-five (385) units (each a "**Unit**") of membership interest in the Company (the "**Membership Interests**"), at a subscription purchase price of Five Hundred Thousand Dollars ($500,000.00) (the "**Capital Contribution**") per Membership Interest, or a total of up to One Hundred Ninety-Two Million Five Hundred Thousand Dollars ($192,500,000) (or such other Maximum Offering Amount as may be necessary to account for changes resulting from new EB-5 legislation that requires an increase in the maximum offering amount to avoid the issuance of a fractional Unit) ("**Maximum Offering Amount**"), payable in cash by each Subscriber, as such term is referred to in the confidential private placement memorandum (the "**Offering Memorandum**"), operating agreement of the Company, including and amendments related thereto ("**Operating Agreement**") and the subscription agreement, including and addendums related thereto ("**Subscription Agreement**");

**WHEREAS**, the Subscriber must also pay Fifty Thousand Dollars ($50,000.00) (the "**Expense Amount**") as described in the Operating Agreement and applicable Subscription Agreements;

**WHEREAS**, pursuant to the Operating Agreement and the Subscription Agreement, the Capital Contribution and Expense Amount (the "**Subscription Proceeds**") are to be held in escrow;

**WHEREAS**, the Subscribers will be executing an acknowledgement confirming their agreement to be bound by this agreement, and such acknowledgement shall be attached hereto as **Exhibit A**; and

**WHEREAS**, Escrow Agent has agreed to act as escrow agent hereunder in accordance with the terms and conditions set forth in this Agreement;

**NOW THEREFORE,** in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      Appointment of Escrow Agent and Depository Bank.

The Company is hereby designated to act as Escrow Agent, and the Escrow Agent accepts such appointment, subject to the terms and conditions contained in this Agreement.

The Company appoints Iberia Bank ("**Depository Bank**") as the depository bank for the Escrow Account(s) (defined below) to be held by the Escrow Agent in accordance with the terms and conditions set forth herein. The Escrow Account is specifically used for the Project. The

113601455.3

Escrow Agent acknowledges and agrees that Depository Bank is not a part to this Agreement and bears no responsibility or liability to Escrow Agent, to any Subscriber for any aspect of the Project or individual Subscriber's I-526 Petition.

      2.     Deposits in Escrow.

      (a)     Five Hundred Fifty Thousand Dollars ($550,000) per Unit, subject to a potential increase in the Capital Contribution amount per Unit as described herein, is due to be paid to the Escrow Agent upon subscription and will be held in escrow with the Company in bank accounts with Iberia Bank pursuant to the Escrow Agreement. Capital Contributions will be released to the Company upon the filing of the applicable Subscriber's I-526 Petition and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber (Form I-797) (the "**Escrow Release Conditions**") and in no event later than following approval of such Investing Member's I-526 Petition.

      (b)     Subscriber recognizes and agrees that the Company will commence operations and has a need for the Capital Contributions of Investing Members before Investing Members' I-526 Petitions are approved by USCIS. Therefore, a portion or all of an Investing Member's Capital Contribution will be released from escrow prior to I-526 Petition approval as follows:

      Upon satisfaction of the Escrow Release Conditions, all of the Investing Member's total Capital Contribution shall be funded to the Company's general operating account by the Escrow Agent to fund the Investing Member's Capital Contribution so the Company can commence operations.

      (c)     If an Investing Member receives an I-526 Petition Denial (without appeal or after denial of any appeal, as provided herein), then the Company shall seek to refund the denied Investing Member's Capital Contribution on a first priority basis and solely to the extent of available cash flow (such that each denied Investing Member shall be refunded his or her Capital Contribution in full in an order of priority based on the timing of when each such Investing Member's I-526 Petition was ultimately denied), as follows:

            (i)     subject to the availability of funds, the Company will refund $500,000 to the denied Investing Member from the Company's Operating Account and (2) cancel such Investing Member's subscription; and

113601455.3

2

(ii)     if, following the application of clause (i) above, there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members, the Company shall use commercially reasonable efforts to substitute the denied Investing Member with a Substitute Investing Member at which time a refund of the Capital Contribution shall be made to the Investing Member, as long as substitution occurs prior to the completion of the Project and in accordance with USCIS guidelines.   If a Substitute Investing Member has not been found, within three (3) months of the Investing Member receiving I-526 Petition denial, the provisions of Section D below shall apply.

(d)     If (i) there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members; and (ii) a Substitute Investing Member has not otherwise subscribed for Membership Interests hereunder (as described above), then such refund will be made to the denied Investing Member as of the date that adequate funds are available for the payment of the refund; provided, however, that the Developer agrees to guaranty the full refund of any Subscriber who receives an I-526 Petition denial and has not received a refund of his or her entire Capital Contribution within six (6) months of the Company receiving notice of such I-526 Petition denial (See Guaranty Acknowledgment attached as Appendix I to the Operating Agreement).

(e)     Each Subscriber's Expense Amount shall be paid directly to the Escrow Agent and will be disbursed from escrow to the Manager and used for Offering costs immediately upon the filing of the applicable Subscriber's I-526 Petition; provided, however, that if a Subscriber's I-526 Petition is denied (without appeal or after denial of any appeal, as provided herein), the Company shall attempt to find a Substitute Investing Member as set forth above; provided however, if a Substitute Investing Member has not been found, then the Manager shall refund the Subscriber's Expense Amount, less a Twenty-Five Thousand Dollar ($25,000) charge to cover certain Offering costs (subject to the Company's ability to recoup from its marketing agents and other intermediaries their proportionate share thereof), within 90 days after the time period set forth for the Company to find a Substitute Investing Member; provided further, however, that if the Investing Member is at fault in providing incorrect information related to the I-526 Petition or lies or misrepresents information on his or her I-526 Petition, then the full Fifty Thousand Dollars ($50,000) shall be retained by the Manager for costs incurred on behalf of an individual Subscriber.

If an Investing Member receives an I-526 Petition Denial and elects to appeal that denial to the USCIS Administrative Appeals Office at his or her own expense and the Manager consent to such appeal, the cancellation of such Investing Member's Unit shall be deferred as more fully set forth in Section 12.8 of the Operating Agreement.

(e)     The Company shall provide a copy of this Agreement to each Investing Member.

3.     Regulatory Compliance.

113601455.3                                   3

The Company agrees to observe and comply with all anti-money laundering laws, rules and regulations including, without limitation, regulations issued by the Office of Foreign Assets Control ("**OFAC**") of the United States Department of Treasury. The Company represents and warrants to Escrow Agent that (i) no Subscriber or any person transferring funds on behalf of Subscriber shall be located in an OFAC sanctioned country; (ii) no Subscriber or any person transferring funds on behalf of Subscriber shall be a person listed on OFAC's list of Specially Designated Nationals and Blocked Persons, and (iii) except as otherwise specifically provided in this Section 5, none of the Escrow Funds shall originate from an OFAC sanctioned country. The Company acknowledges and agrees that if Escrow Agent receives a "hit" or alert" in connection with a Subscriber, or any person transferring funds on behalf of LLC, shall provide Escrow Agent with the name, address and date of birth of such Subscriber or person within a timely manner. In the event that the Escrow Agent is unable to clear the "hit" or "alert" using such information, LLC agrees to reasonably cooperate with Escrow Agent and provide such additional information as Escrow Agent may reasonably request in order to evaluate the subject transfer. Additionally, if Escrow Agent receives a funds transfer that originated from an OFAC sanctioned country, LLC shall provide Escrow Agent with evidence of OFAC approval, reasonably satisfactory to Escrow Agent, appropriate for the specific sanctions program that permits the subject funds transfer ("**OFAC Approval**"). The Company further acknowledges and agrees that Escrow Agent shall "block" any monies or funds without liability hereunder, unless and until the "hit" or "alert" is cleared,  such Subscriber's or person transferring funds on behalf of Subscriber identity has been verified to Escrow Agent's reasonable satisfaction, or the OFAC Approval has been provided to and verified by Escrow Agent.

4.      Escrow Administration.

All taxes in respect of any earnings on the Escrow Funds shall be the obligation of the Subscriber to the extent of its pro rata share thereof, which pro rata shares will be in the same proportion of the amounts deposited by each into the Escrow Account.  The Company, as agent for the Subscribers and tax owner of record of the Escrow Funds, shall furnish the Escrow Agent with a completed Form W-9.  Escrow Agent shall not credit any amount of interest earned on the Escrow Funds, or make any payment of all or a portion of the Escrow Funds, to any person unless and until such person has provided to Escrow Agent such documents as Escrow Agent may require to enable Escrow Agent to comply with its obligations under such USA Freedom Act (the "**Act**").

5.      Duties of Escrow Agent; Indemnification.

(a)      The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no additional duties or obligations shall be implied hereunder. In performing its duties under this Agreement, or upon the claimed failure to perform any of its duties hereunder, the Escrow Agent shall not be liable to anyone for any damages, losses or expenses which may be incurred as a result of the Escrow Agent's so acting or failing to so act; provided, however, that the Escrow Agent shall not be relieved from liability for damages arising from the Escrow Agent's proven gross negligence or willful misconduct. The Escrow Agent shall in no event incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of legal counsel, which may be counsel to any party hereto including, without limitation Escrow Agent's counsel, given with respect to any question relating to the duties and responsibilities of the Escrow Agent hereunder, or (ii) any action taken or omitted to be taken in reliance upon any instrument delivered to the Escrow Agent and believed by it to be genuine and to have been signed or presented by the proper party or parties. In no event shall the Escrow Agent be liable for lost profits or any consequential, special, indirect or punitive damages even if

113601455.3                                                4

the Escrow Agent has been advised of the possibility of the foregoing.

(b)     The Company warrants to and agrees with the Escrow Agent that there is no security interest in the Escrow Funds or any part of the Escrow Funds; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Escrow Funds or any part of the Escrow Funds; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Escrow Funds or any part of the Escrow Funds or to file any financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Escrow Funds or any part thereof.

(c)     As an additional consideration for and as an inducement for the Escrow Agent to serve as escrow agent hereunder, it is understood and agreed that, in the event of any disagreement resulting in adverse claims and demands being made in connection with or for any money or other property involved in or affected by this Agreement, the Escrow Agent shall be entitled, at the option of the Escrow Agent, to refuse to comply with the demands of any parties so long as such disagreement shall continue. In such event, the Escrow Agent may elect not to make any delivery or other disposition of the Escrow Funds or any part of such Escrow Funds. Anything herein to the contrary notwithstanding, the Escrow Agent shall not be or become liable to such parties or any of them for the failure of the Escrow Agent to comply with the conflicting or adverse demands of such parties. The Escrow Agent shall be entitled to continue to refrain and refuse to deliver or otherwise dispose of the Escrow Funds or any part thereof or to otherwise act hereunder, as stated above, unless and until:

(i)     the Escrow Agent shall have received a final binding nonappealable order of a court with jurisdiction over the matter directing the Escrow Agent to make a disbursement of the Escrow Funds, together with an opinion of counsel of LLC in form and substance reasonably acceptable to the Escrow Agent and its counsel, stating that the court order is a final determination of the rights of the parties hereto with respect to the Escrow Funds, that the time to appeal from said court order has expired, and that said court order is binding upon the applicable parties; or

(ii)     The parties have reached an agreement resolving their differences and have notified the Escrow Agent in writing of such agreement and have provided the Escrow Agent with indemnity satisfactory to the Escrow Agent against any liability, claims or damages resulting from compliance by the Escrow Agent with such agreement.

In the event of a disagreement as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the option of Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all money and property comprising the Escrow Funds and may take such other legal action as may be appropriate or necessary, in the opinion of Escrow Agent or its legal counsel. Upon such tender, the Escrow Agent shall be discharged from all further duties under this Agreement; provided, however, that the filing of any such legal proceedings shall not deprive the Escrow Agent of its compensation hereunder earned prior to such filing and discharge of the Escrow Agent of its duties hereunder.

(d)     The Company agrees that in the event any controversy arises under or in connection with this Agreement or the Escrow Funds or the Escrow Agent is made a party to or intervenes in any litigation pertaining to this Agreement or the Escrow Funds, to pay to the Escrow Agent reasonable compensation for its extraordinary services and to reimburse the Escrow Agent

113601455.3                                         5

for all costs and expenses, including legal fees and expenses, associated with such controversy or litigation. As security for all fees and expenses of Escrow Agent hereunder and any and all losses, claims, damages, liabilities and expenses incurred by the Escrow Agent in connection with its acceptance of appointment hereunder or with the performance of its obligations under this Agreement and to secure the obligation of the Company to indemnify the Escrow Agent as set forth herein, the Escrow Agent is hereby granted a security interest in and a lien upon the Processing Fees, which security interest and lien shall be prior to all other security interests, liens or claims against the Escrow Funds or any part thereof.

(e)     The Escrow Agent may resign at any time from its obligations under this Agreement by providing written notice to the Company. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been given. On or prior to the date such resignation is to become effective, the Escrow Agent may deliver the Escrow Funds to any successor escrow agent appointed by the other parties hereto. In the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction the Escrow Funds then held by it hereunder and shall thereupon be relieved of all further duties and obligations under this Agreement; provided however, the Escrow Agent shall be entitled to its compensation earned prior thereto. The Escrow Agent shall have the right to withhold from the Processing Fee an amount equal to the amount due and owing to the Escrow Agent plus any costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with its resignation. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

(f)     The Escrow Agent shall have no obligation to take any legal action in connection with this Agreement or its enforcement, or to appear in, prosecute or defend any action or legal proceeding which would or might involve the Escrow Agent in any cost, expense, loss or liability unless security and indemnity satisfactory to the Escrow Agent, shall be furnished.

(g)     The Company jointly and severally, agrees to indemnify the Escrow Agent and each of its officers, directors, employees, parent, subsidiaries, affiliates and agents and each of their respective successors and assigns (collectively, the "**Indemnified Parties**") and to save the Indemnified Parties harmless from and against any and all Claims (as hereunder defined) and Losses (as hereinafter defined) which may be incurred by the Indemnified Parties as a result of Claims asserted against the Indemnified Parties either directly or indirectly as a result of or in connection with Escrow Agent's serving in the capacity of escrow agent under this Agreement. For the purposes hereof, the term "**Claims**" shall mean all claims, lawsuits, causes of action or other legal actions and proceedings of whatever nature brought against (whether by way of direct action, counterclaim, cross action, cross-claim, affirmative defense, interpleader or otherwise) the Indemnified Parties, even if groundless, meritless, false or fraudulent, so long as the claim, lawsuit, cause of action or other legal action or proceeding is alleged or determined, directly or indirectly, to arise out of, result from, relate to or be based upon, in whole or in part: (a) the acts or omissions of the Company or (b) the appointment of the Escrow Agent as escrow agent under this Agreement, or (c) the performance by the Escrow Agent of its powers and duties under this Agreement. The term "**Losses**" shall mean all losses, costs, damages, expenses, judgments, settlements and liabilities of whatever nature (including but not limited to attorneys', accountants' and other professionals' fees, litigation and court costs and expenses and amounts paid in settlement), directly or indirectly resulting from, arising out of or relating to one or more Claims. Upon the written request of an Indemnified Party, the Company agrees to assume the investigation and defense of any Claim, including the employment of counsel acceptable to the applicable

113601455.3                                                          6

Indemnified Party and the payment of all expenses related thereto and, notwithstanding any such assumption, the Indemnified Party shall have the right, and the Company agrees to pay the costs and expense thereof, to employ separate counsel with respect to any such Claim and to participate in the investigation and defense thereof in the event that such Indemnified Party shall have been advised by legal counsel that there may be one or more legal defenses available to such Indemnified Party which are different from or additional to those available to the Company. The Company hereby agrees that the indemnifications and protections afforded the Indemnified Parties in this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

(h)     The Company acknowledges that the Escrow Agent is serving as escrow agent for the limited purposes set forth herein and represent, covenant and warrant to the Escrow Agent that no statement or representation, whether oral or in writing, has been or will be made to any Subscriber to the effect that the Escrow Agent has investigated the desirability or advisability of investment in the Interests or approved, endorsed or passed upon the merits of such investment or is otherwise involved in any manner with the transactions contemplated hereby, other than as Escrow Agent under this Agreement. It is further agreed that the Company shall not use or permit the use of the name "Arnstein & Lehr LLP" or any variation thereof in any sales presentation, placement or offering memorandum or literature pertaining directly or indirectly to the offering except strictly in the context of the duties of the Escrow Agent as escrow agent under this Agreement. Any breach or violation of the paragraph shall be grounds for immediate termination of this Agreement by the Escrow Agent.

(i)     The Escrow Agent shall have no duty or responsibility for determining whether the Interests or the offer and sale thereof conform to the requirements of applicable Federal or state securities laws, including but not limited to the Securities Act of 1933 or the Securities Exchange Act of 1934. The Company represents and warrants to the Escrow Agent that the Interests and the Offering will comply in all respects with applicable Federal and state securities laws and further represents and warrants that the Company has obtained and acted upon the advice of legal counsel with respect to such compliance with applicable Federal and state securities laws.  The Company acknowledges that the Escrow Agent has not participated in the preparation or review of any sales or offering material relating to the Offering or the Interests. In addition to any other indemnities provided for in this Agreement, the Company agrees to indemnify and hold harmless the Escrow Agent and each of its officers, directors, agents, employees, parent, subsidiaries and affiliates from and against all claims, liabilities, losses and damages (including, without limitation, attorneys' fees and litigation costs and expenses) incurred by the Escrow Agent or such persons and which directly or indirectly result from any violation or alleged violation of any
Federal or state securities laws.

6.     Notices.

Any notices, elections, demands, requests and responses thereto permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the party giving the same, and addressed to the other party at the address of such other party set forth below or at such other address as such other party may designate in writing in accordance herewith.  Any such notice, election, demand, request or response shall be addressed as follows and shall be deemed to have been delivered upon receipt by the addressee thereof:

113601455.3                                      7

If to the Company:

Odlum Equestrian Lenders, LLC
c/o Appalachian EB5 Regional Center, LLC
Attention: Andrew Dover - Odlum Capital (Managing Partner)
Biltmore Park Town Square
One Town Square Boulevard, Suite 315
Asheville, NC 28803
Phone: (740) 704-3256
Fax: (305) 400-0679
Email: abdover@odlumcapital.com

If to the Investing Member:

At the address designated on the signature page of the Investing Member's
Subscription Agreement

7.    Successors and Assigns; Amendment.

The rights created by this Agreement shall inure to the benefit of and the obligations created hereby shall be binding upon the successors and assigns of the Parties; provided, however, that neither this Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of the other party hereto. Notwithstanding the foregoing, this Agreement may be assigned by Escrow Agent without the prior written consent of the other parties hereto in connection with any merger, acquisition or other consolidation of Escrow Agent. This Agreement may not be amended without the written consent of all parties in writing.

8.    Force Majeure.

A party to this Agreement shall be released from liability hereunder for failure to perform any of the obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, hurricane, communications failure, sabotage, war, military operation, national emergency, mechanical or electrical breakdown, civil commotion, strikes, or the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or either party's compliance therewith or government pro-ration, regulation, or priority, or any other cause beyond either party's reasonable control whether similar or dissimilar to such causes.

9.    No Waiver.

No failure on the party of any party to exercise, and no delay in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No waiver of any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

113601455.3                                              8

10.    Governing Law; Venue.

This Agreement shall be construed and enforced according to the laws of the State of Delaware without regard to its conflict of laws principles. Any action arising out of or concerning this Agreement shall be heard by a judge sitting without a jury and shall be heard exclusively in the state court of North Carolina, Polk, County. The Parties hereby submit to the exclusive jurisdiction of the state court of the State of North Carolina, Polk County for purposes of all legal proceedings arising out of or relating to this Agreement.

11.    Severability.

If any term or provision set forth in this Agreement shall be invalid or unenforceable, the remainder of this Agreement, other than those provisions held invalid or unenforceable shall remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party.

12.    Captions.

The headings contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

13.    Counterparts.

This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of executed signature pages by facsimile or electronic transmission will constitute effective and binding execution and delivery of this Agreement and have the same effect as the delivery of an original executed counterpart. This Agreement shall become effective when each party to this Agreement shall have received a counterpart of this Agreement signed by each other party hereto.

14.    Term.

This Agreement shall terminate and the Escrow Agent shall be discharged of all responsibilities hereunder at such time as the Escrow Agent shall have disbursed all Escrow Funds in accordance with the provisions of this Agreement; provided, however, that the provisions of Sections 6(g) and 6(i) hereof shall survive any termination of this Agreement and any resignation or removal of the Escrow Agent.

15.    Conflicting Direction.

In the event that the Escrow Agent receives conflicting written instructions, then the Escrow Agent shall maintain the Deposit in escrow until consistent direction is provided to the Escrow Agent or there is a non-appealable court order provided to the Escrow Agent related to the disposition of the Deposit.

16.    Provisions Relating to Escrow Agent.

The Escrow Agent shall hold the Deposit under the terms and conditions of this Agreement and shall perform the acts and duties imposed upon it. If at any time in the performance of its

113601455.3                                      9

duties hereunder, it is necessary for the Escrow Agent to receive, accept or act upon any notice or writing purported to have been executed or issued by or on behalf of any Party, it shall not be necessary for the Escrow Agent to ascertain whether or not the person or persons who are represented as having executed, signed or otherwise issued or authenticate the said writing or any of them did in fact, execute, sign or otherwise issue or authenticate the said writings or any of them, or that they are the same persons named therein or otherwise to pass upon any requirements of such instruments that may be essential for their validity. The Escrow Agent may act in reliance upon the advice of counsel in reference to any matter relating hereto and shall not be liable for any acts or omissions of any kind unless occasioned by its own gross negligence or willful misconduct. LLC shall indemnify, defend and hold Escrow Agent harmless from and against any and all loss, liability and expense of every kind, including reasonable attorneys' fees, incurred without gross negligence or willful misconduct on the part of Escrow Agent, arising out of or in connection with Escrow Agent's performance or non-performance of its duties hereunder. In the event of any dispute as to the disposition of the Deposit, Escrow Agent shall have the right to deliver same into the registry of the Circuit Court in and for Polk County, North Carolina, and upon said delivery, Escrow Agent shall be discharged from any and all further obligations and liabilities hereunder.

17.     Resignation of Escrow Agent.

The Escrow Agent may resign at any time upon giving thirty (30) days' prior written notice to all Parties. If a successor escrow agent is not appointed within thirty (30) days after delivery of such written notice, the Escrow Agent may petition any court of competent jurisdiction to name a successor escrow agent, and the Escrow Agent herein shall be fully relieved of any and all liability under this Agreement to any and all parties upon the transfer of the Deposit to the successor escrow agent as designated or appointed by the court, as applicable.

18.     Appointment of Successor.

Upon the delivery of ten (10) days written notice appointing a successor escrow agent to the Escrow Agent, the services of the Escrow Agent hereunder will terminate. In the event of such termination, the Escrow Agent shall immediately deliver the Deposit to the successor escrow agent, less any fees and expenses due to the Escrow Agent, if any, or required to be paid by the Escrow Agent to a third party pursuant to this Agreement. Upon such delivery, Escrow Agent shall be fully relieved of any and all further liabilities under this Agreement.

19.     Limited Responsibility.

This Agreement expressly sets forth all the duties of Escrow Agent with respect to any and all matters pertinent hereto. No implied duties or obligations shall be read into this Agreement against Escrow Agent. Escrow Agent shall not be bound by the provisions of any other agreement.

20.     Jurisdiction/Service of Process.

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the Parties in the courts of the State of North Carolina, County of Polk, and each of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

113601455.3                              10

[*Signature page follows.*]

113601455.3

11

**IN WITNESS WHEREOF,** the Company has executed this Escrow Agreement on the day and year first above written.

**COMPANY:**

ODLUM EQUESTRIAN LENDERS, LLC

By:     Odlum Equestrian Manager, LLC,
       Its Manager

By:_Andrew B. Dover_
Name:_Andrew B. Dover_
Title:_Managing Member_
Dated:_7.12.18_

113601455.3             12

<u>**EXHIBIT A**</u>

**ACKNOWLEDGMENT OF RECEIPT OF**
**ESCROW AGREEMENT**

The undersigned, intending to be legally bound hereby, has executed and delivered this Acknowledgement of Receipt of Escrow Agreement on this 12ᵗʰ day of ___JULY___ 2̶0̶1̶7̶. 2018

**ACKNOWLEDGED AND AGREED TO BY:**

INVESTOR:

_____
Signature

SIDDHARTHA RANGINENI
Print or Type Name

113601455 3

# OPERATING AGREEMENT

# OF

# ODLUM EQUESTRIAN LENDERS, LLC

**EXHIBIT C**

113600759.4

## TABLE OF CONTENTS

1.    DEFINITIONS...........................................................................................................2

2.    FORMATION.............................................................................................................7

3.    NAME AND PLACE OF BUSINESS. .....................................................................7

4.    PURPOSE AND SCOPE OF COMPANY................................................................7

5.    TITLE. ......................................................................................................................8

6.    COMMENCEMENT, TERM....................................................................................8

7.    CAPITAL CONTRIBUTIONS. ................................................................................8

8.    RIGHTS AND DUTIES OF THE MANAGER ......................................................10

9.    FEES, SALARIES AND EXPENSES......................................................................13

10.   PROFITS, LOSSES, DISTRIBUTIONS AND JOB CREATION ALLOCATION. 14

11.   SALE, DISSOLUTION AND LIQUIDATION. ......................................................18

12.   INVESTING MEMBERS.........................................................................................19

13.   RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS...................20

14.   MISCELLANEOUS FINANCIAL AND ACCOUNTING MATTERS...................21

15.   AMENDMENTS. .....................................................................................................23

16.   POWER OF ATTORNEY.........................................................................................24

17.   MEETINGS; MEANS OF VOTING........................................................................24

18.   WITHDRAWALS. ....................................................................................................26

20.   STATUTORY WAIVER OF FIDUCIARY DUTIES...............................................31

21.   MISCELLANEOUS. ................................................................................................31

113600759.4

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, THESE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS AGREEMENT. HEDGING UNITS MAY NOT BE CONDUCTED EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND THIS AGREEMENT.

**NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THE OFFERING MEMORANDUM (DEFINED BELOW), AND NO OTHER PARTY EXCEPT SALES AGENTS AUTHORIZED BY THE COMPANY WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THE MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM INVESTING MEMBERS.**

## OPERATING AGREEMENT
## OF
## ODLUM EQUESTRIAN LENDERS, LLC

THIS OPERATING AGREEMENT (this "**Agreement**") of **ODLUM EQUESTRIAN LENDERS, LLC**, a Delaware limited liability company (the "**Company**"), effective as of July 12, 2017, is by and among **ODLUM EQUESTRIAN MANAGER, LLC**, a Delaware limited liability company   (the "**Manager**"), and such persons as hereafter become members (the "**Investing Members**") in accordance with the provisions of this Agreement and the Delaware Limited Liability Company Act, as amended, by executing or causing to be executed a signature page in the form attached hereto.

## BACKGROUND INFORMATION

The Investing Members desire to form a limited liability company pursuant to the laws of the State of Delaware for the purpose described below.  To that end, the Manager has caused to be prepared, executed and filed with the Delaware Secretary of State, a Certificate of Formation, and has agreed to issue to the Investing Members units of Membership Interest described herein. Accordingly, in consideration of the mutual promises contained herein, the Manager and the Investing Members agree as follows:

113600759.4

**OPERATIVE PROVISIONS**

### 1. DEFINITIONS.

Except as otherwise defined herein, the following terms shall have the following meanings ascribed to such terms:

1.1 "**Accountants**" means such firm of independent certified public accountants as may be engaged from time to time by the Manager to provide professional services to the Company.

1.2 "**Adjusted Capital Account Balance**" means, with respect to any Investing Member, the balance, if any, in such Investing Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments.

(1) Increase such balance by any amounts which such Investing Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate (second to last) sentence of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(1)(5); and

(2) Decrease such balance by such Investing Members share of the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith. The calculation of the Adjusted Capital Account Balance of an Investing Member shall exclude any Section 754 election.

1.3 "**Adjusted Capital Contribution**" means, with respect to any Investing Member, the aggregate amount of such Investing Member's Capital Contributions, as at any given point in time, reduced by the amount of cash (if any) distributed to such Investing Member pursuant to Section 10.6 and Section 10.7. In the event that any Investing Member transfers all or any portion of his or her Membership Interest in accordance with the terms of this Agreement, his or her transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

1.4 "**Adjustment of Status**" shall have the meaning set forth in paragraph 5 of the EB-5 Job Allocation Addendum, attached hereto as Schedule 2.

1.5 "**Affiliate**" shall have the meaning set forth in Rule 405 promulgated under the Securities Act, except as otherwise provided herein.

1.6 "**Bankruptcy**" means with respect to a specified Person: (i) the appointment of a receiver, conservator, rehabilitator or similar officer for the specified Person, unless the appointment of such officer shall be challenged in an application filed within thirty (30) days after the appointment and the appointment is vacated and such officer discharged within one hundred twenty (120) days of the appointment; (ii) the taking of possession of, or the assumption of control over, all or any substantial part of the property of the specified Person by any receiver, conservator, rehabilitator or similar officer or by the United States government or any agency thereof, unless

113600759.4                                         2

such possession or control is challenged in an application filed within thirty (30) days after such possession or control is taken and property is relinquished within one hundred twenty (120) days of the taking; (iii) the filing of a petition in bankruptcy or the commencement of any proceeding under any present or future federal or state law relating to bankruptcy, insolvency, debt relief or reorganization of debtors by or against the specified Person, provided, if filed against (and not by) the specified Person, such petition or proceeding is not challenged within thirty (30) days after it is filed and if so challenged is not dismissed within one hundred twenty (120) days of the filing of the petition or the commencement of the proceeding; or (iv) the making of an assignment for the benefit of creditors or a private composition, arrangement or adjustment with the creditors of the specified Person.

1.7     "**Borrower**" or "**Developer**" means **TRYON EQUESTRIAN PARTNERS, LLC**, a Delaware limited liability company.

1.8     "**BSA**" shall have the meaning set forth in Section 19(o) hereof.

1.9     "**Business**" means the business of the Company of making the Loan pursuant to USCIS guidelines.

1.10    "**Capital Account**" means, with respect to any Investing Member, the sum of his or her paid-in Capital Contribution (a) increased by all profits allocated to such Investing Member; and (b) decreased by (i) the amount of all cash distributions to such Investing Member, and (ii) all losses allocated to such Investing Member.  Otherwise, each Investing Member's Capital Account shall be maintained and adjusted in accordance with the Code and the Treasury Regulations thereunder, including expressly, but not by way of limitation, the adjustments to Capital Accounts permitted by Section 704(b) of the Code and the Treasury Regulations thereunder in the case of an Investing Member who receives the benefit or detriment of any special basis adjustment under Sections 734, 743 and 754 of the Code.

1.11    "**Capital Contributions**" means the total cash contributed to the Company by the Investing Members pursuant to the terms of this Agreement, excluding the Expense Amount.  Any reference to the Capital Contribution of an Investing Member shall include the Capital Contribution made by a predecessor holder of the interest of such Investing Member.

1.12    "**Cash Distributions**" means the Cash Flow distributions a set forth in Section 10.6 hereof.

1.13    "**Cash Flow**" means the total cash receipts of the Company, plus any other funds (including amounts designated as reserves by the Manager, where and to the extent it no longer regards such reserves as reasonably necessary to the efficient conduct of the Company's business) deemed available for distribution and designated as Cash Flow (excluding Capital Contributions) by the Manager less (a) any operating expenses of the Company excluding any expense not involving a cash expenditure, such as amounts charged for depreciation; (b) all payments of principal and interest on account of any loans secured by Company property or any other Company obligations or loans; and (c) reserves for working capital and anticipated expenditures in such amounts as may be determined from time to time by the Manager. Cash Flow shall be determined separately for each fiscal year of the Company.

113600759.4                                                3

1.14    "**Certificate of Formation**" means the valid Certificate of Formation, duly filed in its original or any amended form in accordance with (and in all respects sufficient in form and substance under) the laws of the State of Delaware.

1.15    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent laws.

1.16    "**Company**" shall have the meaning set forth in the introductory paragraph hereof.

1.17    "**Developer**" or "**Borrower**" means **TRYON EQUESTRIAN PARTNERS, LLC**, a North Carolina limited liability company.

1.18    "**EB-5 Program**" shall have the meaning set forth in Section 8.4 hereof.

1.19    "**EB-5 Visa**" shall have the meaning set forth in paragraph 4 of the EB-5 Job Allocation Addendum, attached hereto as Schedule 2.

1.20    "**Escrow Agent**" means the Company, or its successor, appointed as such under the Escrow Agreement.

1.21    "**Escrow Agreement**" means that certain Escrow Agreement executed by the Escrow Agent and acknowledged by each Investing Member.

1.22    "**Escrow Release Conditions**" shall have the meaning set forth in Section 7.5(a) hereof.

1.23    "**Expense Amount**" means the Fifty Thousand Dollar ($50,000) amount funded by each Investing Member upon subscription for a Unit that will be paid directly to the Escrow Agent upon subscription to cover certain Offering costs and administrative expenses.

1.24    "**Gross Asset Value**" means with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes.

1.25    "**I-526 Petition**" means a Form I-526 Immigrant Petition for Entrepreneur filed with USCIS on behalf of an Investing Member.

1.26    "**I-829 Petition**" means a Form I-829 Immigrant Petition for Entrepreneur filed with USCIS on behalf of an Investing Member.

1.27    "**Investing Member**" shall have the meaning set forth in the introductory paragraph hereof.

1.28    "**Limited Liability Company Act**" means the Delaware Limited Liability Company Act, as amended.

1.29    "**Loan**" shall have the meaning set forth in Section 4.1(a) hereof.

1.30    "**Loan Agreement**" shall have the meaning set forth in Section 4.1(a) hereof.

113600759.4                                              4

1.31    "**Majority in Interest**" means Investing Members owning in the aggregate more than fifty percent (50%) of the Units then outstanding.

1.32    "**Manager**" shall have the meaning set forth in the introductory paragraph hereof.

1.33    "**Manager Parties**" shall have the meaning set forth in Section 8.5 hereof.

1.34    "**Membership Interest**" means the membership interest of each Investing Member in the Company.

1.35    "**OFAC**" shall have the meaning set forth in Section 8.4(8) hereof.

1.36    "**Offering Memorandum**" means the Confidential Private Placement Memorandum of the Company dated July of 2017, relating to the offering of the Units through a private placement.

1.37    "**Permanent Disability**" or "**Permanently Disabled**," when used with reference to a specified Person, shall mean (i) any mental or physical illness, condition or incapacity which prevents the specified Person from performing his or her duties on behalf of the Company or any of its Affiliates for a period of 180 days during any 365 day period, (ii) a determination by an insurer that has issued a disability insurance policy to the Company or one or more Investing Members or the Manager with respect to a Person that such Person is permanently disabled as defined in such policy, or (iii) the determination by a court of competent jurisdiction that the specified Person is legally incompetent.

1.38    "**Person**" means an individual, a partnership (general, limited or limited liability), a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental, quasi-governmental, judicial or regulatory entity or any department, agency or political subdivision thereof.

1.39    "**Profits**" and "**Losses**" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, respectively, including gain or loss from capital transactions, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the

113600759.4                                  5

Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(iv)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation Section 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in complete liquidation of an Investing Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(v)     Notwithstanding any other provision of this Section, any items which are specially allocated pursuant to Section 10.11 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 10.11 shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (v) above.

1.40     "**Project**" means the development of a new economic cluster centered around the development of a world class equestrian destination in Tryon, North Carolina.  The 1,600 acre development site is designed to become the premiere Equestrian Lifestyle Destination in the world as evidenced by being one of two finalist for the world equestrian games.  The new economic cluster is centered around a World Class Equestrian Competition Venue and the United States Equestrian Training Center and will include a wide array of lodging options (i.e. hotels, rental cabins, inns, and recreational vehicles), restaurants, retail centers, golf courses, spa, sporting clay complex, assisted living, and a sports complex that will include a tennis complex, fitness center, and wide array of pool and water features.  The project includes an inventory of over 800 building lots and will also include hundreds of condominium and custom homes for sale, as more fully described in the Offering Memorandum.

1.41     "**Regional Center**" means **APPALACHIAN EB-5, LLC**, a North Carolina limited liability company.

1.42     "**Securities Act**" means the Securities Act of 1933, as amended.

1.43     "**Securities Laws**" shall have the meaning set forth in Section 19(a) hereof.

1.44     "**Subscription Agreement**" means the Subscription Agreement utilized by the Company to sell Units to Investing Members, including all attachments thereto.

1.45     "**Substitute Investing Member**" means an Investing Member who subscribes to the Offering, replaces a denied Investing Member and wires his or her Capital Contribution and Expense Amount to the Escrow Agent pursuant to the Subscription Agreement.

1.46     "**Sustainment Period**" means the period of two (2) years of conditional resident status during which Investing Members must maintain their capital investment.

113600759.4                                        6

1.47    **"Unit"** means a single unit of an Investing Member's Membership Interest.

1.48    **"USA Freedom Act"** shall have the meaning set forth in Section 19(o) hereof.

1.49    **"USCIS"** means United States Citizenship and Immigration Services.

## 2.    FORMATION.

The Manager has formed a limited liability company pursuant to the Limited Liability Company Act and other applicable laws of the State of Delaware.

## 3.    NAME AND PLACE OF BUSINESS.

3.1    The name of the Company is "Odlum Equestrian Lenders, LLC" or such other name as the Manager shall hereafter designate by written notice to the Investing Members. Its principal mailing address shall be c/o Appalachian EB-5, LLC, Attention: Andrew Dover and Dale Carroll, Biltmore Park Town Square, One Town Square Boulevard, Suite 315, Asheville, NC 28803, or such other location as the Manager may from time to time designate by notice to the Investing Members.

## 4.    PURPOSE AND SCOPE OF COMPANY.

4.1    (a)    The Company has been formed for the purpose of making a loan to the Developer (the "**Loan**") in connection with the development of the Project pursuant to the terms of a loan agreement to be entered into between the Company and the Developer (the "**Loan Agreement**"), and to assist the Investing Members in obtaining I-829 Petition approvals in connection with their investment in the Company.

(b)    In furtherance of the foregoing, but in no way limiting the generality of the foregoing, the Company may: (i) enter into, perform and carry out contracts and agreements as may be necessary, appropriate or incidental to the accomplishment of the purposes of the Company; and (ii) do all other acts and things which may be necessary, appropriate or incidental to the carrying out of the business and purposes of the Company.

(c)    The Company is specifically prohibited from engaging in the business of investing, reinvesting or trading in securities or in the business of issuing face-amount certificates of the installment type or having any such certificate outstanding.

4.2    Other Business Ventures: The Manager, affiliates of the Manager and any officers, directors, employees, stockholders or other persons holding a legal or beneficial interest in any of the foregoing, may engage or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company nor any Investing Member shall have any right by virtue of this Agreement in or to such independent ventures or the income or profits derived therefrom.

113600759.4                                    7

5.     **TITLE.**

Title to any property and to any other assets acquired to carry out the purposes of the Company shall be held in the name of the Company.

6.     **COMMENCEMENT, TERM.**

The Company shall be deemed to commence its existence as of the date of this Agreement. The term of the Company shall continue until terminated in accordance with the provisions of Section 11 hereof, or as otherwise provided by law.

7.     **CAPITAL CONTRIBUTIONS.**

7.1     Investing Members:  Each Investing Member shall contribute his or her Capital Contribution to the capital of the Company in the amounts set forth in each Investing Member's respective Subscription Agreement, in return for which they shall receive the applicable Membership Interest.  The total amount to be contributed by each Investing Member shall be paid to the Escrow Agent as set forth in the Subscription Agreement.  Contributions shall only be payable via wire transfer.  Further, the Company reserves the right to increase, on a prospective basis, the Capital Contributions of each Investing Member in the event of an increase in the minimum investment amount as a result of new legislation.

7.2     No Additional Contributions:  The Investing Members are not required to contribute additional capital in excess of his or her Capital Contribution or lend funds to the Company, subject only to a potential additional contribution required to comply with the EB-5 Program's revised investment standards.

7.3     Capital Accounts:  The Company shall establish for each Investing Member a Capital Account.

7.4     Withdrawal and Return of Capital:  No Investing Member may withdraw any capital from the Company without the consent of the Manager.  Under circumstances causing a return of a Capital Contribution, no Investing Member shall have the right to receive property other than cash, except as may otherwise be specifically provided herein, nor to be paid interest on such contributions with respect to the period such contributions are held by the Company.

7.5     Escrow Accounts.

(a)     Pursuant to the Subscription Agreement executed by a Subscriber, Five Hundred Fifty Thousand Dollars ($550,000) per Unit, subject to a potential increase in the Capital Contribution amount per Unit as described herein, is due to be paid to the Escrow Agent upon subscription and will be held in escrow with the Company in bank accounts with Iberia Bank pursuant to the Escrow Agreement. Capital Contributions will be released to the Company upon the filing of the applicable Subscriber's I-526 Petition and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber (Form I-797) (the "**Escrow Release Conditions**") and in no event later than following approval of such Investing Member's I-526 Petition.

113600759.4                                                8

(b)     Subscriber recognizes and agrees that the Company will commence operations and has a need for the Capital Contributions of Investing Members before Investing Members' I-526 Petitions are approved by USCIS.  Therefore, a portion or all of an Investing Member's Capital Contribution will be released from escrow prior to I-526 Petition approval as follows:

Upon satisfaction of the Escrow Release Conditions, all of the Investing Member's total Capital Contribution shall be funded to the Company's general operating account by the Escrow Agent to fund the Investing Member's Capital Contribution so the Company can commence operations.

(c)     If an Investing Member receives an I-526 Petition Denial (without appeal or after denial of any appeal, as provided herein), then the Company shall seek to refund the denied Investing Member's Capital Contribution on a first priority basis and solely to the extent of available cash flow (such that each denied Investing Member shall be refunded his or her Capital Contribution in full in an order of priority based on the timing of when each such Investing Member's I-526 Petition was ultimately denied), as follows:

(i)     subject to the availability of funds, the Company will (A) refund $500,000 to the denied Investing Member and (2) cancel such Investing Member's subscription; and

(ii)    if, following the application of clause (i) above, there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members, the Company shall use commercially reasonable efforts to substitute the denied Investing Member with a Substitute Investing Member at which time a refund of the Capital Contribution shall be made to the Investing Member, as long as substitution occurs prior to the completion of the Project and in accordance with USCIS guidelines.  If a Substitute Investing Member has not been found, within three (3) months of the Investing Member receiving I-526 Petition denial, the provisions of Section D below shall apply.

(d)     If (i) there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members; and (ii) a Substitute Investing Member has not otherwise subscribed for Membership Interests hereunder (as described above), then such refund will be made to the denied Investing Member as of the date that adequate funds are available for the payment of the refund; provided, however, that the Developer agrees to guaranty the full refund of any Subscriber who receives an I-526 Petition denial and has not received a refund of his or her entire Capital Contribution within six (6) months of the Company receiving notice of such I-526 Petition denial (See Guaranty Acknowledgment attached hereto as Appendix I).

(e)     Each Subscriber's Expense Amount shall be paid directly to the Escrow Agent and will be disbursed from escrow to the Manager and used for Offering costs immediately upon the filing of the applicable Subscriber's I-526 Petition; provided, however, that if a Subscriber's I-526 Petition is denied (without appeal or after denial of any appeal, as provided herein), the Company shall attempt to find a Substitute Investing Member as set forth above; provided however, if a

113600759.4                                     9

Substitute Investing Member has not been found, then the Manager shall refund the Subscriber's Expense Amount, less a Twenty-Five Thousand Dollar ($25,000) charge to cover certain Offering costs (subject to the Company's ability to recoup from its marketing agents and other intermediaries their proportionate share thereof), within 90 days after the time period set forth for the Company to find a Substitute Investing Member; provided further, however, that if the Investing Member is at fault in providing incorrect information related to the I-526 Petition or lies or misrepresents information on his or her I-526 Petition, then the full Fifty Thousand Dollars ($50,000) shall be retained by the Manager for costs incurred on behalf of an individual Subscriber.

If an Investing Member receives an I-526 Petition Denial and elects to appeal that denial to the USCIS Administrative Appeals Office at his or her own expense and the Manager consent to such appeal, the cancellation of such Investing Member's Unit shall be deferred as more fully set forth in Section 12.8 hereto.

## 8.   **RIGHTS AND DUTIES OF THE MANAGER**

8.1     Management of Company Business:   The Manager shall have the power and authority to manage and direct all of the Company's business, unless otherwise provided in this Agreement or the Act.  The Manager may from time to time seek the direction of the Investing Members in making any decisions related to the Business, although it shall not be required to seek such direction.  The exercise of any power conferred by this Agreement by the Manager shall constitute the act of and be binding upon the Company.  The Company shall follow the terms regarding the Loan set forth in the Offering Memorandum in connection with the making of the Loan.  The Manager may make modifications to the Loan Agreement in its sole discretion.

8.2     Specific Rights and Powers of the Manager:  The Company will be managed by the Manager.  In addition to any other rights and powers which it may possess under law, but subject to the provisions of Sections 4 and 8 hereof, the Manager and/or its designated agents shall have such other rights and powers required for or appropriate to its management of the Company's business, which, by way of illustration but not limitation, shall include the following:

(1)     maintaining the Company's compliance with USCIS rules and regulations, including, without limitation, (A) monitoring the Company's actions affecting the Company's compliance with USCIS rules and regulations, (B) acting and responding expeditiously in the execution of any necessary USCIS and related filings, (C) reporting of any information requested by USCIS; and (D) communicating with USCIS on EB-5 compliance matters and other immigration matters affecting the Offering;

(2)     to enter into any contract of insurance which the Manager may reasonably deem appropriate for the protection or conservation of Company property, or for any other purpose beneficial to the Company;

(3)     to employ attorneys, agents, consultants, accountants and other independent contractors to perform services on behalf of the Company, including Affiliates of the Manager; provided that such services are reasonably necessary or advisable and the compensation therefore is reasonable;

113600759.4                                     10

(4)     to bring or defend legal actions in the name of the Company, pay, collect, compromise, arbitrate, or otherwise adjust or settle claims or demands of or against the Company or its agents;

(5)     to establish reasonable reserve funds from income derived from the Loan in connection with its administration, but the Company shall not establish reserves consisting of Capital Contributions of Investing Members prior to repayment of the Loan;

(6)     to perform or cause to be performed all of the Company's obligations under any agreement to which the Company is a party;

(7)     to make the Loan (and any other loan, including without limitation for the purposes of maintaining the "at risk" status of the Members in accordance with USCIS guidelines) and from time to time modify the conditions of same if reasonably necessary, including the redeployment of funds upon the payment of the EB-5 Loans, in whole or in part, until all Investing Members satisfy the investment for the Sustainment Period.  Alternate Investments may include investments or loans to other real estate projects, which may or may not be affiliated with the Developer, or such other investment opportunities consistent with USCIS guidelines, as more fully described in the Offering Memorandum.  If applicable, the Manager shall attempt to redeploy funds in investments that are subject to USCIS guidelines in effect from time to time;

(8)     to engage the third parties to provide administrative services to the Company;

(9)     to identify, evaluate, and apply to other projects capital that Investing Members choose not to be distributed after repayment of the Loan; and

(10)    to execute, acknowledge and deliver any and all instruments necessary to effectuate any of the foregoing.

8.3     Limitations on Manager Authority:  Notwithstanding anything to the contrary herein contained and subject to the provisions of Section 4, without in each instance receiving the prior written consent of a Majority in Interest of the Investing Members, the Company shall not have the authority to:

(1)     lend Company funds to any person other than in connection with the Loan or in the ordinary course of business, except for purposes of maintaining the "at risk" status of the Members in accordance with USCIS guidelines;

(2)     perform any act which would make it impossible to carry on the ordinary business of the Company or which would be in contravention of the express terms of this Agreement;

(3)     admit a person as an Investing Member other than as provided herein; or

(4)     take any action which would result in the Company being classified other than as a partnership for federal income tax purposes.

113600759.4                                      11

8.4     Compliance with EB-5 Restrictions.  The Manager shall endeavor to operate the Company in compliance with the legal and policy requirements of USCIS's EB-5 Immigrant Investor Program ("**EB-5 Program**") administered by USCIS, as advised by the Regional Center. In particular, the Manager shall cause the Company to.

(1)     deploy the Capital Contributions of Investing Members in job creating activity constituting the Project, directly or indirectly, and to keep such funds invested (including by loan) in job creating activity until the required jobs have been created and with respect to each individual Investing Member until such time as such Investing Member has satisfied the Sustainment Period;

(2)     avoid reserve accounts designed to evade at-risk investment, and avoid agreements for redemption (including return on investment) of Investing Members' Capital Contributions before adjudication of the petitions for removal of conditions on their permanent residence;

(3)     redeem any Investing Members' Capital Contributions, if at all, only at fair market rates;

(4)     maintain an ongoing business deploying capital to job creating activity until the Project has been completed;

(5)     follow the business plan for the Project as submitted for approval to USCIS, consulting with the Regional Center before implementing any changes that could be considered material;

(6)     track, maintain records, and share data and records with the Regional Center concerning the Loan and the underlying Project, including the expenditure of funds, employment of workers, completion of construction, operation of facilities and enterprises;

(7)     require the Developer to perform such tracking, documentation, and sharing of information with the Company and the Regional Center as is required to enable the Regional Center to meet its obligations to USCIS and to provide information to Investing Members as needed for them to request removal of conditions from their U.S. permanent residence;

(8)     obtain approval from the Office of Foreign Assets Control (**"OFAC"**) of the U.S. Treasury Department, or confirmation of no need for approval, before subscribing an Investing Member who is a native or citizen or whose capital derives from a country subject to embargo under regulations administered by OFAC;

(9)     cause the Investing Members to participate in making management decisions for the Company to comply with USCIS regulations; and

(10)    cause the Company not to sell or otherwise dispose of its interest in the Loan except in accordance with the provisions of this Agreement.

8.5     Liability of the Manager to Investing Members and Company; Indemnification: The Manager shall be required to devote only so much time and attention to the business affairs of

113600759.4                                    12

the Company as is reasonably necessary or advisable to competently oversee such affairs. Except as otherwise specifically set forth herein, neither the Manager, nor any of its Affiliates, nor any of its respective officers, directors, employees, agents, representatives, owners or principals, partners and/or members (collectively, the "**Manager Parties**") shall be personally liable to any Investing Member because any taxing authority disallows or adjusts any deduction or credit claimed in a Company income tax return, nor for the repayment of Capital Contributions. The performance of or the omission to perform any act, the effect of which may cause or result in loss or damage to the Company, if performed or omitted in good faith and in accordance with the terms of the Operating Agreement, shall not subject the Manager Parties to any liability to either the Company or any Investing Members. The Company, its receiver, or its trustee, as applicable, shall indemnify and save harmless the Manager Parties from any claim, loss, expense, liability, action or damage resulting from any such act or omission, including, without limitation, reasonable costs and expenses of litigation and appeal (including reasonable fees and expenses of attorneys engaged by the Manager Parties in defense of each such act or omission); but the Manager Parties shall not be entitled to be indemnified or held harmless to the extent such claim, loss, expense, liability, action or damage results from fraud, bad faith, gross negligence or willful misconduct.

8.6     Special Duties of the Manager: In addition to and without limiting the duties and obligations specified or referenced hereunder, the Manager shall advise and take direction from professional advisors that it may choose to engage, including, without limitation, with respect to (a) performing and complying with the provisions of any agreement affecting Company property or the operation thereof with any independent contractor with or agent of the Company; and (b) causing the Company to file an amended Certificate and such other documents and to perform such acts as shall be required under Delaware law in order to preserve the valid existence of the Company and the limited liability of the Investing Members.

8.7     Removal; Resignation:

(1)     The Manager may be removed upon its bankruptcy by a Majority in Interest vote of the Investing Members.

(2)     The Manager may resign as an agent of the Company at any time upon written notice to the Company.

(3)     Upon removal or resignation of such Manager, the removed/resigned Manager shall immediately cease to have any authority to act as an agent for the Company.

8.8     Election of Successor Manager. Within thirty (30) days after the removal or resignation of a Manager, the Majority in Interest of the Investing Members shall elect a successor Manager.

9.     **FEES, SALARIES AND EXPENSES.**

9.1     Management and Other Fees: The Company shall pay to the Manager, out of the interest payment it receives, a Management Fee equal to 5.74% per annum of the outstanding Loan amount over the Loan term (the "**Management Fee**") in consideration for the Manager's services as a Manager hereunder. The Manager will use substantially all of the Management Fee to pay marketing costs and fees. Any balance remaining after payments of marketing costs and other

113600759.4                                          13

brokerage fees will be allocated to the Manager and the Regional Center. The Management Fee shall not be paid from the Investing Member's $500,000 Capital Contribution.

9.2    Expenses: Except as otherwise provided herein, the Company will pay out of its interest payment it receives, among other things, all ordinary administrative and operating expenses of the Company incurred by the Company in connection with maintaining and operating its office and the books and records of the Company. The Company will bear all extraordinary costs and expenses.

9.3    Salaries, Drawings and Interest on Capital Accounts: No Investing Member shall receive any interest on a Capital Contribution or any salary, either with respect to any Capital Contribution, for services rendered on behalf of the Company or otherwise in his or her capacity as Investing Member, except as expressly provided elsewhere in this Agreement.

## 10.    **PROFITS, LOSSES, DISTRIBUTIONS AND JOB CREATION ALLOCATION.**

10.1    Generally: The following provisions shall apply with respect to the allocation of profits and losses:

(1)    Profits and losses for all purposes of this Agreement shall be determined in accordance with the accounting method followed by the Company for federal income tax purposes and otherwise in accordance with generally accepted accounting principles. Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profit or loss, or applicable to the period during which such profit or loss was realized, shall be considered allocated to each Investing Member in the same proportion as profits and losses are allocated to such Investing Member below.

(2)    Profits and losses shall be allocated to the Investing Members commencing with the fiscal year ending December 31, 2017 and annually thereafter.

(3)    Allocation of Profits and Losses. Except with respect to the repayment of indebtedness and the allocation of any built-in gain provided for under Section 704(c) of the Code, all profits and losses of the Company shall be allocated as set forth hereinafter.

10.2    Allocation Following Transfer of Membership Interest:   Except as otherwise provided herein, in any year in which an Investing Member transfers all or any portion of a Membership Interest to any person who, during such year, is admitted as a substitute Investing Member, the share of profits, losses and distributable Cash Flow allocated to or attributable to the Membership Interest sold, assigned or transferred, shall be divided between the assignor and the assignee on the basis of the number of days in such year before, and the number of days on or after, the execution by the assignee of this Agreement; provided, however, that the assignor and the assignee may by agreement make special provisions for the allocation of items of income, profit, gain, loss, deduction or credit as may from time to time be permitted under the Code, and for the distribution of Cash Flow, but such agreement shall be binding as to the Company only after it shall have received notice thereof from the assignor and assignee.

113600759.4                                        14

10.3     Allocation to the Manager:  No profits or losses shall be allocated to the Manager for its serving in such capacity.

10.4     Apportionment of Allocations and Distributions:  Except as otherwise provided in this Agreement, allocations and distributions to be made to each Investing Member pursuant to this Section 10 shall be made in the proportion that his or her respective Membership Interest bears to the Membership Interests of all Investing Members, measured as of the last day of the period for which such allocation or distribution is made.

10.5     Allocation of Profits and Losses:

(1)     Profits and Losses shall be allocated pro rata to the Investing Members.

(2)     Limitation.  The Losses allocated to an Investing Member shall not exceed the maximum amount of Losses that can be so allocated without causing any Investing Member to have an Adjusted Capital Account deficit (determined after all cash distributions for the fiscal period) at the end of the fiscal period for which the allocation relates.  All Losses in excess of the limitation set forth in the preceding sentence shall be allocated among those Investing Members that will not have an Adjusted Capital Account deficit at the end of the fiscal period in the ratio of their relative Membership Interests, and any excess thereafter shall be allocated to the Investing Member in accordance with their percentage interests.

10.6     Distribution of Cash Flow:  The Manager shall have the sole authority to determine when Cash Flow is available for distribution among the Investing Members.  Once a determination is made that such a distribution is in order, the same shall be made as follows subject to the other provisions of this Article 10:

(1)     To the Investing Members, *pro rata*, until the interest on the Loan received by the Company has been fully distributed; and

(2)     Then to the Investing Members, *pro rata*, as a return of their Capital Contributions until all Capital Contributions have been repaid.

Notwithstanding the foregoing, no distributions under clause (2) above will be made to an Investing Member prior to the fulfillment by such Investing Member of the Sustainment Period.  Upon the repayment of the Loan, with respect to Investing Members who have not satisfied the Sustainment Period, the Loan proceeds attributable to their capital investments shall be redeployed by the Manager, on behalf of the Company, in alternate investments that qualify under the EB-5 Program for the purpose of preserving the Investing Members' "at risk" investment until such Investing Member has satisfied the Sustainment Period, as more fully set forth in the Offering Memorandum.

Upon repayment of the Loan in full, an Investing Member may decline the return of its Capital Contribution and thereby request to reinvest such Capital Contribution in the Company in order to participate in a new loan to be identified by the Manager.  If the Manager determines that no such loan is available on favorable terms, or if in its sole discretion the Manager determines that the Company should terminate, the Manager may distribute all of the Investing Members' Membership Interests in accordance with this Operating Agreement and terminate the Company.

113600759.4                                          15

10.7     Liquidating Distributions:   The proceeds resulting from the liquidation of the Company pursuant to Section 11.2 (but subject to the provisions of Section 11.2(3)), shall be distributed and applied in the following order of priority:

(1)     To the payment of debts and liabilities of the Company, including all expenses of the Company incident to any such liquidation and all loans or any other debts and liabilities of the Company to the Investing Members or their Affiliates;

(2)     To the establishment of any reserves which the Liquidator deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Company; and

(3)     To the Investing Members in accordance with the provisions of Section 10.6 above.

10.8     Nonrecourse:   Each Investing Member shall look solely to the assets of the Company for all distributions from the Company, the repayment of his or her Capital Contributions, and the repayment of any loans previously made to the Company when all such payments are due hereunder, and shall have no recourse, upon dissolution or otherwise, against any Manager or Investing Member.

10.9     Withholding Taxes with Respect to Investing Members.   The Company shall comply with any withholding requirements under federal, state, local and foreign law and shall remit any amounts withheld to, and file required forms with, the applicable jurisdiction. All amounts withheld from Company revenues or distributions by or for the Company pursuant to the Code or any provision of any federal, state, local or foreign law, and any taxes, fees or assessments levied upon the Company, shall be treated for purposes of this Section 10.9 as having been distributed to those Investing Members from whom such amounts are withheld, or whose identity or status caused the withholding obligations, taxes, fees or assessments to be incurred. If the amount withheld was not withheld from the affected Investing Member's actual share of cash available for distribution, the Manager on behalf of the Company may, at its opinion (a) require such Investing Member to reimburse the Company for such withholding or (b) reduce any subsequent distributions to which such Investing Member is entitled by the amount of such withholding. Each Investing Member agrees to furnish the Company with such representations and forms as the Manager shall reasonably request to assist it in determining the extent of, and in fulfilling, the Company's withholding obligations, if any. As soon as practicable after becoming aware that any withholding requirement may apply to an Investing Member, the Manager shall advise the Investing Member of such requirement and the anticipated effect thereof. Each Investing Member shall pay or reimburse to the Company all identifiable costs or expenses of the Company caused by or resulting from withholding taxes with respect to such Investing Member.

10.10    Job Creation Allocation.   The allocation to each Investing Member of job creation numbers arising from fulfillment of the Company's business plan will be reported to the Regional Center, avoiding double counting any job. Jobs created by the Project that qualify for approval at the Form I-829 Petition stage shall be allocated to the Investing Members in accordance with the EB-5 Job Allocation Addendum attached hereto as Schedule 2.

113600759.4                                      16

10.11 Authority of Manager to Vary Allocations to Preserve and Protect Investing Members' Intent:

(1)     It is the intent of the Investing Members that each Investing Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code.  In order to preserve and protect the determinations and allocations provided for in this Section 10, the Manager is authorized and directed to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Section 10 to the extent that allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in Section 10 would cause the determination and allocation of each Investing Member's distributed share of income, gain, loss, deduction or credit (or item thereof) to not be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder.  Any new allocation (the "**New Allocation**") made pursuant to this Section 10.11 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Section 10, and no amendment of this Agreement or approval of any Investing Member shall be required.

(2)     In making any New Allocation under Section 10.11(1), the Manager is authorized to act only after having been advised by the Accountants that, under Section 704(b) of the Code and the Treasury Regulations thereunder, (i) the New Allocation is necessary, and (ii) the New Allocation is the minimum modification of the allocations otherwise provided for in this Section 10 necessary in order to ensure that, either in the then current year or in any preceding year, each Investing Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) is determined and allocated in accordance with this Section 10 to the fullest extent permitted by Section 704(b) of the Code and the Treasury Regulations thereunder.

(3)     If the Manager is required by Section 10.11(1) to make any New Allocation in a manner less favorable to the Investing Members than is otherwise provided for in this Section 10, then the Manager is authorized and directed, insofar as it is advised by the Accountants to the Company that it is permitted by Section 704(b) of the Code, to allocate income, gain, loss, deduction, or credit (or item thereof) arising in later years in such a manner so as to bring the allocations of income, gain, loss, deduction, or credit (or item thereof) to the Investing Members as near as possible to the allocations thereof otherwise contemplated by this Section 10.  Furthermore, in the event that any New Allocation requires repayment by the Investing Members of any distribution made during any tax year, the Investing Members shall be required to refund to the Company only amounts in excess of the net tax cost to the Investing Member based upon the original allocation.  For example, if an Investing Member's tax rate was twenty percent (20%) and the distribution to such Investing Member was $100.00, the Investing Member would only be required to refund $80.00 of the distribution.

(4)     New Allocations made by the Manager under Section 10.11(1) shall be made in reliance upon the advice of the Accountants, and no such allocation shall give rise to any claim or cause of action by any Investing Member.

113600759.4                                    17

11. **SALE, DISSOLUTION AND LIQUIDATION.**

11.1 <u>Dissolution of Company</u>: Subject to the provisions of Section 4, the Company shall be dissolved upon the earlier of:

(1) Following repayment of the Loan, the distribution of the interests of all Investing Members in the event that no Investing Member elects to decline distribution of his or her Capital Contribution pursuant to Section 10.6;

(2) The election of the Manager, in its sole discretion, when the Loan and any subsequent loans made by the Company are not outstanding;

(3) The determination of the Manager to dissolve the Company with the prior written consent of a Majority in Interest of the Investing Members;

(4) The sale or other disposition by the Company of all or substantially all of its property, unless the Company, as part of the consideration for any such sale or other disposition acquires a mortgage or lease on or security interest in all or substantially all of such property, in which case the Company shall be dissolved following the sale or other disposition of its entire interest in such mortgage, lease or security interest; or

(5) Any other event causing the dissolution of the Company under the laws of the State of Delaware.

11.2 <u>Winding Up and Distribution</u>:

(1) Except as otherwise expressly permitted under this Agreement, upon the dissolution of the Company, the Company shall be liquidated by (1) the Manager or, if there is no Manager, a court appointed liquidating trustee, or (2) at the direction of the Manager, the Accountants (the "**Liquidator**"). In carrying out the liquidation of the Company, a liquidating trustee or the Accountants shall have all of the rights and powers of the Manager hereunder.

(2) A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of the Company's liabilities so as to enable the Liquidator to minimize the normal losses attendant to liquidation. The operations of the Company shall continue during such liquidation solely for the purpose of winding up the Company's business. Upon completion of the liquidation each of the Investing Members shall be furnished with a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation. Upon approval of this statement by a Majority in Interest of the Investing Members, the Liquidator shall cause a certificate of cancellation of the Company to be duly prepared, executed and filed causing the dissolution of the Company under the laws of the State of Delaware. Nothing herein shall be construed as a limitation upon or termination of any of the rights of the Investing Members during or following any liquidation.

(3) The proceeds of any liquidation shall be applied and distributed as set forth in Section 10.7 hereof. It is the intent of the Investing Members that, upon liquidation of the Company, any liquidation proceeds available for distribution to the Investing Members be distributed in accordance with the Investing Members' respective Capital Account balances.

113600759.4                                                  18

## 12.   **INVESTING MEMBERS.**

12.1   Admission:   The Manager is authorized to admit to the Company Investing Members.

12.2   Limitation on Investing Member Liabilities:   No Investing Member will be personally liable for the debts or losses of the Company.

12.3   No Control of Business or Right to Act for Company:   An Investing Member shall take no part in the day to day management, conduct or control of the business of the Company and shall have no right or authority to act for or to bind the Company, except as otherwise set forth in this Agreement.   Investing Members shall vote on issues calling for a vote of the Investing Members as listed herein or required by the Act.

12.4   Registered Holders:   Upon the admission of an Investing Member, his or her address and Membership Interest shall be registered on the records of the Company maintained at its principal office and inserted in an amended and updated Schedule 1 hereto.

12.5   Other Events:   Upon the bankruptcy or insolvency of any Investing Member, the authorized representative of such individual shall have all of the power as such individual possessed to make an assignment of its Membership Interest in accordance with the terms of Section 13 and to join with any assignee in making application to substitute such assignee as an Investing Member.

12.6   Withdrawal of Investing Members:   No Investing Member may voluntarily withdraw or resign as an Investing Member of the Company, prior to the dissolution and winding up of the Company, without the Manager's prior written consent.

12.7   Nature of Investing Members' Membership Interest:   Membership Interests in the Company shall be personal property for all purposes. No Investing Member or their successor, representative or assign, shall have any right, title or interest in specific Company property.

12.8   Mandatory Repurchase:   If an Investing Member receives an I-526 Petition denial (without certification of the denial to the USCIS Administrative Appeals Office), and if the Investing Member demands return of his or her Capital Contribution, then the Company shall use reasonable efforts to obtain a Substitute Investing Member promptly following such demand, in accordance with the provisions set forth in Section 7.5, above. The denied Investing Member's Membership Interest shall be repurchased upon the return to such person of his or her Capital Contribution, using available cash, and the Company will return the denied Investing Member's Expense Amount, each subject to the procedures and provisions described herein, including, without limitation, the provisions set forth in Section 7.5, above. If an Investing Member receives an I-526 Petition denial and elects to appeal that denial at his or her own expense and the Manager consents to such appeal, the repurchase of such Investing Member's Membership Interest shall be deferred until (i) the appeal is resolved and such Investing Member receives I-526 Petition approval, in which event no repurchase will occur, or (ii) the denial is affirmed, in which event the repurchase will proceed.

At the sole discretion of the Manager, no additional documents will be necessary to effect such repurchase; it being agreed by the Manager and the Investing Members that the Company's delivery of a check for such amount to the Investing Member whose Membership Interest was repurchased shall constitute the full and complete repurchase of such Investing Member's Membership Interest. The Manager may unilaterally amend Schedule 1 to this Agreement to reflect the deletion of any Investing Member whose Membership Interest in repurchased.

Notwithstanding anything to the contrary in this Section, (i) if the Manager determines, in their sole and absolute discretion, that the repurchase of a denied Investing Member's Membership Interest would have an adverse effect on the business or immigration objectives of the Company or the ability of other Investing Members to obtain unconditional permanent resident status in the United States pursuant to the EB-5 Program, (ii) if the Company is restricted from repurchasing any Membership Interests under the provisions of the Securities Act or other applicable law or under the terms of any loan agreements with its lenders, or (iii) if the Company does not have the available cash to effect such repurchase of the Membership Interests, then the Company's obligation to repurchase the Membership Interest and refund the Capital Contribution and any portion of the Expense Amount, if at all (as provided in Section 7.5, above), shall be suspended until the Manager determines, in their sole and absolute discretion, that such adverse effect will not occur or such condition or restriction does not apply.

12.9    Rights of a Representative: Upon the death, Permanent Disability, determination of legal incompetence or Bankruptcy of an individual who is an Investing Member (including a substituted Investing Member), his or her personal representative, guardian, trustee or Person serving in a similar capacity, as the case may be, shall have all of the rights of an Investing Member for the purpose of settling or managing his or her estate, and such power as the decedent, incompetent, or bankrupt possessed to constitute a successor as an Assignee and to join with such Assignee in making application under this Section 12 to substitute such Assignee as an Investing Member.

13.    **RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS.**

13.1    Conditions Precedent to Transfer: No Investing Member shall have the right to sell or assign all or any part of such Member's Interest except by reason of death, unless such assignment is effected by, and in any event not until the Investing Member has satisfied the Sustainment Period, (a) such assignment is effected by written instrument in form and substance acceptable to counsel for the Company, stating that the assignee intends to be substituted or admitted as an Investing Member and accepts and adopts all of the terms and provisions of this Agreement, as the same may have been amended, and providing for the payment of all reasonable expenses incurred by the Company in connection with such substitution or admission, including but not limited to the cost of preparing the necessary amendment to this Agreement; (b) such assignment is consented to by the Manager, which consent may be granted or denied in the Manager's sole and absolute discretion; and (c) if requested by the Manager, an opinion of acceptable legal counsel is delivered to the Manager stating that the substitution or admission is exempt from registration and qualification under the Securities Act and any applicable state securities laws. The Manager may not consent to any transfer or assignment of a Membership Interest (i) to a minor or person adjudged incompetent; (ii) under circumstances which would result in the termination of the Company under the Code; or (iii) under circumstances which would result

113600759.4                                    20

in the denial of any Investing Member's I-526 Petition. If an Investing Member sells any part of his or her Membership Interest representing a Capital Contribution before removal of conditions on his or her permanent residence, the Manager shall give notice to the Regional Center for prompt reporting to USCIS for possible revocation of immigration benefits arising from the initial investment.

13.2    Legend: Any certificate representing a Membership Interest shall bear on the face thereof legends substantially in the following form:

"THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, EITHER PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, THESE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO the MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO the MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO the MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE    OR    REGULATION    PROMULGATED    THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THE COMPANY'S OPERATING AGREEMENT."

13.3    Mechanics of Substitution or Admission: Any substitution or admission of an Investing Member shall become effective as of the last day of the calendar month in which all the conditions of such substitution or admission as specified in Section 13.1 shall have been satisfied. Any person admitted as a substitute or additional Investing Member pursuant to this Section 13 shall (except as herein otherwise expressly provided) be an Investing Member for all purposes of this Agreement to the extent of the Membership Interest acquired by such person.

13.4    Prohibited Assignments: Any purported assignment of a Membership Interest otherwise than in accordance with this Section 13 shall be of no effect as between the Company and the purported assignee and shall be unenforceable as against the Company. The Manager shall not be charged with actual or constructive notice of any such purported assignment and is expressly prohibited from making allocations and distributions hereunder in accordance with any such purported assignment.

14.    **MISCELLANEOUS FINANCIAL AND ACCOUNTING MATTERS.**

14.1    Availability of Financial Records: At all times during the existence of the Company, the Manager shall keep or cause to be kept accurate and complete books of account in accordance with generally accepted accounting principles applied in a consistent manner, which

113600759.4                                    21

shall reflect all Company transactions (including Capital Contributions, income, expense, gain, loss and distributions) and shall be appropriate and adequate for the Company's business. Such books shall be maintained at the principal place of business of the Company. Any Investing Member or his or her duly authorized representative shall have the right, at his or her expense, to inspect and copy from such books and documents during normal business hours upon reasonable notice.

14.2    Financial Reports: As soon as practicable after the close of the fiscal year of the Company, and in any event within one hundred and twenty (120) days thereafter, the Manager shall deliver to each Investing Member a financial report of the Company for such period, including: (a) a balance sheet, (b) a profit and loss statement, (c) a statement showing the source and amount of distributions made to the Investing Members and the allocation to each Investing Member of Company income, gain, loss, deductions, credits and items of tax preference, and (d) full disclosure of such other matters as may be material to the financial operations of the Company or to an understanding by the Investing Members of such operations. Such statements need not be audited but shall be on a basis consistent with the Company's method of accounting and shall be certified by the Manager as complete and correct, subject to changes resulting from year-end adjustments.

14.3    Accounting Decisions: All decisions as to accounting principles and procedures, except as specifically provided to the contrary herein, shall be made by the Manager in accordance with the recommendations of the Company's Accountants.

14.4    Taxable and Fiscal Year: The Company's taxable and fiscal years shall be selected by the Manager in its sole discretion.

14.5    Income Tax Information: Each Investing Member shall be provided with a copy of the Company's annual income tax return (by electronic delivery), and such additional data as is necessary to adequately disclose each class of income, gain, loss or deduction acquired or incurred by the Company during the preceding taxable year and each Investing Member's distributive share thereof. Such return and data shall be furnished at least one week prior to the due date (including any requested extension) of the filing of such return with the Internal Revenue Service.

14.6    Maintenance of Cash Assets: All cash funds of the Company from whatever source received shall be invested in short term governmental or corporate securities or in cash items such as money market funds or certificates of deposit, or may be deposited and maintained in one or more Company accounts located at the financial institution designated by the Manager. All withdrawals from any such account or sale of any such investment shall be made upon the signature of the Manager, or by such other individual(s) as may be authorized in writing by the Manager.

14.7    Basis Election: Upon the transfer of a Membership Interest, or a distribution of Company property, the Company shall have the right, but not the obligation, to elect pursuant to Section 754 of the Code to adjust the basis of Company property as allowed by Section 734(b) and 743(b) of the Code; provided, however, that if such an election is made, the Company shall not be required to make (and shall not be obligated to bear the expense of making) any accounting adjustments resulting from such election in the information supplied to any Investing Member.

14.8    Tax Matters Partner. The Manager, based on a majority vote of the Members, shall be designated as the "Tax Matters Partner," and will have considerable authority to make decisions affecting the tax treatment and procedural rights of all Investing Members. In addition, the Tax Matters Partner will have the authority to bind certain Investing Members to settlement agreements and the right on behalf of all investors to extend the statute of limitations relating to the investors' tax liabilities with respect to Company items. The legal and accounting costs incurred in connection with any audit of the Company's tax returns will be paid off by the Company, but each Investing Member will bear the cost of audits of his or her own return.

15.    **AMENDMENTS.**

15.1    Procedure for Amendment: Subject to the terms of this Section and Section 16, this Agreement may be amended only upon the written consent of the Manager and of a Majority in Interest of the Investing Members. The Manager may amend this Agreement without the written consent of a Majority in Interest of the Investing Members:  (a) if advised by counsel to the Company that such amendment is required to avoid having the Company treated as an association taxable as a corporation, or (b) for the reasons set forth in Section 15.2 (1), (2), (5) or (6) hereof.

15.2    Reasons for Certain Amendments: In addition to such other circumstances as may be necessary or appropriate, this Agreement shall be amended whenever:

(1)    There is a change in the name of the Company;

(2)    A Person is substituted or otherwise admitted as an Investing Member (so long as same does not materially change the terms and conditions of the investment of the Investing Members in the Company);

(3)    There is a material change in the nature of the Business or purpose of the Company;

(4)    There is a change in any right to vote given by this Agreement to an Investing Member on matters affecting the basic nature of the Company;

(5)    The Manager may cause this Operating Agreement to be amended to conform with EB-5 regulations; or

(6)    The Manager may cause this Operating Agreement to be amended to conform with USCIS regulations in order to comply with the requirements for a Company approval.

16. **POWER OF ATTORNEY.**

16.1     Description: Each Investing Member hereby irrevocably constitutes and appoints the Manager, with full power of substitution, as his or her true and lawful attorney-in-fact on his or her behalf and in his or her name, place and stead, to make, execute, consent to, swear to, acknowledge, publish, record and/or file the following:

(1)     Certificate of Formation, a Fictitious Name Registration and any other certificate or instrument which may be required to be filed by the Company or the Investing Members under the laws of any jurisdiction, to the extent that the Manager may reasonably deem such filing to be appropriate, including any and all amendments or modifications thereto;

(2)     Such instruments as may be required to effectuate the dissolution and termination of the Company pursuant to the provisions of this Agreement;

(3)     Any and all consents for the admission of Substitute Investing Members, pursuant to the terms of this Agreement; and

(4)     Such other instruments as the Manager may reasonably deem appropriate to fully carry out the provisions of this Agreement in accordance with its terms.

16.2     Characteristics of Power: The grant of the foregoing power of attorney is coupled with an interest; shall be irrevocable and binding on any assignee of all or any part of a Membership Interest; shall survive the death, legal incapacity, bankruptcy or insolvency of any Investing Member during the term hereof; and shall survive the delivery of any assignment by any Investing Member of the whole or any portion of his or her Membership Interest; and any assignee of an Investing Member hereby constitutes and appoints the Manager as his or her attorney in the same manner and force and for the same purposes as does the assignor.

16.3     Limitations of Power of Attorney: No document or amendment executed by the Manager pursuant to this Section 16 shall, in the absence of the prior consent of a majority of the Investing Members, (a) reduce the obligations of the Manager, (b) affect the rights or restrictions regarding the assignability of Membership Interests, (c) modify the term of the Company, (d) amend this Section 16, or (e) reduce the rights or interests or enlarge the obligations of the Investing Members. The Manager shall promptly notify the Investing Members of any documents or amendments executed pursuant to this Section 16.

17. **MEETINGS; MEANS OF VOTING.**

17.1     Meetings: Meetings of the Investing Members shall be called by the Manager at their discretion, or whenever requested in writing to do so by Investing Members owning 25% or more of the Membership Interests (whether or not held by investors affiliated or unaffiliated with the Manager). The notice of such meeting shall state the reason for the meeting. Notice of any such meeting shall be delivered to all Investing Members in the manner prescribed in Section 17.2 not less than ten (10) days or more than sixty (60) days prior to the meeting.

17.2     Record Date: For the purpose of determining the Investing Members entitled to vote at any meeting of the Company, the Manager or the Investing Members requesting such

113600759.4                                    24

meeting may fix in advance a record date for any such determination of Investing Members. Such date shall not be more than fifty (50) days nor less than ten (10) days before any such meeting.

17.3    Proxies: An Investing Member may authorize any person to act for him by proxy on all matters in which he is entitled to participate or vote. Every proxy must be signed by the Investing Member or his or her attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Investing Member executing it.

17.4    Conduct of Meetings: Each meeting of the Investing Members shall be conducted by the Manager or such other person(s) as it shall appoint and pursuant to rules of conduct as it shall reasonably deem appropriate.

17.5    Quorum for Meetings: There shall be deemed to be a quorum at any meeting of the Investing Members at which the voting power of the Investing Members attending such meeting plus the voting power exercised by Investing Members who have submitted to the Manager effective proxies or written consents to action at such meeting constitutes a Majority in Interest of such Investing Members.

17.6    Voting Rights. Each Investing Member may take part in the management of the Company by (a) exercising that Investing Member's voting rights as set forth in this Agreement and (b) advising the Manager regarding investment decisions and policy as set forth in this Agreement. Without limiting the generality of the foregoing, the Investing Members will have the right, by a majority vote of the Investing Members, to advise the Manager in connection with the business operations of the Company.

Notwithstanding any contrary provision of this Agreement or in the Act, and notwithstanding any rights or powers otherwise expressly granted to the Manager hereunder, the Investing Members have the right to approve or disapprove by majority vote the following, and only the following matters (where applicable):

(a)    the dissolution and winding up of the Company.

(b)    the merger, consolidation, or other business combination of the Company with any Person;

(c)    the sale, exchange, lease, mortgage, pledge or other transfer of all or substantial part of the assets of the Company other than as for the purposes of making the Loan and otherwise transacting in the ordinary course of the Company's business;

(d)    the incurrence of any obligation or indebtedness exceeding 10% of the value of the Company's assets;

(e)    a change in the fundamental nature of the business of the Company, or a change in the fundamental purpose of the Company, from making the Investment;

113600759.4                                   25

(f)     subject to the terms of Section 8 hereof, appointment, reappointment or removal of the Manager, as the case may be;

(g)     a change in the Certificate of Formation whereby the management of the Company is vested in the Members; and

(h)     to the extent not made as a result of an increase in the minimum investment amount as required under the EB-5 Program, any additional Capital Contributions to be made by the Members and corresponding changes in the Membership Interests.

18.     **WITHDRAWALS.**

An Investing Member may not withdraw from the Company unless such withdrawal is in accordance with Delaware law. All expenses incurred by the Company in connection with such withdrawal shall be paid for by the withdrawing Investing Member. If an Investing Member withdraws any part of his or her Capital Contribution before removal of conditions on his or her permanent residence, the Manager shall give notice to the Regional Center for prompt reporting to USCIS for possible revocation of immigration benefits arising from the initial investment.

19.     **REPRESENTATIONS OF THE MEMBERS.**

19.1     Investing Member Representations. By their execution below, each Person as an inducement to be admitted to the Company as an Investing Member represents and warrants to the Company as follows:

(a)     The Investing Member understands that the offer and sale of the Units have not been registered under the Securities Act, any state securities or "blue sky" laws, or any rules or regulations promulgated thereunder (collectively, "**Securities Laws**"), pursuant to applicable exemptions. The Investing Member acknowledges the Company is not obligated to register the Unit under the Securities Laws. In addition to restrictions on transferability pursuant to this Operating Agreement, without such registration, such Unit may not be sold, pledged, hypothecated or otherwise transferred at any time whatsoever, except upon delivery to the Company of an opinion of counsel satisfactory to the Manager and the Company that registration is not required for such transfer or the submission to the Manager of such other evidence as may be satisfactory to the Manager and the Company to the effect that any such transfer will not be in violation of the Securities Laws. Investing Member further understands that any transfer of the Unit may be substantially restricted by the absence of a trading market therefor and none is expected to develop, and that any sale or other disposition of the Unit may result in unfavorable tax consequences to the Investing Member. The Investing Member acknowledges that the restrictions on the transferability of the Unit are substantial and may require the Investing Member to hold the Unit indefinitely.

(b)     The Investing Member is acquiring the Unit solely for the account of the Investing Member for investment purposes only and not for distribution or resale to others. The Investing Member will not resell or offer to resell all or a portion of the Unit except in strict compliance with all applicable Securities Laws, including, without limitation, Regulation S (Rules 901 through 905 and Preliminary Statement) under the Securities Act and this Agreement. Without

113600759.4                                   26

limiting the generality of the provisions set forth herein, the Subscriber consents to the placement of substantially the legend on any document representing the Units being purchased by the Subscriber, if applicable, stating that transfer is prohibited except in accordance with the provisions of Regulation S of the Securities Act (§§ 230.901 through 230.905, and Preliminary Notes), pursuant to registration under the Securities Act, or pursuant to an available exemption from registration. Investing Member will not engage in any hedging transactions involving the Unit, except in compliance with the Securities Laws and this Agreement.

(c)     Investing Member (i) is not a U.S Person, is not a citizen or resident alien of the United States, is not acquiring the Units for the account or benefit of any U.S. Person, did not receive the Offering Memorandum or an offer to purchase the Unit in the United States and did not execute the Subscription Agreement and pay the amounts specified thereunder from within the United States; or (ii) is an "accredited investors," as defined in Rule 501 under the Securities Act and pursuant to Regulation D of the Securities Act, acquiring the Units in a transaction not requiring registration under the Securities Act through Regulation D of the Securities Act. If requested by the Company, Investing Member further agrees to execute and deliver to the Company an executed IRS Form W-8 certifying that he or she is a Non-Resident Alien.

(d)     The Investing Member is a bona fide resident of the country set forth in his or her address in the Subscription Agreement, and agrees that if his or her principal residence changes prior to his or her purchase of a Unit, he or she will promptly notify the Manager.

(e)     The Investing Member acknowledges that the offer and sale of the Units is not taking place within the United States, but rather in an "offshore transaction," as defined in Rule 902 of Regulation S adopted by the Securities Exchange Commission pursuant to the Securities Act, and that no "directed selling efforts" took place within the United States in compliance with Regulation S, unless the Investing Member is an "accredited investors" as such term is defined in Rule 501(a) under the Securities Act in compliance with Regulation D of the Securities Act. The term "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia.

(f)     The Investing Member's financial condition is such that he or she has no need for liquidity with respect to its investment to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of its investment for an indefinite period of time, including the risk of losing all of its investment.

(g)     The Investing Member understands that the Project has not yet been developed and it has no operating history.  The Project is in its early stages, is not currently generating any revenue, and its future profitability cannot be assured.

(h)     The Investing Member understands that: (i) his or her subscription for a Unit is irrevocable until the Offering Period ends without the Company's written consent; (ii) an investment in the Unit is a speculative investment that involves a high degree of risk, including the risk of loss of the entire investment of the Investing Member in the Company; (iii) no federal or state agency has passed upon the adequacy or accuracy of the information made available to the Investing Member, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Unit as an investment; (iv) any anticipated federal and/or

113600759.4                                        27

state income tax benefits applicable to the Unit may be lost through changes in, or adverse interpretations of, existing laws and regulations; and (vi) there is no assurance that the Company will ever be profitable, or that the Investing Member's investment in the Unit will ever be recoverable.

(i)　The Investing Member acknowledges that there is no assurance that his or her I-526 Petition will be granted or, if it is, that Investing Member will ultimately be approved for conditional or unconditional lawful permanent residence in the U.S. or be able to become a U.S. citizen. Neither the Company, Regional Center, Developer, nor the Company's immigration counsel has made any effort to pre-determine Investing Member's personal qualifications and circumstances and whether the Investing Member is likely or not likely to obtain favorable action on its I-526 Petition or EB-5 Visa (defined below), and that there are numerous reasons that will result in the Investing Member being denied residency in the United States, including, without limitation, the Project failing to qualify as an approved project for the EB-5 Program.

(j)　The Investing Member (i) has been provided with a copy of the Offering Memorandum, including, as exhibits thereto, this Agreement, the Escrow Agreement, the Subscription Agreement, and has reviewed same; (ii) has been given complete access to all documents, records, contracts and books of or relating to the Company and the Unit, and all other information reasonably requested by the Investing Member; and (iii) has performed a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the Investing Member in reaching the Investing Member's decision to invest in the Company. The Investing Member further acknowledges and confirms that the Investing Member has had an opportunity to ask questions of and receive answers from the Company and the Developer concerning the Unit, the prospective contemplated business and purpose of the Company, and any other matter the Investing Member has deemed relevant, and all such inquiries have been answered to the Investing Member's satisfaction. In addition, Investing Member acknowledges that he or she has had and may have, at any reasonable hour, after reasonable prior notice, access to the financial and other records of the Company which the Company can obtain without unreasonable effort or expense, and further acknowledges that Investing Member has obtained, in Investing Member's judgment, sufficient information from the Company to evaluate the merits and risks of an investment in the Unit.

(k)　The Investing Member acknowledges that: (i) the risks inherent to this investment have been fully considered; (ii) the Manager will have substantial and exclusive authority to conduct the operation of the Company; and (iii) an investment in the Unit has neither been approved nor disapproved by the Securities and Exchange Commission or any other federal, state or local department or agency of any other jurisdiction, and such authorities have not passed upon the adequacy or accuracy of the disclosure provided to investors in connection with an investment in the Unit.

(l)　The Investing Member acknowledges that neither the Company, Manager, the Regional Center nor any representative of the Company, the Manager or the Regional Center has made any representations or warranties in respect of the Developer's business or profitability. Without limiting the generality of the foregoing, the Investing Member acknowledges and agrees that information, including any business plan or financial projections or forecasts or other information contained in written materials provided or made available to the undersigned, and any

113600759.4　　　　　　28

oral, visual or other presentations made by the Company, the Manager or the Regional Center or its representatives to the Investing Member shall not be deemed a representation or warranty in respect of the matters therein.  Investing Member acknowledges that the Offering Memorandum contains information that the Developer and Company believe is accurate and, as such information relates to the projected revenues and expenses of the Developer, data that the Developer believes is a reasonable forecast of the results that the Developer will achieve; however, as an accredited, experienced and sophisticated investor, Investing Member is aware that there are many foreseeable and unforeseeable events that could cause the assumptions underlying the financial projections to not materialize, and the results of same may cause material adverse consequences to the financial results of the Developer and Company.

(m)     In making the decision to purchase the Unit, Investing Member has relied solely upon independent investigations made by Investing Member, and the Investing Member further represents and warrants that the Investing Member is not acquiring the Unit as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media distributed in the United States, any seminar in the United States or any solicitation by a person in the United States not previously known to the Investing Member, and that Investing Member is not aware of any general solicitation within the United States or general advertising within the United States regarding the purchase or sale of the Unit.  The Investing Member acknowledges and confirms that he or she is not relying upon any statement, representation or warranty made by the Company or its respective representatives in making a decision to subscribe for the Unit.  Investing Member must rely solely on the terms of this Agreement for the terms of Investing Member's participation in the Company and the rights and responsibilities of owning its Unit.

(n)     The Investing Member understands that the Company and the Manager will be relying on the accuracy and completeness of all matters set forth in the Subscription Agreement, and the Investing Member represents and warrants to the Company, the Manager and each of their affiliates that the information, representations, warranties, acknowledgments and all other matters set forth in the Subscription Agreement with respect to the Investing Member are complete, true and correct and does not fail to include any material fact necessary to make the facts stated, in light of the circumstances in which they are made, not misleading, and may be relied upon by them in determining whether the offer and sale of a Unit to the Investing Member is exempt from registration under the Securities Laws, and the Investing Member will notify them immediately of any change in any statements made in the Subscription Agreement that occurs prior to the consummation of the purchase of a Unit.

(o)     The Investing Member is in compliance with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Freedom Act**"), the U.S. Bank Secrecy Act (the "**BSA**") and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA.  The Investing Member is not and shall not be a person: (i) acting, directly or indirectly, on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any of the OFAC lists; (ii) listed on, residing in or having a place of business in a country or territory named on any of such lists or which is designated as a Non-Cooperative Jurisdiction by the Financial Action Task

Force on Money Laundering (FATF), or whose funds are from or through such a jurisdiction; (iii) that is a "Foreign Shell bank" within the meaning of the USA Freedom Act; or (iv) residing in or organized under the laws of a jurisdiction designated by the U.S. Secretary of the Treasury under Sections 311 or 312 of the USA Freedom Act as warranting special measures due to money-laundering concerns.

(p)  The Investing Member (i) has accurately completed the Investor Questionnaire that is an exhibit to the Offering Memorandum; and (ii) is a "sophisticated person" in that Investing Member has such knowledge and experience in financial and business matters that individually and/or with the aid of advisers, it is capable of evaluating the merits and risks of an investment in the Company by making an informed investment decision with respect thereto.

(q)  If the Investing Member is (i) a purchaser in a sale that occurs outside the United States within the meaning of Regulation S or (ii) a "distributor," "dealer" or person "receiving a selling concession, fee or other remuneration" in respect of Units sold, prior to the expiration of the applicable "distribution compliance period" (as defined below), it acknowledges that (A) until the expiration of such "distribution compliance period" any offer or sale of the Units shall not be made by it to a U.S. Person or for the account or benefit of a U.S. Person within the meaning of Rule 902(k) of the Securities Act and (B) until the expiration of the "distribution compliance Period," it may not, directly or indirectly, refer, resell, pledge or otherwise transfer a Unit or any interest therein except to a person who certifies in writing to the Company that such transfer satisfies, as applicable, the requirements of the legends described herein and that the Units will not be accepted for registration of any transfer prior to the end of the applicable "distribution compliance period" unless the transferee has first complied with certification requirements described in this Section. The "distribution compliance period" means the one-year period following the issue date for the Units.

(r)  The Investing Member acknowledges that the Manager and the Developer are affiliated parties.

(s)  The Investing Member acknowledges and agrees to comply with all of his or her obligations set forth in the EB-5 Job Allocation Addendum attached hereto as Schedule 2, and all of the Investing Member's representations, warranties and agreements set forth therein are hereby incorporated herein by reference.

(t)  The Investing Member acknowledges and agrees that (i) the Manager, Regional Center and the Developer have not given, and have no authority to give, any investment advice with respect to the purchase of a security; and (ii) a prospective subscriber has not requested or otherwise sought any such investment advice from the Manager, Regional Center and/or the Developer.

(u)  The Investing Member acknowledges and agrees that (i) the Regional Center is unaffiliated with the Developer; (ii) the Regional Center makes no representations about the Project- and Developer-related information in the Project Business Plan or documents related to the business plan or the investment the Subscriber is making, and (iii) the Subscriber is in no way relying on the Regional Center for providing any service other than filing the annual I-924A report with USCIS.

113600759.4                              30

20.   **STATUTORY WAIVER OF FIDUCIARY DUTIES**

To the fullest extent permitted by law, to the extent that, at law or in equity, the Manager owe any fiduciary duty to the Company pursuant to this Agreement, such duty is hereby eliminated pursuant to Section 18-1101(c) of the Delaware Act, it being the express intent of the Manager that no Manager shall owe any fiduciary duties of any nature whatsoever to the Company; provided, however, that, notwithstanding any provision hereof, such Manager shall be subject to the implied contractual covenant of good faith and fair dealing.

21.   **MISCELLANEOUS.**

21.1   Copies of Documents:   Promptly upon the execution and delivery of this Agreement, the Manager shall deliver to each Investing Member a conformed copy of this Agreement and of the Certificate (in the form in which it has been filed) (by electronic delivery at the option of the Company).

21.2   Notices:  Any notice, payment, demand, offer or other communication required or permitted to be given by any provision of this Agreement shall be deemed to have been delivered and given for all purposes (a) if personally delivered, (b) whether or not actually received, if sent by registered or certified mail, postage prepaid, or (c) by electronic delivery, addressed as follows:

(1)   if to the Company, then to
Odlum Equestrian Lenders, LLC
c/o Appalachian EB-5, LLC
Attention: Andrew Dover and Dale Carroll
Biltmore Park Town Square
One Town Square Boulevard, Suite 315
Asheville, NC 28803
Phone (Andrew): (740) 704-3256
Phone (Dale): (919) 665-7932
Emails: andydover@odlumcapital.com and dcarroll@appalachianeb5.com

(2)   if to an Investing Member, then to the address of such Investing Member as set forth in Schedule 1 hereto or such other address as such Investing Member may designate by notice to the Company.

All notices except notices of change of address shall be deemed given when mailed, and notices of change of address shall be deemed given when received.

21.3   Arbitration of Disputes.  Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement   shall be submitted to JAMS, Inc. (hereafter, the "**Arbitration Service**") and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section 21.3.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state

113600759.4                                    31

and federal statutes and local ordinances as well as to claims arising under the common law. Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract or otherwise, regardless of its nature. Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service. In the event of a conflict between the applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern. To select the three-member arbitration panel, the parties shall each name one neutral arbitrator, and those two arbitrators shall select a third neutral arbitrator from a list of potential arbitrators jointly prepared by the parties. The arbitration proceeding shall be decided by majority vote of the three-arbitrator panel. Unless mutually agreed by the parties otherwise, any arbitration shall take place in Tryon, North Carolina.

In the event of a dispute subject to this Section 21.3, (a) the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings. The remedial authority of the arbitrator shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitrator shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation. The parties and the arbitrator shall keep confidential all matters relating to any arbitration hereunder (including without limitation the existence of the dispute and the arbitration).

In interpreting this Agreement, the arbitrator shall be bound by and follow the substantive law of the State of Delaware. To the extent applicable and not inconsistent with this Section, the arbitrator shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Any filing or administrative fees shall be borne initially by the party requesting administration by the Arbitration Service. If both parties request such administration, the fees shall be borne initially by the party incurring such fees as provided by the rules of the Arbitration Service. The initial fees and costs of the arbitrator shall be borne equally by the parties. The prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. Judgment upon any award rendered by the arbitrators may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

If any of the provisions of this Section are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Section, and this Section shall be reformed to the extent necessary to carry out its provisions

113600759.4                                                    32

to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Section are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

21.4    Remedies:  The Company and the Investing Members shall be entitled to all available legal and equitable remedies against each other.

21.5    Severability:  Each provision hereof is intended to be severable, and the invalidity or illegality of any portion of this Agreement shall not affect the validity or legality of the remainder hereof.

21.6    Captions:  Paragraph captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend, or describe the scope of this Agreement or the intent of any provision hereof.

21.7    Person or Gender:  The masculine gender shall include the feminine and neuter genders, the singular shall include the plural, and the word "person" shall include an individual, corporation, trust, partnership or other form of association.

21.8    Binding Agreement:  Subject to the restrictions on assignment herein contained, the terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, the successors, assigns, personal representatives, estates, heirs and legatees of the respective Investing Members.

21.9    Governing Law:  This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, the obligations provided therein or performance thereof shall be governed or interpreted according to the laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof.

21.10   Entire Agreement:  This Agreement constitutes the entire agreement of the parties hereto with respect to the matters set forth herein and supersedes any prior understanding or agreement, oral or written, with respect thereto.  There are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth herein or herein provided for.

21.11   Agreement in Counterparts:  This Agreement may be executed in any number of counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatories to the original or the same counterpart.

21.12   Qualification in Other Jurisdictions:  In the event the business of the Company is carried on or conducted in one or more states in addition to the State of Delaware, the Company shall exist under the laws of each state in which business is actually conducted by the Company, and the parties will execute such further documents as may be appropriate in order that the Manager may legally qualify the Company in each such state.  The power of attorney granted to the Manager by each Investing Member in Section 16, shall constitute the authority of the Manager

113600759.4                                              33

to perform the ministerial duty of qualifying this Company under the laws of any state in which it is necessary to file documents or instruments of qualification. A Company office or principal place of business in any state may be designated from time to time by the Manager.

21.13 Waiver of Partition: Each of the parties hereto irrevocably waives during the term of the Company any right to maintain any action for partition with respect to any Company property.

21.14 Litigation: Subject to the arbitration provisions set forth in Section 21.3 herein, the Company shall prosecute and defend such actions at law or in equity as may be necessary to enforce or protect the interest of the Company. The Company shall respond to any final decree, judgment or decision of any court, board or authority having jurisdiction in the premises. The Company shall satisfy any such judgment, decree or decision, first out of any insurance proceeds available therefor, and next out of assets of the Company. The cost of defending any actions brought against the Company and/or the Manager with respect to Company matters shall be borne by the Company except as otherwise provided in this Agreement.

21.15 Time: Time is of the essence with respect to this Agreement.

21.16 Remedies Not Exclusive: Any remedies herein contained for a breach of obligation hereunder shall not be deemed to be exclusive, and shall not impair the right of any party to exercise any other right or remedy, whether for damages, injunction or otherwise.

21.17 Legal Counsel: Legal counsel for the Manager or their Affiliates may also represent the Company and/or the Developer in connection with legal work or issues arising in connection with the Company. Each Investing Member recognizes and acknowledges that any such counsel will be acting as legal counsel for the Company, the Manager and/or the Developer with respect to each such matter and shall not be acting as the legal counsel of any individual Investing Member. Each Investing Member further recognizes and accepts that his or her interest with respect to any such matter may be adverse to the interests of the Manager and/or the Developer and the Company. Each Investing Member nevertheless consents to the representation of the Manager, Company and the Developer by such counsel with respect to each such matter and waives for the benefit to such parties of such counsel having any potential or actual conflict of interest between or among such parties. Each Investing Member acknowledges that in the event of any future dispute or litigation between or among the Investing Members and/or between any of the Investing Members and the Company, Manager, and/or the Developer, such counsel may continue to represent the Manager, the Company and the Developer, notwithstanding any such dispute and its prior representation of such parties.

21.18 Advice from Independent Legal Counsel; Voluntary Agreement: Notwithstanding Section 21.17, the Investing Members represent and warrant that (a) each of them has had the opportunity to be represented by legal and tax counsel of his or her choice, (b) each of them has had the opportunity to consult with such counsel regarding this Agreement, and (c) except as set forth herein, each of them has not relied in any way on any representation or other statement made by any other Member or its legal or tax counsel or by any other Person.

113600759.4

34

21.19   Patent Errors:  The Investing Members hereby authorize and direct the Manager to correct patent errors and to fill in any blanks, which blanks shall not be substantive to the terms hereof, in this Agreement or in any exhibit, instrument, document or agreement related hereto and to attach hereto or thereto any exhibits or schedules which are a part hereof or thereof.

21.20   Currency:  All references to "dollars" in this Agreement shall mean U.S. Dollars.

21.21   Native Language Translation.  Each Investing Member hereby agrees that it is the sole responsibility of Investing Member to ensure proper translation of this Agreement into their native language if necessary for Investing Member's understanding of the rights and obligations contained herein.  Any language translation of this Agreement provided by any of the parties hereto is not a binding legal document, and is being provided solely for the Investing Member's convenience, and shall not in any way be construed as a contract or any part of this Agreement as set forth in English. None of the parties hereto are liable for any inaccuracies in any language translation or for any misunderstandings due to differences in language usage or dialect. In the event of any inconsistencies between this Agreement as set forth in English and any language translation, this Agreement as set forth in English and as executed shall govern. Each Investing Member assumes the responsibility for fully understanding the nature and terms of the rights and obligations under this Agreement.

21.22   Side Letters.   Notwithstanding any provisions of this Agreement or of any Subscription Agreement to the contrary, it is hereby acknowledged and agreed that the Manager on its own behalf may, without the approval of any other Member, enter into a side letter or similar agreement (each, a "**Side Letter**") with an Investing Member pursuant to which the Manager may modify the amount of the Expense Amount to be paid by the Investing Member and/or pay such Investing Member a portion of its management fees; provided, that: (i) such payment does not otherwise adversely affect the rights or benefits of any other Investing Member; and (ii) any such Side Letter shall expressly provide that the Manager's discretionary right to make such payment shall be non-binding, and shall not be made to return any Investing Member Capital Contributions or otherwise be contrary to USCIS guidelines.  The parties hereto agree that any terms contained in a Side Letter shall govern with respect to such Investing Member notwithstanding the provisions of this Agreement or of any Subscription Agreement.  Except as required by law, the Manager and the Company shall not be required to deliver the Side Letter or disclose the existence of any Side Letter or the terms and agreements contained therein to any Member, but, if requested, will provide such side letter to USCIS along with the I-526 Petition of any such Investing Member.

[The remainder of this page has intentionally been left blank]

113600759.4                          35

**IN WITNESS WHEREOF**, the parties hereto have entered into this Operating Agreement as of the date first above written.

ODLUM EQUESTRIAN LENDERS, LLC

By:     ODLUM EQUESTRIAN MANAGER, LLC,
        its Manager

By: _Andrew B. Dover_

Name: _AndRew B. DoveR_

Title: _Managing Member_

Dated: _7.12.18_

**ODLUM EQUESTRIAN LENDERS, LLC**
**OPERATING AGREEMENT**

SIGNATURE PAGE

R.S

(Signature)

Print Name: SIDDHARTHA RANGINEN

Address: 4709, NW 155th ST, EDMOND, OK 73013

Telephone: 4-05-501-4276

Tax I.D. or Social Security #: ____-____-6741

Number of Units: — ONE —

Email Address: SNRANGINENI @ GMAIL.COM

Fax Number
:_____

**CUSTODIAN/GUARDIAN:**

To the extent that the Subscriber is a minor child under applicable law (usually 18 years old), including the applicable jurisdiction provided for in the offering documents, a signature of the Subscriber's Custodian/Guardian must accompany the signature of the minor in order to validate the Operating Agreement.

The below Custodian/Guardian hereby acknowledges that, on behalf of the minor Subscriber, he or she certifies that he or she has read and understands the Operating Agreement of Odlum Equestrian Lenders, LLC and all other documents referenced therein, and approves the terms and conditions of all such documents referenced therein on behalf of said minor Subscriber and is signing this document as the authorized Custodian/Guardian of the minor Subscriber.

_____, as Custodian/Guardian for _____ under the Delaware Uniform Transfers to Minors Act

_____
Signature of Custodian/Guardian

113600759 4                                        37

## SCHEDULE 1

## <u>List of Investing Members</u>

.

113600759.4

## SCHEDULE 2

### EB-5 JOB ALLOCATION ADDENDUM

The Company and each Investing Member hereby agree and acknowledge as follows:

1.     the Company is a business with an investment opportunity associated with the Regional Center where the Regional Center has been designated by USCIS as a regional center to participate in the EB-5 Program;

2.     the Investing Member desires to be one of up to three hundred eighty-five (385) limited liability members of the Company, making an investment in the Company to enable the Company to create ten (10) direct or indirect qualifying jobs for each $500,000 investment funded to the Company pursuant to the EB-5 Program;

3.     the Investing Member acknowledges that, except as otherwise provided in this Agreement, Investing Member will only become a member of the Company upon the following: (i) the Company's receipt of the Investing Member's initial Capital Contribution and Expense Amount; (ii) the Company's receipt of the Investing Member's fully executed Subscription Agreement, and (iii) and written acknowledgement of the Company's acceptance of the Investing Member's subscription;

4.     a member of the Company who receives USCIS' approval of his/her I-526 Petition while outside the United States obtains conditional lawful permanent residency status after filing an application for an immigrant visa with the United States Department of State (the "**EB-5 Visa**"), the processing of the EB-5 Visa at a United States Consulate abroad, and such member's admission to the United States on the EB-5 Visa as a conditional lawful permanent resident;

5.     a member of the Company who receives USCIS' approval of his/her I-526 Petition while in the United States on another United States visa may obtain conditional lawful permanent residency status upon USCIS' approval of such member's Form I-485, Application to Register Permanent Residence or Adjust Status ("**Adjustment of Status**");

6.     the total number of qualifying jobs created shall be allocated solely to those who have used the establishment of the Company as the basis of a petition on I-526 Petition; and

7.     each member of the Company shall be required to demonstrate at the time of filing his/her respective Form I-829 Petition, within the 90-day period preceding the second anniversary of his/her (i) admission to the United States as a conditional lawful permanent resident or (ii) adjustment of status to that of a conditional lawful permanent resident, that ten (10) direct and/or indirect and/or induced full-time equivalent, qualifying positions have been created as a result of his/her investment in the Company.

### INTRODUCTION

The Company shall take such action to meet the objective of allocating to each Investing Member a minimum number of ten (10) direct, indirect and/or induced full-time equivalent, permanent positions created by the Company on the following basis:

113600759.4

In the event of a shortfall of jobs for all three hundred eighty-five (385) Investing Members at the time of the I-526 Petition adjudication, projected jobs to be created by the Company shall be allocated to each Investing Member based on the date of filing the I-526 Petition for the purposes of determining whether sufficient jobs will be created within two and one-half (2½) years from the approval of the Investing Member's I-526 Petition.

At the time of the I-829 Petition adjudication, the assignment of full-time equivalent, permanent positions created by the Company shall be allocated to the Investing Members of the Company based on the sequential order of the date that each Investing Member either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status. If the I-829 Petition of any Investing Member is permanently denied, the job creation credit allocated to such Investing Member will be reallocated to the other Investing Members in the manner described above.

## ARTICLE I
## DUTIES OF INVESTING MEMBER

Prior to Investing Member's entry into the United States on an EB-5 Visa, Investing Member shall notify the Company of Investing Member's intent to enter the United States and provide Company with Investing Member's expected travel dates.

Within thirty (30) days after Investing Member's entry into the United States, based on Investing Member's EB-5 Visa, Investing Member shall provide Company with a copy of the I-551 Stamp in Investing Member's passport.

Within thirty (30) days after Investing Member receives a Form I-797A Notice of Action indicating USCIS' approval of Investing Member's Form I-485, Application for Adjustment of Status, Investing Member shall provide Company with a copy of such Form I-797A Notice of Action.

Within thirty (30) days after Investing Member either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status, Investing Member shall provide the Company with Investing Member's electronic-mail address, new physical address, and telephone number where the Company may contact the Investing Member. Should Investing Member's electronic-mail address, physical address, or telephone number change at any point during the two years after Investing Member's entry into the United States on Investing Member's EB-5 Visa or USCIS' approval of Investing Member's Adjustment of Status, Investing Member shall notify Company of such change within thirty (30) days.

Within one hundred and twenty (120) days prior to the second anniversary of the Investing Member's entry into the United States on an EB-5 Visa, or USCIS' approval of the Investing Member's Adjustment of Status, the Investing Member shall notify the Company of the name and physical address of the attorney retained by Investing Member who shall file the Investing Member's I-829 Petition.

## ARTICLE II
## DUTIES OF COMPANY

3

113600759.4

The Company shall maintain a record at its principal place of business that shall state the date that each member of the Company either (i) entered the United States on an EB-5 Visa, or (ii) received USCIS' approval of such member's Adjustment of Status. The Company shall further maintain at its principal place of business a record of the number of di direct, indirect and/or induced full-time equivalent, qualifying positions created by the Company.

Within one hundred and twenty (120) days after the Investing Member notifies Company that the Investing Member (i) has entered the United States based on the Investing Member's EB-5 Visa, or (ii) received USCIS' approval of the Investing Member's Adjustment of Status, Company shall deliver to the Investing Member a letter indicating the Investing Member's sequential order for job allocation, pursuant to Article I of this Agreement, and the corresponding full-time equivalent positions for qualifying employees to be allocated to the Investing Member for inclusion in Investing Member's I-829 Petition.

Within ninety (90) days preceding the second anniversary of the Investing Member's admission to the United States as a conditional lawful permanent resident, the Company shall provide the Investing Member and/or the Investing Member's attorney with documentation regarding the full-time job creation by the Developer due to the Company's investment in the Developer through the Loan.

## ARTICLE III
## NO GUARANTEES/INDEMNIFICATION

Investing Member hereby acknowledges, understands, and agrees that the Company has not guaranteed, nor can guarantee, that the EB-5 Program job requirements will be satisfied at the time Investing Member files his/her I-829 Petition. Investing Member further acknowledges and understands, that should an Investing Member not be able to demonstrate that Investing Member has met the EB-5 Program job requirements at the time of filing his/her I-829, Investing Member may be placed in a removal proceeding.

Investing Member agrees to hold Company and any agent, director, officer, or employee thereof harmless for (*i.e.*, the Company shall have no liability with respect to) any failure of the Company to create ten (10) direct, indirect and/or induced full-time equivalent, qualifying positions for each $500,000 investment in the Company, so long as Company exercised reasonable business judgment in the fulfillment of Company's duties under this Agreement.

4

113600759.4

## APPENDIX I

### GUARANTY ACKNOWLEDGEMENT

The Developer hereby unconditionally and irrevocably guarantees the refund obligation as set forth in Section 7.5 of the Operating Agreement.

**TRYON EQUESTRIAN PARTNERS, LLC**

By: _Sharon A. Decker_
Name: _Sharon A. Decker_
Its: _Chief Operating Officer, Tryon Equestrian Partners, LLC._

113600759.4

## Letter of Accreditation

To Whom It May Concern:

**July 12th, 2018**

I am a licensed attorney in good standing under the laws of the jurisdictions in which I am admitted to practice law. I have been engaged by Verify Investor, LLC to analyze whether **SIDDHARTHA RANGINENI** (the "Investor") is an "accredited investor", as defined in Rule 501 of Regulation D of the Securities Act of 1933.

In conducting the analysis, I reviewed information provided by or on behalf of the Investor, including certifications as to certain information and supporting documentation uploaded to VerifyInvestor.com. I have taken "reasonable steps" as outlined by the Securities and Exchange Commission in conducting this analysis.

I am pleased to confirm that the Investor has been verified as an "accredited investor" as defined in Rule 501 of Regulation D of the Securities Act of 1933.

Please note that this verification of "accredited investor" status expires on **October 10th, 2018**. To re-order verification services in the future, please visit VerifyInvestor.com. If an investor has been previously verified by VerifyInvestor.com, the verification process may be quicker and be less work for the investor.

Sincerely,

*Stephen Sibbach*

STEPHEN SIBBACH, CA Bar #289672

Powered by VerifyInvestor.com

Exhibits to Complaint  p.  91

References (required):      Investor Name: SIDDHARTHA RANGINENI

2.      **Parental Guardian Consent of Minor.** To the extent that the Subscriber who is funding subscription proceeds directly, is a minor child under applicable law (usually 18 years old), including the applicable jurisdiction provided for in the offering documents, a signature of the Subscriber's parent or legal guardian must co-sign the Subscription Agreement and Operating Agreement in order to validate the subscription documents, which shall be in accordance with the Uniform Transfers to Minors Act (UTMA), as applicable.

In the event that the minor Subscriber's subscription proceeds are paid from a bank account whereby the Custodian (as defined under the applicable law of the jurisdiction provided for in the offering documents) gifted such funds to the minor Subscriber under a custodial account, then the Custodian must co-sign the Subscription Agreement and Operating Agreement in order to validate the subscription documents.

Although the Company will accept subscriptions by a minor that conform to these instructions, all minor Subscribers and their guardians or custodians should speak to their U.S. immigration counsel regarding compliance with USCIS evidentiary requirements.

3.      **Subscription by "U.S. Person."** In the event that the Subscriber is a "U.S. Person" under the applicable securities laws, which may include an F1 student residing in the United States, then arrangements may need to be made to have an offshore designee/parent execute the subscription documents outside of the United States.

4.      **Acceptance of Subscription.** Subscriber understands and agrees that the Subscriber's subscription for Units hereunder ("**Subscription**") may be rejected by the Manager at any time in its sole discretion. If the Subscription is accepted, the Manager will notify Subscriber of same and the scheduled date of closing. If the Subscription is rejected, all funds received from the Subscriber will be returned without interest and thereafter this Agreement shall be of no further force or effect.

5.      **Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require Registration.** THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS (COLLECTIVELY, "**SECURITIES LAWS**"), EITHER PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, THESE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.

113600757.4                              6

**IN WITNESS WHEREOF**, the undersigned Subscriber has executed this Subscription Agreement for ODLUM EQUESTRIAN LENDERS, LLC, as of the date set forth below.

SUBSCRIBER:

_____ __ - 6741

[Social Security Number or FEI Number] (if any)

07/12/2018

Date of Subscriber's Execution

*Total Subscription Payment*:

$500,000.00 Capital Contribution
$ 50,000.00 Expense Amount
**$550,000.00 Total Subscription Payment**

SIDDHARTHA RANGINENI

Print Exact Name of Subscriber

R. Siddhartha

Signature of Subscriber

4709, NW 155th ST, EDMOND OK

Principal Residential Street Address

USA

Country of Residence

405-501-4276

Telephone Number

_____

Fax Number

SN RANGINENI@GMAIL.COM

E-mail Address

**CUSTODIAN/GUARDIAN:**

To the extent that the Subscriber is a minor child under applicable law (usually 18 years old), including the applicable jurisdiction provided for in the offering documents, a signature of the Subscriber's Custodian/Guardian must accompany the signature of the minor in order to validate this subscription.

The below Custodian/Guardian hereby acknowledges that, on behalf of the minor Subscriber, he or she certifies that he or she has read and understands the Odlum Equestrian Lenders, LLC Subscription Agreement and all other documents referenced therein, and approves the terms and conditions of all such documents referenced therein on behalf of said minor Subscriber and is signing this document as the authorized Custodian/Guardian of the minor Subscriber.

_____, as Custodian/Guardian for _____
under the Delaware Uniform Transfers to Minors Act

_____
Signature of Custodian/Guardian

113600757.4                                    17

## ACCEPTANCE

By signing below, the undersigned accepts the foregoing subscription for membership interests in ODLUM EQUESTRIAN LENDERS, LLC, in accordance with the terms hereof, for:

Subscriber Name: SIDDHARTHA RANGINENI

ODLUM EQUESTRIAN LENDERS, LLC

By:     ODLUM EQUESTRIAN MANAGER, LLC,
        its Manager

        By:_____
        Name: _____
        Title: _____
        Dated: _____

113600757.4                          18

## EXHIBIT A

### ACKNOWLEDGMENT OF RECEIPT OF
### ESCROW AGREEMENT

The undersigned, intending to be legally bound hereby, has executed and delivered this Acknowledgement of Receipt of Escrow Agreement on this 12 day of _____JULY_____ 2017. 2018

**ACKNOWLEDGED AND AGREED TO BY:**

INVESTOR:

_____
Signature

SIDDHARTHA RANGINENI
Print or Type Name

113601455.3

# ODLUM EQUESTRIAN LENDERS, LLC

# SUBSCRIPTION AGREEMENT

**EXHIBIT A**

113600757.4

## TABLE OF CONTENTS

Page

RECITALS: ................................................................................................................... 2

AGREEMENT ................................................................................................................. 5

1.  Subscription ............................................................................................................. 5

2.  Parental Guardian Consent of Minor .................................................................... 6

3.  Subscription by "U.S. Person .................................................................................. 6

4.  Acceptance of Subscription .................................................................................... 6

5.  Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require
    Registration ........................................................................................................... 6

6.  Subscriber's Additional Representations and Warranties ...................................... 7

7.  Withholding Tax .................................................................................................... 12

8.  Confirmation ......................................................................................................... 12

9.  Consultation with Independent Counsel and Tax Advisor ................................... 12

10. Indemnification ..................................................................................................... 12

11. Investor Information Form, Form W-8BEN and Investor Questionnaire ............ 12

12. Escrow Agreement ................................................................................................ 12

13. Miscellaneous. ...................................................................................................... 12

ACCEPTANCE ............................................................................................................. 18

## EXHIBITS

EXHIBIT A    -    INVESTOR INFORMATION FORM

EXHIBIT B    -    CERTIFICATE OF FOREIGN STATUS OF BENEFICIAL OWNER
                  FOR UNITED STATES TAX WITHHOLDING

Name of Subscriber:_____
Number of Registration:_____
**NON-U.S. PURCHASER**

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, EITHER PURSUANT TO APPLICABLE EXEMPTIONS WITHOUT SUCH REGISTRATION, THESE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS AGREEMENT AND THE OPERATING AGREEMENT. HEDGING UNITS MAY NOT BE CONDUCTED EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THIS AGREEMENT AND THE OPERATING AGREEMENT.

**NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THE OFFERING MEMORANDUM (DEFINED BELOW), AND NO OTHER PARTY EXCEPT SALES AGENTS AUTHORIZED BY THE COMPANY WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THE MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS.**

**ODLUM EQUESTRIAN LENDERS, LLC**

**SUBSCRIPTION AGREEMENT**

THIS SUBSCRIPTION AGREEMENT (this "**Agreement**") is made and entered into as of the date shown on the signature page hereof, by the undersigned subscriber ("**Subscriber**") identified on the signature page of this Agreement, in favor of **ODLUM EQUESTRIAN LENDERS, LLC**, a Delaware limited liability company (the "**Company**"), **ODLUM EQUESTRIAN MANAGER, LLC**, a Delaware limited liability company (the "**Manager**"), and if accepted by the Company in writing in accordance with the terms hereof, then this Agreement shall be by and between the Subscriber and the Company.

**THE UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ARE BEING OFFERED PURSUANT TO TRANSACTION EXEMPTION AFFORDED BY (A) REGULATION S PROMULGATED UNDER THE SECURITIES ACT SOLELY OUTSIDE OF THE UNITED STATES AND SOLELY TO NON-U.S. PERSONS AND IN SPECIFIC**

113600757.4                                                    1

RELIANCE UPON THE REPRESENTATIONS BY EACH SUBSCRIBER THAT (1) AT THE TIME OF THE OFFER AND SALE OF THE UNIT TO SUBSCRIBER, SUBSCRIBER WAS NOT A U.S. PERSON AS DEFINED IN REGULATION S, AND (2) AT THE TIME OF THE OFFER AND SALE OF THE UNIT TO SUBSCRIBER AND, AS OF THE DATE OF THE EXECUTION AND DELIVERY OF THIS SUBSCRIPTION AGREEMENT AND THE OPERATING AGREEMENT BY THE SUBSCRIBER, THE SUBSCRIBER WAS OUTSIDE OF THE UNITED STATES OR (B) REGULATION D PROMULGATED UNDER THE SECURITIES ACT.  THE UNIT MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S) UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE.  HEDGING TRANSACTIONS IN THE UNITS MAY NOT BE CONDUCTED EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND THE COMPANY'S OPERATING AGREEMENT.

## RECITALS:

A.      Pursuant to a Confidential Private Placement Memorandum dated as of July 12, 2017 (the "**Offering Memorandum**"), the Company is offering for purchase (the "**Offering**") only to a limited number of individual investors who are (i) not "U.S. persons," as such term is defined in Rule 902(k) of the Securities Act, in compliance with Regulation S, on a limited and private basis, or (ii) "accredited investors," as defined in Rule 501 under the Securities Act and pursuant to Regulation D of the Securities Act ("**Accredited Investors**"), a maximum of three hundred eighty-five (385) units ("**Units**") of membership interests in the Company ("**Membership Interests**"), representing total capital contributions to the Company of up to One Hundred Ninety-Two Million Five Hundred Thousand Dollars ($192,500,000) (or such other Maximum Offering Amount as may be necessary to account for changes resulting from new EB-5 legislation that requires an increase in the maximum offering amount to avoid the issuance of a fractional Unit) (the "**Maximum Offering Amount**"), excluding the sum of $50,000 per Investor for Offering costs and administrative expenses (the "**Expense Amount**"). The terms and conditions applicable to holders of the Units are described in the Operating Agreement of the Company (the "**Operating Agreement**") to be entered into by and among the Manager and each of the Subscribers for Units whose subscriptions are accepted by the Manager.

B.      The Offering of the Membership Interests is limited to only individual persons (not any legal entities) who are "Accredited Investors," as such term is defined in Rule 501(a) under the Securities Act.  Subscribers for Interests must subscribe for Five Hundred Fifty Thousand Dollars ($550,000) of Interests (the "**Total Subscription Payment**"), representing the Five Hundred Thousand Dollar ($500,000) capital contribution (or such other capital contribution amount as may be necessary to account for changes resulting from new EB-5 legislation that require an increase in the Subscriber's minimum investment amount) (the "**Capital Contribution**") and Fifty Thousand Dollar ($50,000) Expense Amount per Unit. Subscribers, in the aggregate, will own one hundred percent (100%) of the Investing Member Membership Interests in the Company, and each Subscriber shall be issued a Unit that represents

113600757.4                                              2

a limited liability company membership interest in the Company, as more fully described in the Operating Agreement.

   C.  **APPALACHIAN EB-5, LLC**, a North Carolina limited liability company (the "**Regional Center**"), is an approved regional center under the EB-5 program (the "**EB-5 Program**") with the United States Citizenship and Immigration Service ("**USCIS**") authorized under The Immigration Act of 1990 (IMMACT 90), effective November 29, 1991 ("**Immigration Act**"), for purposes of authorizing foreign investors in the Company to include indirect job creation from investment in participating businesses toward qualification for the EB-5 Program, and it will be granting the Project the rights to utilize the EB-5 program to raise capital for the development of the Project.  The Regional Center has agreed to sponsor the Project for participation in the EB-5 Program pursuant to a Memorandum of Understanding with the Company and Developer to utilize the EB-5 Regional Center designation in connection with the Loan to the Borrower, whereby the Project will, in turn, create jobs (the "**Memorandum of Understanding**").

   D.  The Company has been formed for the purpose of making a loan to **TRYON EQUESTRIAN PARTNERS, LLC**, a North Carolina limited liability company (the "**Borrower**" or "**Developer**"), in connection with the development of the Project (as defined in the Offering Memorandum).

   E.  Each Subscriber's Capital Contribution and Expense Amount will be paid to the Escrow Agent (as defined below) and will be held in bank accounts with Iberia Bank pursuant to the Escrow Agreement which maintains the Capital Contribution in and Expense Amount. Capital Contributions will be released from escrow to the Company's general operating account upon the filing of the applicable Subscriber's I-526 Immigrant Petition by Alien Entrepreneur (the "**I-526 Petition**") and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber (Form I-797) (collectively, the "**Escrow Release Conditions**") and in no event later than following approval of such Investing Member's I-526 Petition.  After the Escrow Release Conditions are satisfied, the Investing Member's Capital Contribution will be utilized to fund the Loan even before the I-526 Petition approval has been received, as more fully described under Section 7.5 of the Operating Agreement.

   F.  If an Investing Member receives an I-526 Petition Denial (without appeal or after denial of any appeal, as provided herein), then the Company shall seek to refund the denied Investing Member's Capital Contribution on a first priority basis and solely to the extent of available cash flow (such that each denied Investing Member shall be refunded his or her Capital Contribution in full in an order of priority based on the timing of when each such Investing Member's I-526 Petition was ultimately denied), as follows:

   (a)  subject to the availability of funds, the Company will (A) refund $500,000 to the denied Investing Member and (2) cancel such Investing Member's subscription; and

   (b)  if, following the application of clause (i) above, there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied

113600757.4        3

Investing Member and continue operations with the Capital Contributions of other Investing Members, the Company shall use commercially reasonable efforts to substitute the denied Investing Member with a Substitute Investing Member at which time a refund of the Capital Contribution shall be made to the Investing Member, as long as substitution occurs prior to the completion of the Project and in accordance with USCIS guidelines. If a Substitute Investing Member has not been found, within three (3) months of the Investing Member receiving I-526 Petition denial, the provisions of Section H below shall apply.

G.      If (i) there is an insufficient amount of fundsto enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members; and (ii) a Substitute Investing Member has not otherwise subscribed for Membership Interests hereunder (as described above), then such refund will be made to the denied Investing Member as of the date that adequate funds are available for the payment of the refund; provided, however, that the Developer agrees to guaranty the full refund of any Subscriber who receives an I-526 Petition denial and has not received a refund of his or her entire Capital Contribution within six (6) months of the Company receiving notice of such I-526 Petition denial (See Guaranty Acknowledgment attached as Appendix I to the Operating Agreement).

H.      Each Subscriber's Expense Amount shall be paid directly to the Escrow Agent and will be disbursed from escrow to the Manager and used for Offering costs immediately upon the filing of the applicable Subscriber's I-526 Petition; provided, however, that if a Subscriber's I-526 Petition is denied (without appeal or after denial of any appeal, as provided herein), the Company shall attempt to find a Substitute Investing Member as set forth above; provided however, if a Substitute Investing Member has not been found, then the Manager shall refund the Subscriber's Expense Amount, less a Twenty-Five Thousand Dollar ($25,000) charge to cover certain Offering costs (subject to the Company's ability to recoup from its marketing agents and other intermediaries their proportionate share thereof), within 90 days after the time period set forth for the Company to find a Substitute Investing Member; provided further, however, that if the Investing Member is at fault in providing incorrect information related to the I-526 Petition or lies or misrepresents information on his or her I-526 Petition, then the full Fifty Thousand Dollars ($50,000) shall be retained by the Manager for costs incurred on behalf of an individual Subscriber.

I.      The Offering has been structured so that each Investing Member, by subscribing for a Unit and becoming a member of the Company, will have made an investment that qualifies as the investment component required for an I-526 Petition that entitles the Investing Member to seek permanent United States residency and, ultimately, to apply for U.S. citizenship, provided that the Investing Member otherwise satisfies the non-investment criteria for an EB-5 Visa, subject to a potential increase in the investment amount as noted above. For further information, see "IV. IMMIGRATION MATTERS" and "V. E. RISK FACTORS - Immigration Risk Factors" of the Offering Memorandum. The Subscriber, at his or her sole cost and expense, will arrange for an immigration attorney to file his or her I-526 Petition following acceptance of the subscription and admission as a member of the Company; provided that the Company may require that an immigration attorney selected by the Company review the Subscriber's I-526 Petition to ensure consistency with this Offering Memorandum, in which case the Subscriber will be required to pay such immigration attorney's fee for performing such

113600757.4                                4

review.

J.      In addition to executing this Agreement and remitting the purchase price for the Units subscribed for hereunder to the Company, as described herein, the Subscriber will also need to execute the Company's Operating Agreement and deliver the executed Operating Agreement to the Company in order to complete its subscription hereunder. *Please review the Operating Agreement in its entirety.*

K.      The Offering will end on June 30, 2018 at 5:00 p.m. EST, unless extended by the Manager until December 31, 2018 (the "**Offering Period**"). Notwithstanding the foregoing, the Company reserves the right, following the end of the Offering Period, to substitute a Subscriber whose I-526 Petition is denied with a Substitute Investing Member, as defined and more fully set forth in Section 7.5 of the Operating Agreement. The Subscriber shall pay the Capital Contribution and the Expense Amount to the Escrow Agent (as defined below) in one or more installments, simultaneously with the execution of this Agreement. A copy of the Escrow Agreement (the "**Escrow Agreement**") executed by the Company, as escrow agent ("**Escrow Agent**"), is attached as Exhibit B to the Offering Memorandum.

L.      Subject to the terms of the Operating Agreement, the Subscriber irrevocably commits the Subscriber's Capital Contribution to the Company upon payment thereof to the Escrow Agent.

M.      All subscription proceeds from this Offering will be held in escrow pursuant to the terms of the Escrow Agreement. By execution hereof, each Subscriber agrees to be bound to the terms and conditions of the Escrow Agreement to the same extent as if the Subscriber had separately executed the Escrow Agreement.

## AGREEMENT

**NOW, THEREFORE,** the Subscriber hereby agrees as follows:

1.      Subscription. The Subscriber hereby irrevocably subscribes for and agrees to purchase the Unit indicated on the signature page of this Agreement. Payment of the Capital Contribution and Expense Amount shall be made in one or more installments payable upon subscription, as follows:

**$550,000 by wire transfer to:**

| | |
|---|---|
| **Wire to:** | **Iberia Bank**<br>**200 W. Congress St.**<br>**Lafayette, LA 70501** |
| **ABA#:** | **265270413** |
| **SWIFT CODE:** | **IBEAUS44** |
| **Account Name:** | Odlum Equestrian Lenders, LLC |
| **Account Number:** | 9785 |

113600757.4

5

References (required):    Investor Name: SIDDHARTHA RANGINENI

2.    Parental Guardian Consent of Minor.   To the extent that the Subscriber who is funding subscription proceeds directly, is a minor child under applicable law (usually 18 years old), including the applicable jurisdiction provided for in the offering documents, a signature of the Subscriber's parent or legal guardian must co-sign the Subscription Agreement and Operating Agreement in order to validate the subscription documents, which shall be in accordance with the Uniform Transfers to Minors Act (UTMA), as applicable.

In the event that the minor Subscriber's subscription proceeds are paid from a bank account whereby the Custodian (as defined under the applicable law of the jurisdiction provided for in the offering documents) gifted such funds to the minor Subscriber under a custodial account, then the Custodian must co-sign the Subscription Agreement and Operating Agreement in order to validate the subscription documents.

Although the Company will accept subscriptions by a minor that conform to these instructions, all minor Subscribers and their guardians or custodians should speak to their U.S. immigration counsel regarding compliance with USCIS evidentiary requirements.

3.    Subscription by "U.S. Person."   In the event that the Subscriber is a "U.S. Person" under the applicable securities laws, which may include an F1 student residing in the United States, then arrangements may need to be made to have an offshore designee/parent execute the subscription documents outside of the United States.

4.    Acceptance of Subscription.    Subscriber understands and agrees that the Subscriber's subscription for Units hereunder ("Subscription") may be rejected by the Manager at any time in its sole discretion.   If the Subscription is accepted, the Manager will notify Subscriber of same and the scheduled date of closing.   If the Subscription is rejected, all funds received from the Subscriber will be returned without interest and thereafter this Agreement shall be of no further force or effect.

5.    Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require Registration.   THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS (COLLECTIVELY, "SECURITIES LAWS"), EITHER PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, THESE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.

113600757 4                                  6

ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THE COMPANY'S OPERATING AGREEMENT ADDITIONALLY, THE SUBSCRIBER ACKNOWLEDGES THAT NEITHER THE COMPANY NOR THE MANAGER IS OBLIGATED TO REGISTER THE UNITS UNDER THE SECURITIES LAWS. SUBSCRIBER FURTHER UNDERSTANDS THAT THE TRANSFER OF THE UNITS MAY BE SUBSTANTIALLY RESTRICTED BY THE SECURITIES LAWS AND BY THE ABSENCE OF A TRADING MARKET THEREFOR, AND THE TRANSFER OF THE UNITS IS ADDITIONALLY RESTRICTED BY THE TERMS OF THE OPERATING AGREEMENT; THAT NO TRADING MARKET FOR THE UNITS EXISTS AND NONE IS EXPECTED TO DEVELOP; AND THAT ANY SALE OR OTHER DISPOSITION OF THE UNITS MAY RESULT IN UNFAVORABLE TAX CONSEQUENCES TO THE SUBSCRIBER. THE SUBSCRIBER ACKNOWLEDGES THAT THE RESTRICTIONS ON THE TRANSFERABILITY OF THE UNITS ARE SUBSTANTIAL AND MAY REQUIRE THE SUBSCRIBER TO HOLD THE UNITS INDEFINITELY. THE SUBSCRIBER HEREBY REPRESENTS AND WARRANTS THAT THE SUBSCRIBER HAS ADEQUATE MEANS OF PROVIDING FOR THE SUBSCRIBER'S CURRENT AND FUTURE NEEDS AND POSSIBLE PERSONAL CONTINGENCIES AND HAS NO NEED FOR LIQUIDITY OF THE UNITS.

6.     Subscriber's Additional Representations and Warranties.     The Subscriber additionally represents and warrants to the Regional Center and the Company as follows:

(a)     The Subscriber understands that the offer and sale of the Units have not been registered under the Securities Laws, pursuant to applicable exemptions. The Subscriber acknowledges the Company is not obligated to register the Unit under the Securities Laws. In addition to restrictions on transferability pursuant to the Operating Agreement, without such registration, such Unit may not be sold, pledged, hypothecated or otherwise transferred at any time whatsoever, except upon delivery to the Company of an opinion of counsel satisfactory to the Manager and the Company that registration is not required for such transfer or the submission to the Manager of such other evidence as may be satisfactory to the Manager and the Company to the effect that any such transfer will not be in violation of the Securities Laws. Subscriber further understands that any transfer of the Unit may be substantially restricted by the absence of a trading market therefor and none is expected to develop, and that any sale or other disposition of the Unit may result in unfavorable tax consequences to the Subscriber. The Subscriber acknowledges that the restrictions on the transferability of the Unit are substantial and may require the Subscriber to hold the Unit indefinitely.

(b)     The Subscriber is acquiring the Unit solely for the account of the Subscriber for investment purposes only and not for distribution or resale to others. The Subscriber will not resell or offer to resell all or a portion of the Unit except in strict compliance with all applicable Securities Laws, including, without limitation, Regulation S (Rules 901 through 905 and Preliminary Statement) under the Securities Act and the Operating Agreement. Without limiting the generality of the provisions set forth herein, the Subscriber consents to the placement of substantially the legend on any document representing the Units being purchased by the Subscriber, if applicable, stating that transfer is prohibited except in accordance with the provisions of Regulation S of the Securities Act (§§ 230.901 through 230.905, and Preliminary Notes), pursuant to registration under the Securities Act, or pursuant to an available exemption from

113600757.4                                    7

registration. Subscriber will not engage in any hedging transactions involving the Unit, except in compliance with the Securities Laws and the Operating Agreement.

(c)     Subscriber (i) is not a U.S. Person, is not a citizen or resident alien of the United States, is not acquiring the Units for the account or benefit of any U.S. Person, did not receive the Offering Memorandum or an offer to purchase the Unit in the United States and did not execute this Agreement and pay the amounts specified hereunder from within the United States; or (ii) is an Accredited Investor acquiring the Units in a transaction not requiring registration under the Securities Act through Regulation D of the Securities Act. If requested by the Company, Subscriber further agrees to execute and deliver to the Company an executed IRS Form W-8BEN certifying that he or she is a Non-Resident Alien.

(d)     The Subscriber is a bona fide resident of the country set forth in his or her address in this Agreement, and agrees that if his or her principal residence changes prior to his or her purchase of a Unit, he or she will promptly notify the Manager.

(e)     The Subscriber acknowledges that the offer and sale of the Units is not taking place within the United States, but rather in an "offshore transaction," as defined in Rule 902 of Regulation S adopted by the Securities Exchange Commission pursuant to the Securities Act, and that no "directed selling efforts" took place within the United States in compliance with Regulation S, unless the Subscriber is an "accredited investors" as such term is defined in Rule 501(a) under the Securities Act in compliance with Regulation D of the Securities Act. The term "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia.

(f)     The Subscriber's financial condition is such that he or she has no need for liquidity with respect to its investment to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of its investment for an indefinite period of time, including the risk of losing all of its investment.

(g)     The Subscriber understands that the Project has not yet been developed and it has no operating history. The Project is in its early stages, is not currently generating any revenue, and its future profitability cannot be assured.

(h)     The Subscriber understands that: (i) his or her subscription for a Unit is irrevocable until the Offering Period ends without the Company's written consent; (ii) an investment in the Unit is a speculative investment that involves a high degree of risk, including the risk of loss of the entire investment of the Subscriber in the Company; (iii) no federal or state agency has passed upon the adequacy or accuracy of the information made available to the Subscriber, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Unit as an investment; (iv) any anticipated federal and/or state income tax benefits applicable to the Unit may be lost through changes in, or adverse interpretations of, existing laws and regulations; and (vi) there is no assurance that the Company will ever be profitable, or that the Subscriber's investment in the Unit will ever be recoverable.

(i)     The Subscriber acknowledges that there is no assurance that his or her I-526 Petition will be granted or, if it is, that Subscriber will ultimately be approved for conditional or

113600757.4                                        8

unconditional lawful permanent residence in the U.S. or be able to become a U.S. citizen. Neither the Company, Regional Center, Developer, nor the Company's immigration counsel has made any effort to pre-determine Subscriber's personal qualifications and circumstances and whether the Subscriber is likely or not likely to obtain favorable action on its I-526 Petition or EB-5 Visa, and that there are numerous reasons that will result in the Subscriber being denied residency in the United States, including, without limitation, the Project failing to qualify as an approved project for the EB-5 Program.

(j)  The Subscriber (i) has been provided with a copy of the Offering Memorandum, including, as exhibits thereto, this Agreement, the Escrow Agreement, the Operating Agreement, and has reviewed same; (ii) has been given complete access to all documents, records, contracts and books of or relating to the Company and the Unit, and all other information reasonably requested by the Subscriber; and (iii) has performed a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the Subscriber in reaching the Subscriber's decision to invest in the Company. The Subscriber further acknowledges and confirms that the Subscriber has had an opportunity to ask questions of and receive answers from the Company and the Developer concerning the Unit, the prospective contemplated business and purpose of the Company, and any other matter the Subscriber has deemed relevant, and all such inquiries have been answered to the Subscriber's satisfaction. In addition, Subscriber acknowledges that he or she has had and may have, at any reasonable hour, after reasonable prior notice, access to the financial and other records of the Company which the Company can obtain without unreasonable effort or expense, and further acknowledges that Subscriber has obtained, in Subscriber's judgment, sufficient information from the Company to evaluate the merits and risks of an investment in the Unit.

(k)  The Subscriber acknowledges that: (i) the risks inherent to this investment have been fully considered; (ii) the Manager will have substantial and exclusive authority to conduct the operation of the Company; and (iii) an investment in the Unit has neither been approved nor disapproved by the Securities and Exchange Commission or any other federal, state or local department or agency of any other jurisdiction, and such authorities have not passed upon the adequacy or accuracy of the disclosure provided to investors in connection with an investment in the Unit.

(l)  The Subscriber acknowledges that neither the Company, Manager, the Regional Center nor any representative of the Company, the Manager or the Regional Center has made any representations or warranties in respect of the Developer's business or profitability. Without limiting the generality of the foregoing, the Subscriber acknowledges and agrees that information, including any business plan or financial projections or forecasts or other information contained in written materials provided or made available to the undersigned, and any oral, visual or other presentations made by the Company, the Manager or the Regional Center or its representatives to the Subscriber shall not be deemed a representation or warranty in respect of the matters therein. Subscriber acknowledges that the Offering Memorandum contains information that the Developer and Company believe is accurate and, as such information relates to the projected revenues and expenses of the Developer, data that the Developer believes is a reasonable forecast of the results that the Developer will achieve; however, as an accredited, experienced and sophisticated investor, Subscriber is aware that there are many foreseeable and unforeseeable events that could cause the assumptions underlying the financial projections to not materialize,

and the results of same may cause material adverse consequences to the financial results of the Developer and Company.

(m)     In making the decision to purchase the Unit, Subscriber has relied solely upon independent investigations made by Subscriber, and the Subscriber further represents and warrants that the Subscriber is not acquiring the Unit as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media distributed in the United States, any seminar in the United States or any solicitation by a person in the United States not previously known to the Subscriber, and that Subscriber is not aware of any general solicitation within the United States or general advertising within the United States regarding the purchase or sale of the Unit.  The Subscriber acknowledges and confirms that he or she is not relying upon any statement, representation or warranty made by the Company or its respective representatives in making a decision to subscribe for the Unit.  Subscriber must rely solely on the terms of the Operating Agreement for the terms of Subscriber's participation in the Company and the rights and responsibilities of owning its Unit.

(n)     The Subscriber understands that the Company and the Manager will be relying on the accuracy and completeness of all matters set forth in this Agreement, and the Subscriber represents and warrants to the Company, the Manager and each of their affiliates that the information, representations, warranties, acknowledgments and all other matters set forth in the Subscription Agreement with respect to the Subscriber are complete, true and correct and does not fail to include any material fact necessary to make the facts stated, in light of the circumstances in which they are made, not misleading, and may be relied upon by them in determining whether the offer and sale of a Unit to the Subscriber is exempt from registration under the Securities Laws, and the Subscriber will notify them immediately of any change in any statements made in the Subscription Agreement that occurs prior to the consummation of the purchase of a Unit.

(o)     The Subscriber is in compliance with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Freedom Act**"), the U.S. Bank Secrecy Act (the "**BSA**") and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA.  The Subscriber is not and shall not be a person: (i) acting, directly or indirectly, on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any of the OFAC lists; (ii) listed on, residing in or having a place of business in a country or territory named on any of such lists or which is designated as a Non-Cooperative Jurisdiction by the Financial Action Task Force on Money Laundering (FATF), or whose funds are from or through such a jurisdiction; (iii) that is a "Foreign Shell bank" within the meaning of the USA Freedom Act; or (iv) residing in or organized under the laws of a jurisdiction designated by the U.S. Secretary of the Treasury under Sections 311 or 312 of the USA Freedom Act as warranting special measures due to money-laundering concerns.

(p)     The Subscriber (i) has accurately completed the Investor Questionnaire that is an exhibit to the Offering Memorandum; and (ii) is a "sophisticated person" in that Subscriber has such knowledge and experience in financial and business matters that individually and/or with

113600757.4

10

the aid of advisers, it is capable of evaluating the merits and risks of an investment in the Company by making an informed investment decision with respect thereto.

(q)     Without limiting the generality of the provisions set forth herein, the Subscriber consents to the placement of substantially the legend on any document representing the Units being purchased by the Subscriber, if applicable, stating that transfer is prohibited except in accordance with the provisions of Regulation S of the Securities Act (§§ 230.901 through 230.905, and Preliminary Notes), pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and that hedging transactions involving those securities may not be conducted unless in compliance with the Securities Act.

(r)     If the Subscriber is (i) a purchaser in a sale that occurs outside the United States within the meaning of Regulation S or (ii) a "distributor," "dealer" or person "receiving a selling concession, fee or other remuneration" in respect of Units sold, prior to the expiration of the applicable "distribution compliance period" (as defined below), it acknowledges that (A) until the expiration of such "distribution compliance period" any offer or sale of the Units shall not be made by it to a U.S. Person or for the account or benefit of a U.S. Person within the meaning of Rule 902(k) of the Securities Act and (B) until the expiration of the "distribution compliance Period," it may not, directly or indirectly, refer, resell, pledge or otherwise transfer a Unit or any interest therein except to a person who certifies in writing to the Company that such transfer satisfies, as applicable, the requirements of the legends described herein and that the Units will not be accepted for registration of any transfer prior to the end of the applicable "distribution compliance period" unless the transferee has first complied with certification requirements described in this Section. The "distribution compliance period" means the one-year period following the issue date for the Units.

(s)     The Subscriber acknowledges that the Manager and the Developer are affiliated parties.

(t)     The Subscriber acknowledges and agrees to comply with all of his or her obligations set forth in the EB-5 Job Allocation Addendum attached as a schedule to the Operating Agreement, and all of the Subscriber's representations, warranties and agreements set forth therein are incorporated by reference into the Operating Agreement and Subscription Agreement.

(u)     The Subscriber acknowledges and agrees that (i) the Manager, Regional Center and Developer have not given, and have no authority to give, any investment advice with respect to the purchase of a security; and (ii) a prospective subscriber has not requested or otherwise sought any such investment advice from the Manager, Regional Center and/or the Developer.

(v)     The Subscriber acknowledges and agrees that (i) the Regional Center is unaffiliated with the Developer; (ii) the Regional Center makes no representations about the Project- and Developer-related information in the Project Business Plan or documents related to the business plan or the investment the Subscriber is making, and (iii) the Subscriber is in no way relying on the Regional Center for providing any service other than filing the annual I-924A report with USCIS.

113600757.4                                   11

7.      Withholding Tax.  The Subscriber acknowledges that in the event the Internal Revenue Service determines that the Subscriber's country of residence does not exchange adequate tax information with the United States, pursuant to Internal Revenue Code Sections 871(h)(5) or Section 881(c)(5), then the Company will be obligated to withhold United States income taxes and remit such taxes to the Internal Revenue Service, pursuant to applicable law, and the Subscriber consents to such withholding.

8.      Confirmation.  All information that the Subscriber has provided anywhere in this Agreement concerning the Subscriber and the Subscriber's financial position is correct and complete as of the date set forth below, and if there should be any material change in such information prior to the acceptance of the Subscriber's subscription for the Unit that is being purchased, the Subscriber will immediately provide such information to the Manager.

9.      Consultation with Independent Counsel and Tax Advisor.  The Subscriber's investment in the Units is an investment in the equity of a Delaware limited liability company, which confers certain rights and liabilities upon the Subscriber pursuant to Delaware law and the Operating Agreement.  Subscriber has been advised that Subscriber should consult with his or her own legal and tax advisors prior to executing this Agreement, acquiring a Unit or consummating the transactions contemplated hereby.  Subscriber understands that the lawyers(s) for the Company, Regional Center and Developer represent only these entities in connection with the transactions contemplated by this Agreement, and do not represent the Subscriber, and such lawyer(s) make no representation regarding the Regional Center, the Company, the Developer or the Subscriber's investment in Units.

10.     Indemnification.  Subscriber hereby agrees to indemnify and hold harmless the Regional Center, the Company and the Developer and their affiliates, and the respective employees, agents and attorneys of the foregoing against any and all losses, claims, demands, liabilities and expenses (including reasonable legal or other expenses) incurred by each such person or entity in connection with any claims or liabilities, whether or not resulting in any liability to such person or entity, to which any such indemnified party may become subject under the Securities Laws, under any other statute, at common law or otherwise, insofar as such losses, claims, demands, liabilities and expenses (a) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact made by Subscriber, or (b) arise out of or are based upon any breach of any representation, warranty or agreement of Subscriber contained herein.

11.     Investor Information Form, Form W-8BEN and Investor Questionnaire.  Subscriber shall complete and fully execute, together with this Subscription Agreement, the Investor Information Form and Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (W-8BEN), attached hereto as **Exhibits A** and **B**, respectively, and the Investor Questionnaire attached to the Offering Memorandum.

12.     Escrow Agreement.  By execution hereof, the Subscriber agrees to be bound to the terms and conditions of the Escrow Agreement to the same extent as if the Subscriber had separately executed the Escrow Agreement attached as Exhibit B to the Offering Memorandum.

13.     Miscellaneous.

113600757.4                                            12

(a)　　Severability.  In the event any portion of this Agreement is found to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in a jurisdiction shall not affect the validity, legality or enforceability of any portions of this Agreement in any other jurisdiction.

(b)　　Entire Agreement; Amendment; Waiver.  This Agreement constitutes the entire Agreement between the parties and supersedes all prior oral and written agreements between the parties hereto with respect to the subject matter hereof.  Neither this Agreement nor any provision hereof may be amended, modified, changed, waived, discharged or terminated orally, except by a statement in writing signed by the party or parties against which enforcement or the change, waiver, discharge or termination is sought.  No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

(c)　　Governing Law; Venue; Jurisdiction.  This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, the obligations provided therein or performance thereof shall be governed or interpreted according to the laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof.

(d)　　Arbitration:  Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement  shall be submitted to JAMS, Inc. (hereafter, the "**Arbitration Service**") and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract or otherwise, regardless of its nature.  Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service.  In the event of a conflict between the applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern. To select the three-member arbitration panel, the parties shall each name one neutral arbitrator, and those two arbitrators shall select a third neutral arbitrator from a list of potential arbitrators jointly prepared by the parties.  The arbitration proceeding shall be decided by majority vote of the three-arbitrator panel.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in Tryon, North Carolina.

In the event of a dispute subject to this Section, (a) the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings. The remedial authority of the arbitrator shall be the same as, but no greater than, would

113600757.4                                        13

be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitrator shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation. The parties and the arbitrator shall keep confidential all matters relating to any arbitration hereunder (including without limitation the existence of the dispute and the arbitration).

In interpreting this Agreement, the arbitrator shall be bound by and follow the substantive law of the State of Delaware. To the extent applicable and not inconsistent with this Section, the arbitrator shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Any filing or administrative fees shall be borne initially by the party requesting administration by the Arbitration Service. If both parties request such administration, the fees shall be borne initially by the party incurring such fees as provided by the rules of the Arbitration Service. The initial fees and costs of the arbitrator shall be borne equally by the parties. The prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. Judgment upon any award rendered by the arbitrators may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

If any of the provisions of this Section are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Section, and this Section shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Section are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

(e)     Litigation: Subject to the arbitration provisions set forth in Section 10(d) herein, the Company shall prosecute and defend such actions at law or in equity as may be necessary to enforce or protect the interest of the Company. The Company shall respond to any final decree, judgment or decision of any court, board or authority having jurisdiction in the premises. The Company shall satisfy any such judgment, decree or decision, first out of any insurance proceeds available therefor, and next out of assets of the Company. The cost of defending any actions brought against the Company and/or the Manager with respect to Company matters shall be borne by the Company except as otherwise provided in this Agreement.

(f)    Notices.  All notices, offers, acceptance and any other acts under this Agreement (except payment) shall be in writing, and shall be sufficiently given if delivered to the addressee in person, by Federal Express or similar receipted delivery, or if mailed, postage prepaid, by certified mail, return receipt requested, as follows:

Subscriber:    At the address designated on the signature page of this Agreement.

The Company:    Odlum Equestrian Lenders, LLC
c/o Appalachian EB-5, LLC
Attention: Andrew Dover and Dale Carroll
Biltmore Park Town Square
One Town Square Boulevard, Suite 315
Asheville, NC 28803
Phone (Andrew): (740) 704-3256
Phone (Dale): (919) 665-7932
Emails:  andydover@odlumcapital.com and
dcarroll@appalachianeb5.com

or to such other address as either of them, by notice to the other may designate from time to time.

(g)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The execution of this Agreement may be by actual or facsimile signature.

(h)    Survival of Representations, Warranties and Agreements.  The representations, warranties and agreements contained herein shall survive the delivery of, and payment for, the Unit.

(i)    Assignability. This Agreement and the rights and obligations hereunder and the Units contemplated to be purchased hereunder are not transferable or assignable by the Subscriber without the prior written consent of the Company, and any such attempted transfer or assignment shall be void *ab initio* except as provided in the Operating Agreement.  Before consenting to any such assignment, the Regional Center may require a proposed assignee to take certain actions and execute certain documents, including, without limitation, executing a separate subscription agreement, as the Regional Center may reasonably determine.

(j)    Benefit. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors, and assigns.

(k)    English Language. The English language text of this Agreement has been translated to a language in which the Subscriber is competent and the Subscriber understands all of the provisions of this Agreement. The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

113600757.4              15

## EXHIBIT A

### ACKNOWLEDGMENT OF RECEIPT OF
### ESCROW AGREEMENT

The undersigned, intending to be legally bound hereby, has executed and delivered this Acknowledgement of Receipt of Escrow Agreement on this 22 day of __MARCH__ ~~2017.~~ 2019.

**ACKNOWLEDGED AND AGREED TO BY:**

INVESTOR:

M·S

_____

Signature

SRAVANTHI MARELLA

_____

Print or Type Name

113601455.4



March 22, 2019

Sravanthi Marella
3116 Virginia Ave. SE
Charleston, WV 25304

Re: Appalachian EB-5 Regional Center RCW1631454520

Dear Sravanthi,

This letter is to confirm that we are in receipt of $540,000, which is payment in full, as follows:

- Financial Institution: Iberia Bank
- Account Name: Odlum Equestrian Lenders, LLC
- Account Number: 20001499785
- Investor Name: Sravanthi Marella
- Date Received: March 22, 2019

Thanks to you and your family for investing in the USA with our Regional Center.

Best Regards.

Sincerely,

Andrew B. Dover
Chairman

**ODLUM EQUESTRIAN LENDERS, LLC**
**OPERATING AGREEMENT**

SIGNATURE PAGE

M.S_____

(Signature)

Print Name: SRAVANTHI MARELLA

Address: 3116 VIRGINIA AVENUE SE, CHARLESTON, WV, 25304

Telephone: 4438235315

Tax I.D. or Social Security #: _____ 4452

Number of Units: ONE UNIT

Email Address: Sravanthy_marella@yahoo.com

Fax Number : —

**CUSTODIAN/GUARDIAN:**

To the extent that the Subscriber is a minor child under applicable law (usually 18 years old), including the applicable jurisdiction provided for in the offering documents, a signature of the Subscriber's Custodian/Guardian must accompany the signature of the minor in order to validate the Operating Agreement.

The below Custodian/Guardian hereby acknowledges that, on behalf of the minor Subscriber, he or she certifies that he or she has read and understands the Operating Agreement of Odlum Equestrian Lenders, LLC and all other documents referenced therein, and approves the terms and conditions of all such documents referenced therein on behalf of said minor Subscriber and is signing this document as the authorized Custodian/Guardian of the minor Subscriber.

_____, as Custodian/Guardian for _____ under the Delaware Uniform Transfers to Minors Act

_____
Signature of Custodian/Guardian

113600759.5                                    37

# SCHEDULE 1

## List of Investing Members

113600759.5

## SCHEDULE 2

### EB-5 JOB ALLOCATION ADDENDUM

The Company and each Investing Member hereby agree and acknowledge as follows:

1. the Company is a business with an investment opportunity associated with the Regional Center where the Regional Center has been designated by USCIS as a regional center to participate in the EB-5 Program;

2. the Investing Member desires to be one of up to three hundred eighty-five (385) limited liability members of the Company, making an investment in the Company to enable the Company to create ten (10) direct or indirect qualifying jobs for each $500,000 investment funded to the Company pursuant to the EB-5 Program;

3. the Investing Member acknowledges that, except as otherwise provided in this Agreement, Investing Member will only become a member of the Company upon the following: (i) the Company's receipt of the Investing Member's initial Capital Contribution and Expense Amount; (ii) the Company's receipt of the Investing Member's fully executed Subscription Agreement, and (iii) and written acknowledgement of the Company's acceptance of the Investing Member's subscription;

4. a member of the Company who receives USCIS' approval of his/her I-526 Petition while outside the United States obtains conditional lawful permanent residency status after filing an application for an immigrant visa with the United States Department of State (the "**EB-5 Visa**"), the processing of the EB-5 Visa at a United States Consulate abroad, and such member's admission to the United States on the EB-5 Visa as a conditional lawful permanent resident;

5. a member of the Company who receives USCIS' approval of his/her I-526 Petition while in the United States on another United States visa may obtain conditional lawful permanent residency status upon USCIS' approval of such member's Form I-485, Application to Register Permanent Residence or Adjust Status ("**Adjustment of Status**");

6. the total number of qualifying jobs created shall be allocated solely to those who have used the establishment of the Company as the basis of a petition on I-526 Petition; and

7. each member of the Company shall be required to demonstrate at the time of filing his/her respective Form I-829 Petition, within the 90-day period preceding the second anniversary of his/her (i) admission to the United States as a conditional lawful permanent resident or (ii) adjustment of status to that of a conditional lawful permanent resident, that ten (10) direct and/or indirect and/or induced full-time equivalent, qualifying positions have been created as a result of his/her investment in the Company.

113600759.5

**INTRODUCTION**

The Company shall take such action to meet the objective of allocating to each Investing Member a minimum number of ten (10) direct, indirect and/or induced full-time equivalent, permanent positions created by the Company on the following basis:

In the event of a shortfall of jobs for all three hundred eighty-five (385) Investing Members at the time of the I-526 Petition adjudication, projected jobs to be created by the Company shall be allocated to each Investing Member based on the date of filing the I-526 Petition for the purposes of determining whether sufficient jobs will be created within two and one-half (2½) years from the approval of the Investing Member's I-526 Petition.

At the time of the I-829 Petition adjudication, the assignment of full-time equivalent, permanent positions created by the Company shall be allocated to the Investing Members of the Company based on the sequential order of the date that each Investing Member either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status.  If the I-829 Petition of any Investing Member is permanently denied, the job creation credit allocated to such Investing Member will be reallocated to the other Investing Members in the manner described above.

**ARTICLE I**
**DUTIES OF INVESTING MEMBER**

Prior to Investing Member's entry into the United States on an EB-5 Visa, Investing Member shall notify the Company of Investing Member's intent to enter the United States and provide Company with Investing Member's expected travel dates.

Within thirty (30) days after Investing Member's entry into the United States, based on Investing Member's EB-5 Visa, Investing Member shall provide Company with a copy of the I-551 Stamp in Investing Member's passport.

Within thirty (30) days after Investing Member receives a Form I-797A Notice of Action indicating USCIS' approval of Investing Member's Form I-485, Application for Adjustment of Status, Investing Member shall provide Company with a copy of such Form I-797A Notice of Action.

Within thirty (30) days after Investing Member either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status, Investing Member shall provide the Company with Investing Member's electronic-mail address, new physical address, and telephone number where the Company may contact the Investing Member. Should Investing Member's electronic-mail address, physical address, or telephone number change at any point during the two years after Investing Member's entry into the United States on Investing Member's EB-5 Visa or USCIS' approval of Investing Member's Adjustment of Status, Investing Member shall notify Company of such change within thirty (30) days.

3

113600759.5

Within one hundred and twenty (120) days prior to the second anniversary of the Investing Member's entry into the United States on an EB-5 Visa, or USCIS' approval of the Investing Member's Adjustment of Status, the Investing Member shall notify the Company of the name and physical address of the attorney retained by Investing Member who shall file the Investing Member's I-829 Petition.

## ARTICLE II
## DUTIES OF COMPANY

The Company shall maintain a record at its principal place of business that shall state the date that each member of the Company either (i) entered the United States on an EB-5 Visa, or (ii) received USCIS' approval of such member's Adjustment of Status. The Company shall further maintain at its principal place of business a record of the number of di direct, indirect and/or induced full-time equivalent, qualifying positions created by the Company.

Within one hundred and twenty (120) days after the Investing Member notifies Company that the Investing Member (i) has entered the United States based on the Investing Member's EB-5 Visa, or (ii) received USCIS' approval of the Investing Member's Adjustment of Status, Company shall deliver to the Investing Member a letter indicating the Investing Member's sequential order for job allocation, pursuant to Article I of this Agreement, and the corresponding full-time equivalent positions for qualifying employees to be allocated to the Investing Member for inclusion in Investing Member's I-829 Petition.

Within ninety (90) days preceding the second anniversary of the Investing Member's admission to the United States as a conditional lawful permanent resident, the Company shall provide the Investing Member and/or the Investing Member's attorney with documentation regarding the full-time job creation by the Developer due to the Company's investment in the Developer through the Loan.

## ARTICLE III
## NO GUARANTEES/INDEMNIFICATION

Investing Member hereby acknowledges, understands, and agrees that the Company has not guaranteed, nor can guarantee, that the EB-5 Program job requirements will be satisfied at the time Investing Member files his/her I-829 Petition. Investing Member further acknowledges and understands, that should an Investing Member not be able to demonstrate that Investing Member has met the EB-5 Program job requirements at the time of filing his/her I-829, Investing Member may be placed in a removal proceeding.

Investing Member agrees to hold Company and any agent, director, officer, or employee thereof harmless for (*i.e.*, the Company shall have no liability with respect to) any failure of the Company to create ten (10) direct, indirect and/or induced full-time equivalent, qualifying positions for each $500,000 investment in the Company, so long as Company exercised reasonable business judgment in the fulfillment of Company's duties under this Agreement.

4

## APPENDIX I

### GUARANTY ACKNOWLEDGEMENT

The Developer hereby unconditionally and irrevocably guarantees the refund obligation as set forth in Section 7.5 of the Operating Agreement.


**TRYON EQUESTRIAN PARTNERS, LLC**

By: _Sharon A. Decker_

Name: _Sharon A. Decker_

Its: _Chief Operating Officer, Tryon Equestrian Partners, LLC._

113600759.4

# ODLUM EQUESTRIAN LENDERS, LLC

# SUBSCRIPTION AGREEMENT

**EXHIBIT A**

113600757.5

**TABLE OF CONTENTS**

Page

RECITALS: ................................................................................................................. 2

AGREEMENT .......................................................................................................... 5

1.  Subscription ...................................................................................... 5

2.  Parental Guardian Consent of Minor .............................................. 6

3.  Subscription by "U.S. Person .......................................................... 6

4.  Acceptance of Subscription ............................................................. 6

5.  Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require
Registration ..................................................................................... 6

6.  Subscriber's Additional Representations and Warranties ................ 7

7.  Withholding Tax .............................................................................. 12

8.  Confirmation ................................................................................... 12

9.  Consultation with Independent Counsel and Tax Advisor ............. 12

10.  Indemnification ............................................................................... 12

11.  Investor Information Form, Form W-8BEN and Investor Questionnaire ....... 12

12.  Escrow Agreement .......................................................................... 12

13.  Miscellaneous. ................................................................................ 13

ACCEPTANCE ...................................................................................................... 18

**EXHIBITS**

EXHIBIT A  -  INVESTOR INFORMATION FORM

EXHIBIT B  -  CERTIFICATE OF FOREIGN STATUS OF BENEFICIAL OWNER
FOR UNITED STATES TAX WITHHOLDING

113600757.5

i

Name of Subscriber: _____

Number of Registration: _____

**NON-U.S. PURCHASER**

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, EITHER PURSUANT TO APPLICABLE EXEMPTIONS WITHOUT SUCH REGISTRATION, THESE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS AGREEMENT AND THE OPERATING AGREEMENT. HEDGING UNITS MAY NOT BE CONDUCTED EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THIS AGREEMENT AND THE OPERATING AGREEMENT.

**NO PARTY EXCEPT THE COMPANY IS RESPONSIBLE FOR THE CONTENTS OF THE OFFERING MEMORANDUM (DEFINED BELOW), AND NO OTHER PARTY EXCEPT SALES AGENTS AUTHORIZED BY THE COMPANY WILL BE INVOLVED IN THE OFFERING OF UNITS UNDER THE MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS.**

**ODLUM EQUESTRIAN LENDERS, LLC**

**SUBSCRIPTION AGREEMENT**

THIS SUBSCRIPTION AGREEMENT (this "**Agreement**") is made and entered into as of the date shown on the signature page hereof, by the undersigned subscriber ("**Subscriber**") identified on the signature page of this Agreement, in favor of **ODLUM EQUESTRIAN LENDERS, LLC**, a Delaware limited liability company (the "**Company**"), **ODLUM EQUESTRIAN MANAGER, LLC**, a Delaware limited liability company (the "**Manager**"), and if accepted by the Company in writing in accordance with the terms hereof, then this Agreement shall be by and between the Subscriber and the Company.

**THE UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ARE BEING OFFERED PURSUANT TO TRANSACTION EXEMPTION AFFORDED BY (A) REGULATION S PROMULGATED UNDER THE SECURITIES ACT SOLELY OUTSIDE OF THE**

113600757.4

1

UNITED STATES AND SOLELY TO NON-U.S. PERSONS AND IN SPECIFIC RELIANCE UPON THE REPRESENTATIONS BY EACH SUBSCRIBER THAT (1) AT THE TIME OF THE OFFER AND SALE OF THE UNIT TO SUBSCRIBER, SUBSCRIBER WAS NOT A U.S. PERSON AS DEFINED IN REGULATION S, AND (2) AT THE TIME OF THE OFFER AND SALE OF THE UNIT TO SUBSCRIBER AND, AS OF THE DATE OF THE EXECUTION AND DELIVERY OF THIS SUBSCRIPTION AGREEMENT AND THE OPERATING AGREEMENT BY THE SUBSCRIBER, THE SUBSCRIBER WAS OUTSIDE OF THE UNITED STATES OR (B) REGULATION D PROMULGATED UNDER THE SECURITIES ACT.   THE UNIT MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S) UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE.   HEDGING TRANSACTIONS IN THE UNITS MAY NOT BE CONDUCTED EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND THE COMPANY'S OPERATING AGREEMENT.

## RECITALS:

A.      Pursuant to a Confidential Private Placement Memorandum dated as of July 26, 2018 (the "**Offering Memorandum**"), the Company is offering for purchase (the "**Offering**") only to a limited number of individual investors who are (i) not "U.S. persons," as such term is defined in Rule 902(k) of the Securities Act, in compliance with Regulation S, on a limited and private basis, or (ii) "accredited investors," as defined in Rule 501 under the Securities Act and pursuant to Regulation D of the Securities Act ("**Accredited Investors**"), a maximum of three hundred eighty-five (385) units ("**Units**") of membership interests in the Company ("**Membership Interests**"), representing total capital contributions to the Company of up to One Hundred Ninety-Two Million Five Hundred Thousand Dollars ($192,500,000) (or such other Maximum Offering Amount as may be necessary to account for changes resulting from new EB-5 legislation that requires an increase in the maximum offering amount to avoid the issuance of a fractional Unit) (the "**Maximum Offering Amount**"), excluding the sum of $50,000 per Investor for Offering costs and administrative expenses (the "**Expense Amount**"). The terms and conditions applicable to holders of the Units are described in the Operating Agreement of the Company (the "**Operating Agreement**") to be entered into by and among the Manager and each of the Subscribers for Units whose subscriptions are accepted by the Manager.

B.      The Offering of the Membership Interests is limited to only individual persons (not any legal entities) who are "Accredited Investors," as such term is defined in Rule 501(a) under the Securities Act.   Subscribers for Interests must subscribe for Five Hundred Fifty Thousand Dollars ($550,000) of Interests (the "**Total Subscription Payment**"), representing the Five Hundred Thousand Dollar ($500,000) capital contribution (or such other capital contribution amount as may be necessary to account for changes resulting from new EB-5 legislation that require an increase in the Subscriber's minimum investment amount) (the "**Capital Contribution**") and Fifty Thousand Dollar ($50,000) Expense Amount per Unit. Subscribers, in the aggregate, will own one hundred percent (100%) of the Investing Member Membership Interests in the Company, and each Subscriber shall be issued a Unit that

Exhibits to Complaint  p.  124

represents a limited liability company membership interest in the Company, as more fully described in the Operating Agreement.

C.     **APPALACHIAN EB-5, LLC**, a North Carolina limited liability company (the "**Regional Center**"), is an approved regional center under the EB-5 program (the "**EB-5 Program**") with the United States Citizenship and Immigration Service ("**USCIS**") authorized under The Immigration Act of 1990 (IMMACT 90), effective November 29, 1991 ("**Immigration Act**"), for purposes of authorizing foreign investors in the Company to include indirect job creation from investment in participating businesses toward qualification for the EB-5 Program, and it will be granting the Project the rights to utilize the EB-5 program to raise capital for the development of the Project.  The Regional Center has agreed to sponsor the Project for participation in the EB-5 Program pursuant to a Memorandum of Understanding with the Company and Developer to utilize the EB-5 Regional Center designation in connection with the Loan to the Borrower, whereby the Project will, in turn, create jobs (the "**Memorandum of Understanding**").

D.     The Company has been formed for the purpose of making a loan to **TRYON EQUESTRIAN PARTNERS, LLC**, a North Carolina limited liability company (the "**Borrower**" or "**Developer**"), in connection with the development of the Project (as defined in the Offering Memorandum).

E.     Each Subscriber's Capital Contribution and Expense Amount will be paid to the Escrow Agent (as defined below) and will be held in bank accounts with Iberia Bank pursuant to the Escrow Agreement which maintains the Capital Contribution in and Expense Amount.  Capital Contributions will be released from escrow to the Company's general operating account upon the filing of the applicable Subscriber's I-526 Immigrant Petition by Alien Entrepreneur (the "**I-526 Petition**") and the receipt of notice by USCIS of the filing of the I-526 Petition for the applicable Subscriber (Form I-797) (collectively, the "**Escrow Release Conditions**") and in no event later than following approval of such Investing Member's I-526 Petition.  After the Escrow Release Conditions are satisfied, the Investing Member's Capital Contribution will be utilized to fund the Loan even before the I-526 Petition approval has been received, as more fully described under Section 7.5 of the Operating Agreement.

F.     If an Investing Member receives an I-526 Petition Denial (without appeal or after denial of any appeal, as provided herein), then the Company shall seek to refund the denied Investing Member's Capital Contribution on a first priority basis and solely to the extent of available cash flow (such that each denied Investing Member shall be refunded his or her Capital Contribution in full in an order of priority based on the timing of when each such Investing Member's I-526 Petition was ultimately denied), as follows:

(a)     subject to the availability of funds, the Company will (A) refund $500,000 to the denied Investing Member and (2) cancel such Investing Member's subscription; and

(b)      if, following the application of clause (i) above, there is an insufficient amount of funds to enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members, the Company shall use commercially reasonable efforts to substitute the denied Investing Member with a Substitute Investing Member at which time a refund of the Capital Contribution shall be made to the Investing Member, as long as substitution occurs prior to the completion of the Project and in accordance with USCIS guidelines.  If a Substitute Investing Member has not been found, within three (3) months of the Investing Member receiving I-526 Petition denial, the provisions of Section H below shall apply.

G.      If (i) there is an insufficient amount of fundsto enable the Company to return all of the Capital Contribution to a denied Investing Member and continue operations with the Capital Contributions of other Investing Members; and (ii) a Substitute Investing Member has not otherwise subscribed for Membership Interests hereunder (as described above), then such refund will be made to the denied Investing Member as of the date that adequate funds are available for the payment of the refund; provided, however, that the Developer agrees to guaranty the full refund of any Subscriber who receives an I-526 Petition denial and has not received a refund of his or her entire Capital Contribution within six (6) months of the Company receiving notice of such I-526 Petition denial (See Guaranty Acknowledgment attached as Appendix I to the Operating Agreement).

H.      Each Subscriber's Expense Amount shall be paid directly to the Escrow Agent and will be disbursed from escrow to the Manager and used for Offering costs immediately upon the filing of the applicable Subscriber's I-526 Petition; provided, however, that if a Subscriber's I-526 Petition is denied (without appeal or after denial of any appeal, as provided herein), the Company shall attempt to find a Substitute Investing Member as set forth above; provided however, if a Substitute Investing Member has not been found, then the Manager shall refund the Subscriber's Expense Amount, less a Twenty-Five Thousand Dollar ($25,000) charge to cover certain Offering costs (subject to the Company's ability to recoup from its marketing agents and other intermediaries their proportionate share thereof), within 90 days after the time period set forth for the Company to find a Substitute Investing Member; provided further, however, that if the Investing Member is at fault in providing incorrect information related to the I-526 Petition or lies or misrepresents information on his or her I-526 Petition, then the full Fifty Thousand Dollars ($50,000) shall be retained by the Manager for costs incurred on behalf of an individual Subscriber.

I.      The Offering has been structured so that each Investing Member, by subscribing for a Unit and becoming a member of the Company, will have made an investment that qualifies as the investment component required for an I-526 Petition that entitles the Investing Member to seek permanent United States residency and, ultimately, to apply for U.S. citizenship, provided that the Investing Member otherwise satisfies the non-investment criteria for an EB-5 Visa, subject to a potential increase in the investment amount as noted above.  For further information, see "IV. IMMIGRATION MATTERS" and "V. E. RISK FACTORS - Immigration Risk Factors" of the Offering Memorandum.  The Subscriber, at his or her sole cost and expense, will arrange for an immigration attorney to file his or her I-526 Petition following acceptance of the subscription and admission as a member of the Company; provided that the Company may require that an immigration attorney selected by

the Company review the Subscriber's I-526 Petition to ensure consistency with this Offering Memorandum, in which case the Subscriber will be required to pay such immigration attorney's fee for performing such review.

J.       In addition to executing this Agreement and remitting the purchase price for the Units subscribed for hereunder to the Company, as described herein, the Subscriber will also need to execute the Company's Operating Agreement and deliver the executed Operating Agreement to the Company in order to complete its subscription hereunder. ***Please review the Operating Agreement in its entirety***.

K.       The Offering will end on December 31, 2018 at 5:00 p.m. EST, unless extended by the Manager in its sole discretion (the "**Offering Period**").  Notwithstanding the foregoing, the Company reserves the right, following the end of the Offering Period, to substitute a Subscriber whose I-526 Petition is denied with a Substitute Investing Member, as defined and more fully set forth in Section 7.5 of the Operating Agreement.  The Subscriber shall pay the Capital Contribution and the Expense Amount to the Escrow Agent (as defined below) in one or more installments, simultaneously with the execution of this Agreement.  A copy of the Escrow Agreement (the "**Escrow Agreement**") executed by the Company, as escrow agent ("**Escrow Agent**"), is attached as Exhibit B to the Offering Memorandum.

L.       Subject to the terms of the Operating Agreement, the Subscriber irrevocably commits the Subscriber's Capital Contribution to the Company upon payment thereof to the Escrow Agent.

M.       All subscription proceeds from this Offering will be held in escrow pursuant to the terms of the Escrow Agreement.  By execution hereof, each Subscriber agrees to be bound to the terms and conditions of the Escrow Agreement to the same extent as if the Subscriber had separately executed the Escrow Agreement.

## AGREEMENT

**NOW, THEREFORE**, the Subscriber hereby agrees as follows:

1.       <u>Subscription</u>.  The Subscriber hereby irrevocably subscribes for and agrees to purchase the Unit indicated on the signature page of this Agreement.  Payment of the Capital Contribution and Expense Amount shall be made in one or more installments payable upon subscription, as follows:

**$550,000 by <u>wire transfer</u> to**:

| | |
|---|---|
| **Wire to:** | **Iberia Bank** |
| | **200 W. Congress St.** |
| | **Lafayette, LA 70501** |
| | |
| **ABA#:** | **265270413** |
| **SWIFT CODE:** | **IBEAUS44** |
| | |
| **Account Name:** | Odlum Equestrian Lenders, LLC |

113600757.5

5

**Account Number:** 9785

**References (required):** Investor Name: Sravanthi Marella

2. <u>Parental Guardian Consent of Minor</u>. To the extent that the Subscriber who is funding subscription proceeds directly, is a minor child under applicable law (usually 18 years old), including the applicable jurisdiction provided for in the offering documents, a signature of the Subscriber's parent or legal guardian must co-sign the Subscription Agreement and Operating Agreement in order to validate the subscription documents, which shall be in accordance with the Uniform Transfers to Minors Act (UTMA), as applicable.

In the event that the minor Subscriber's subscription proceeds are paid from a bank account whereby the Custodian (as defined under the applicable law of the jurisdiction provided for in the offering documents) gifted such funds to the minor Subscriber under a custodial account, then the Custodian must co-sign the Subscription Agreement and Operating Agreement in order to validate the subscription documents.

Although the Company will accept subscriptions by a minor that conform to these instructions, all minor Subscribers and their guardians or custodians should speak to their U.S. immigration counsel regarding compliance with USCIS evidentiary requirements.

3. <u>Subscription by "U.S. Person."</u> In the event that the Subscriber is a "U.S. Person" under the applicable securities laws, which may include an F1 student residing in the United States, then arrangements may need to be made to have an offshore designee/parent execute the subscription documents outside of the United States.

4. <u>Acceptance of Subscription</u>. Subscriber understands and agrees that the Subscriber's subscription for Units hereunder ("**Subscription**") may be rejected by the Manager at any time in its sole discretion.  If the Subscription is accepted, the Manager will notify Subscriber of same and the scheduled date of closing.  If the Subscription is rejected, all funds received from the Subscriber will be returned without interest and thereafter this Agreement shall be of no further force or effect.

5. <u>Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require Registration</u>.  THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS (COLLECTIVELY, "**SECURITIES LAWS**"), EITHER PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, THESE MEMBERSHIP INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN

VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR OTHER APPLICABLE STATE OR FEDERAL SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE MEMBERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THE COMPANY'S OPERATING AGREEMENT ADDITIONALLY, THE SUBSCRIBER ACKNOWLEDGES THAT NEITHER THE COMPANY NOR THE MANAGER IS OBLIGATED TO REGISTER THE UNITS UNDER THE SECURITIES LAWS. SUBSCRIBER FURTHER UNDERSTANDS THAT THE TRANSFER OF THE UNITS MAY BE SUBSTANTIALLY RESTRICTED BY THE SECURITIES LAWS AND BY THE ABSENCE OF A TRADING MARKET THEREFOR, AND THE TRANSFER OF THE UNITS IS ADDITIONALLY RESTRICTED BY THE TERMS OF THE OPERATING AGREEMENT; THAT NO TRADING MARKET FOR THE UNITS EXISTS AND NONE IS EXPECTED TO DEVELOP; AND THAT ANY SALE OR OTHER DISPOSITION OF THE UNITS MAY RESULT IN UNFAVORABLE TAX CONSEQUENCES TO THE SUBSCRIBER. THE SUBSCRIBER ACKNOWLEDGES THAT THE RESTRICTIONS ON THE TRANSFERABILITY OF THE UNITS ARE SUBSTANTIAL AND MAY REQUIRE THE SUBSCRIBER TO HOLD THE UNITS INDEFINITELY. THE SUBSCRIBER HEREBY REPRESENTS AND WARRANTS THAT THE SUBSCRIBER HAS ADEQUATE MEANS OF PROVIDING FOR THE SUBSCRIBER'S CURRENT AND FUTURE NEEDS AND POSSIBLE PERSONAL CONTINGENCIES AND HAS NO NEED FOR LIQUIDITY OF THE UNITS.

6.      Subscriber's Additional Representations and Warranties.    The Subscriber additionally represents and warrants to the Regional Center and the Company as follows:

(a)      The Subscriber understands that the offer and sale of the Units have not been registered under the Securities Laws, pursuant to applicable exemptions. The Subscriber acknowledges the Company is not obligated to register the Unit under the Securities Laws. In addition to restrictions on transferability pursuant to the Operating Agreement, without such registration, such Unit may not be sold, pledged, hypothecated or otherwise transferred at any time whatsoever, except upon delivery to the Company of an opinion of counsel satisfactory to the Manager and the Company that registration is not required for such transfer or the submission to the Manager of such other evidence as may be satisfactory to the Manager and the Company to the effect that any such transfer will not be in violation of the Securities Laws. Subscriber further understands that any transfer of the Unit may be substantially restricted by the absence of a trading market therefor and none is expected to develop, and that any sale or other disposition of the Unit may result in unfavorable tax consequences to the Subscriber. The Subscriber acknowledges that the restrictions on the transferability of the Unit are substantial and may require the Subscriber to hold the Unit indefinitely.

(b)      The Subscriber is acquiring the Unit solely for the account of the Subscriber for investment purposes only and not for distribution or resale to others. The Subscriber will not resell or offer to resell all or a portion of the Unit except in strict compliance with all applicable Securities Laws, including, without limitation, Regulation S (Rules 901 through 905 and Preliminary Statement) under the Securities Act and the Operating Agreement. Without limiting the generality of the provisions set forth herein, the Subscriber consents to the placement of substantially the legend on any document representing the Units being purchased

113600757.5

7

by the Subscriber, if applicable, stating that transfer is prohibited except in accordance with the provisions of Regulation S of the Securities Act (§§ 230.901 through 230.905, and Preliminary Notes), pursuant to registration under the Securities Act, or pursuant to an available exemption from registration.  Subscriber will not engage in any hedging transactions involving the Unit, except in compliance with the Securities Laws and the Operating Agreement.

(c)    Subscriber (i) is not a U.S. Person, is not a citizen or resident alien of the United States, is not acquiring the Units for the account or benefit of any U.S. Person, did not receive the Offering Memorandum or an offer to purchase the Unit in the United States and did not execute this Agreement and pay the amounts specified hereunder from within the United States; or (ii) is an Accredited Investor acquiring the Units in a transaction not requiring registration under the Securities Act through Regulation D of the Securities Act. If requested by the Company, Subscriber further agrees to execute and deliver to the Company an executed IRS Form W-8BEN certifying that he or she is a Non-Resident Alien.

(d)    The Subscriber is a bona fide resident of the country set forth in his or her address in this Agreement, and agrees that if his or her principal residence changes prior to his or her purchase of a Unit, he or she will promptly notify the Manager.

(e)    The Subscriber acknowledges that the offer and sale of the Units is not taking place within the United States, but rather in an "offshore transaction," as defined in Rule 902 of Regulation S adopted by the Securities Exchange Commission pursuant to the Securities Act, and that no "directed selling efforts" took place within the United States in compliance with Regulation S, unless the Subscriber is an "accredited investors" as such term is defined in Rule 501(a) under the Securities Act in compliance with Regulation D of the Securities Act. The term "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia.

(f)    The Subscriber's financial condition is such that he or she has no need for liquidity with respect to its investment to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of its investment for an indefinite period of time, including the risk of losing all of its investment.

(g)    The Subscriber understands that the Project has not yet been developed and it has no operating history. The Project is in its early stages, is not currently generating any revenue, and its future profitability cannot be assured.

(h)    The Subscriber understands that: (i) his or her subscription for a Unit is irrevocable until the Offering Period ends without the Company's written consent; (ii) an investment in the Unit is a speculative investment that involves a high degree of risk, including the risk of loss of the entire investment of the Subscriber in the Company; (iii) no federal or state agency has passed upon the adequacy or accuracy of the information made available to the Subscriber, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Unit as an investment; (iv) any anticipated federal and/or state income tax benefits applicable to the Unit may be lost through changes in, or adverse interpretations of, existing laws and regulations; and (vi) there is no assurance that the Company will ever be profitable, or that the Subscriber's investment in the Unit will ever be recoverable.

(i)     The Subscriber acknowledges that there is no assurance that his or her I-526 Petition will be granted or, if it is, that Subscriber will ultimately be approved for conditional or unconditional lawful permanent residence in the U.S. or be able to become a U.S. citizen.  Neither the Company, Regional Center, Developer, nor the Company's immigration counsel has made any effort to pre-determine Subscriber's personal qualifications and circumstances and whether the Subscriber is likely or not likely to obtain favorable action on its I-526 Petition or EB-5 Visa, and that there are numerous reasons that will result in the Subscriber being denied residency in the United States, including, without limitation, the Project failing to qualify as an approved project for the EB-5 Program.

(j)     The Subscriber (i) has been provided with a copy of the Offering Memorandum, including, as exhibits thereto, this Agreement, the Escrow Agreement, the Operating Agreement, and has reviewed same; (ii) has been given complete access to all documents, records, contracts and books of or relating to the Company and the Unit, and all other information reasonably requested by the Subscriber; and (iii) has performed a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the Subscriber in reaching the Subscriber's decision to invest in the Company.  The Subscriber further acknowledges and confirms that the Subscriber has had an opportunity to ask questions of and receive answers from the Company and the Developer concerning the Unit, the prospective contemplated business and purpose of the Company, and any other matter the Subscriber has deemed relevant, and all such inquiries have been answered to the Subscriber's satisfaction.  In addition, Subscriber acknowledges that he or she has had and may have, at any reasonable hour, after reasonable prior notice, access to the financial and other records of the Company which the Company can obtain without unreasonable effort or expense, and further acknowledges that Subscriber has obtained, in Subscriber's judgment, sufficient information from the Company to evaluate the merits and risks of an investment in the Unit.

(k)     The Subscriber acknowledges that: (i) the risks inherent to this investment have been fully considered; (ii) the Manager will have substantial and exclusive authority to conduct the operation of the Company; and (iii) an investment in the Unit has neither been approved nor disapproved by the Securities and Exchange Commission or any other federal, state or local department or agency of any other jurisdiction, and such authorities have not passed upon the adequacy or accuracy of the disclosure provided to investors in connection with an investment in the Unit.

(l)     The Subscriber acknowledges that neither the Company, Manager, the Regional Center nor any representative of the Company, the Manager or the Regional Center has made any representations or warranties in respect of the Developer's business or profitability. Without limiting the generality of the foregoing, the Subscriber acknowledges and agrees that information, including any business plan or financial projections or forecasts or other information contained in written materials provided or made available to the undersigned, and any oral, visual or other presentations made by the Company, the Manager or the Regional Center or its representatives to the Subscriber shall not be deemed a representation or warranty in respect of the matters therein.  Subscriber acknowledges that the Offering Memorandum contains information that the Developer and Company believe is accurate and, as such information relates to the projected revenues and expenses of the Developer, data that the Developer believes is a reasonable forecast of the results that the Developer will achieve; however, as an accredited,

113600757.5

9

experienced and sophisticated investor, Subscriber is aware that there are many foreseeable and unforeseeable events that could cause the assumptions underlying the financial projections to not materialize, and the results of same may cause material adverse consequences to the financial results of the Developer and Company.

(m)  In making the decision to purchase the Unit, Subscriber has relied solely upon independent investigations made by Subscriber, and the Subscriber further represents and warrants that the Subscriber is not acquiring the Unit as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media distributed in the United States, any seminar in the United States or any solicitation by a person in the United States not previously known to the Subscriber, and that Subscriber is not aware of any general solicitation within the United States or general advertising within the United States regarding the purchase or sale of the Unit.  The Subscriber acknowledges and confirms that he or she is not relying upon any statement, representation or warranty made by the Company or its respective representatives in making a decision to subscribe for the Unit.  Subscriber must rely solely on the terms of the Operating Agreement for the terms of Subscriber's participation in the Company and the rights and responsibilities of owning its Unit.

(n)  The Subscriber understands that the Company and the Manager will be relying on the accuracy and completeness of all matters set forth in this Agreement, and the Subscriber represents and warrants to the Company, the Manager and each of their affiliates that the information, representations, warranties, acknowledgments and all other matters set forth in the Subscription Agreement with respect to the Subscriber are complete, true and correct and does not fail to include any material fact necessary to make the facts stated, in light of the circumstances in which they are made, not misleading, and may be relied upon by them in determining whether the offer and sale of a Unit to the Subscriber is exempt from registration under the Securities Laws, and the Subscriber will notify them immediately of any change in any statements made in the Subscription Agreement that occurs prior to the consummation of the purchase of a Unit.

(o)  The Subscriber is in compliance with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Freedom Act**"), the U.S. Bank Secrecy Act (the "**BSA**") and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA.  The Subscriber is not and shall not be a person: (i) acting, directly or indirectly, on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any of the OFAC lists; (ii) listed on, residing in or having a place of business in a country or territory named on any of such lists or which is designated as a Non-Cooperative Jurisdiction by the Financial Action Task Force on Money Laundering (FATF), or whose funds are from or through such a jurisdiction; (iii) that is a "Foreign Shell bank" within the meaning of the USA Freedom Act; or (iv) residing in or organized under the laws of a jurisdiction designated by the U.S. Secretary of the Treasury under Sections 311 or 312 of the USA Freedom Act as warranting special measures due to money-laundering concerns.

(p)     The Subscriber (i) has accurately completed the Investor Questionnaire that is an exhibit to the Offering Memorandum; and (ii) is a "sophisticated person" in that Subscriber has such knowledge and experience in financial and business matters that individually and/or with the aid of advisers, it is capable of evaluating the merits and risks of an investment in the Company by making an informed investment decision with respect thereto.

(q)     Without limiting the generality of the provisions set forth herein, the Subscriber consents to the placement of substantially the legend on any document representing the Units being purchased by the Subscriber, if applicable, stating that transfer is prohibited except in accordance with the provisions of Regulation S of the Securities Act (§§ 230.901 through 230.905, and Preliminary Notes), pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and that hedging transactions involving those securities may not be conducted unless in compliance with the Securities Act.

(r)     If the Subscriber is (i) a purchaser in a sale that occurs outside the United States within the meaning of Regulation S or (ii) a "distributor," "dealer" or person "receiving a selling concession, fee or other remuneration" in respect of Units sold, prior to the expiration of the applicable "distribution compliance period" (as defined below), it acknowledges that (A) until the expiration of such "distribution compliance period" any offer or sale of the Units shall not be made by it to a U.S. Person or for the account or benefit of a U.S. Person within the meaning of Rule 902(k) of the Securities Act and (B) until the expiration of the "distribution compliance Period," it may not, directly or indirectly, refer, resell, pledge or otherwise transfer a Unit or any interest therein except to a person who certifies in writing to the Company that such transfer satisfies, as applicable, the requirements of the legends described herein and that the Units will not be accepted for registration of any transfer prior to the end of the applicable "distribution compliance period" unless the transferee has first complied with certification requirements described in this Section.  The "distribution compliance period" means the one-year period following the issue date for the Units.

(s)     The Subscriber acknowledges that the Manager and the Developer are affiliated parties.

(t)     The Subscriber acknowledges and agrees to comply with all of his or her obligations set forth in the EB-5 Job Allocation Addendum attached as a schedule to the Operating Agreement, and all of the Subscriber's representations, warranties and agreements set forth therein are incorporated by reference into the Operating Agreement and Subscription Agreement.

(u)     The Subscriber acknowledges and agrees that (i) the Manager, Regional Center and Developer have not given, and have no authority to give, any investment advice with respect to the purchase of a security; and (ii) a prospective subscriber has not requested or otherwise sought any such investment advice from the Manager, Regional Center and/or the Developer.

(v)     The Subscriber acknowledges and agrees that (i) the Regional Center is unaffiliated with the Developer; (ii) the Regional Center makes no representations about the Project- and Developer-related information in the Project Business Plan or documents related to

the business plan or the investment the Subscriber is making, and (iii) the Subscriber is in no way relying on the Regional Center for providing any service other than filing the annual I-924A report with USCIS.

7.    Withholding Tax.  The Subscriber acknowledges that in the event the Internal Revenue Service determines that the Subscriber's country of residence does not exchange adequate tax information with the United States, pursuant to Internal Revenue Code Sections 871(h)(5) or Section 881(c)(5), then the Company will be obligated to withhold United States income taxes and remit such taxes to the Internal Revenue Service, pursuant to applicable law, and the Subscriber consents to such withholding.

8.    Confirmation.  All information that the Subscriber has provided anywhere in this Agreement concerning the Subscriber and the Subscriber's financial position is correct and complete as of the date set forth below, and if there should be any material change in such information prior to the acceptance of the Subscriber's subscription for the Unit that is being purchased, the Subscriber will immediately provide such information to the Manager.

9.    Consultation with Independent Counsel and Tax Advisor.  The Subscriber's investment in the Units is an investment in the equity of a Delaware limited liability company, which confers certain rights and liabilities upon the Subscriber pursuant to Delaware law and the Operating Agreement.  Subscriber has been advised that Subscriber should consult with his or her own legal and tax advisors prior to executing this Agreement, acquiring a Unit or consummating the transactions contemplated hereby.  Subscriber understands that the lawyers(s) for the Company, Regional Center and Developer represent only these entities in connection with the transactions contemplated by this Agreement, and do not represent the Subscriber, and such lawyer(s) make no representation regarding the Regional Center, the Company, the Developer or the Subscriber's investment in Units.

10.    Indemnification.  Subscriber hereby agrees to indemnify and hold harmless the Regional Center, the Company and the Developer and their affiliates, and the respective employees, agents and attorneys of the foregoing against any and all losses, claims, demands, liabilities and expenses (including reasonable legal or other expenses) incurred by each such person or entity in connection with any claims or liabilities, whether or not resulting in any liability to such person or entity, to which any such indemnified party may become subject under the Securities Laws, under any other statute, at common law or otherwise, insofar as such losses, claims, demands, liabilities and expenses (a) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact made by Subscriber, or (b) arise out of or are based upon any breach of any representation, warranty or agreement of Subscriber contained herein.

11.    Investor Information Form, Form W-8BEN and Investor Questionnaire.  Subscriber shall complete and fully execute, together with this Subscription Agreement, the Investor Information Form and Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (W-8BEN), attached hereto as **Exhibits A** and **B**, respectively, and the Investor Questionnaire attached to the Offering Memorandum.

12.    Escrow Agreement.  By execution hereof, the Subscriber agrees to be bound to the terms and conditions of the Escrow Agreement to the same extent as if the Subscriber had

separately executed the Escrow Agreement attached as Exhibit B to the Offering Memorandum.

13.    Miscellaneous.

(a)    Severability.  In the event any portion of this Agreement is found to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in a jurisdiction shall not affect the validity, legality or enforceability of any portions of this Agreement in any other jurisdiction.

(b)    Entire Agreement; Amendment; Waiver.  This Agreement constitutes the entire Agreement between the parties and supersedes all prior oral and written agreements between the parties hereto with respect to the subject matter hereof.  Neither this Agreement nor any provision hereof may be amended, modified, changed, waived, discharged or terminated orally, except by a statement in writing signed by the party or parties against which enforcement or the change, waiver, discharge or termination is sought.  No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

(c)    Governing Law; Venue; Jurisdiction.  This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, the obligations provided therein or performance thereof shall be governed or interpreted according to the laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof.

(d)    Arbitration:  Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement  shall be submitted to JAMS, Inc. (hereafter, the "**Arbitration Service**") and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract or otherwise, regardless of its nature.  Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service.  In the event of a conflict between the applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern.  To select the three-member arbitration panel, the parties shall each name one neutral arbitrator, and those two arbitrators shall select a third neutral arbitrator from a list of potential arbitrators jointly prepared by the parties.  The arbitration proceeding shall be decided by majority vote of the three-arbitrator panel.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in Tryon, North Carolina.

In the event of a dispute subject to this Section, (a) the parties shall be entitled to

reasonable discovery subject to the discretion of the arbitrator, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings.  The remedial authority of the arbitrator shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitrator shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party.  The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation.  The parties and the arbitrator shall keep confidential all matters relating to any arbitration hereunder (including without limitation the existence of the dispute and the arbitration).

In interpreting this Agreement, the arbitrator shall be bound by and follow the substantive law of the State of Delaware. To the extent applicable and not inconsistent with this Section, the arbitrator shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Any filing or administrative fees shall be borne initially by the party requesting administration by the Arbitration Service.  If both parties request such administration, the fees shall be borne initially by the party incurring such fees as provided by the rules of the Arbitration Service.  The initial fees and costs of the arbitrator shall be borne equally by the parties.  The prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties.  Judgment upon any award rendered by the arbitrators may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

If any of the provisions of this Section are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Section, and this Section shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration.  If a court should find that the arbitration provisions of this Section are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

(e)     Litigation:  Subject to the arbitration provisions set forth in Section 10(d) herein, the Company shall prosecute and defend such actions at law or in equity as may be necessary to enforce or protect the interest of the Company.  The Company shall respond to any final decree, judgment or decision of any court, board or authority having jurisdiction in the premises.  The Company shall satisfy any such judgment, decree or decision, first out of any insurance proceeds available therefor, and next out of assets of the Company.   The cost of

113600757.5

14

defending any actions brought against the Company and/or the Manager with respect to Company matters shall be borne by the Company except as otherwise provided in this Agreement.

(f)    Notices.  All notices, offers, acceptance and any other acts under this Agreement (except payment) shall be in writing, and shall be sufficiently given if delivered to the addressee in person, by Federal Express or similar receipted delivery, or if mailed, postage prepaid, by certified mail, return receipt requested, as follows:

Subscriber:            At the address designated on the signature page of this Agreement.

The Company:           Odlum Equestrian Lenders, LLC
c/o Appalachian EB-5, LLC
Attention: Andrew Dover and Dale Carroll
Biltmore Park Town Square
One Town Square Boulevard, Suite 315
Asheville, NC 28803
Phone (Andrew): (740) 704-3256
Phone (Dale): (919) 665-7932
Emails:  andydover@odlumcapital.com and
dcarroll@appalachianeb5.com

or to such other address as either of them, by notice to the other may designate from time to time.

(g)    Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The execution of this Agreement may be by actual or facsimile signature.

(h)    Survival of Representations, Warranties and Agreements.   The representations, warranties and agreements contained herein shall survive the delivery of, and payment for, the Unit.

(i)    Assignability.  This Agreement and the rights and obligations hereunder and the Units contemplated to be purchased hereunder are not transferable or assignable by the Subscriber without the prior written consent of the Company, and any such attempted transfer or assignment shall be void *ab initio* except as provided in the Operating Agreement.  Before consenting to any such assignment, the Regional Center may require a proposed assignee to take certain actions and execute certain documents, including, without limitation, executing a separate subscription agreement, as the Regional Center may reasonably determine.

(j)    Benefit.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors, and assigns.

(k)    English Language.  The English language text of this Agreement has been translated to a language in which the Subscriber is competent and the Subscriber understands all

113600757.5

15

of the provisions of this Agreement.  The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

[*Signatures appear on the following pages.*]

**IN WITNESS WHEREOF**, the undersigned Subscriber has executed this Subscription Agreement for ODLUM EQUESTRIAN LENDERS, LLC, as of the date set forth below.

**SUBSCRIBER:**

_____ 452

[Social Security Number or FEI Number] (if any)

SRAVANTHI MARELLA

Print Exact Name of Subscriber

03/22/2019

Date of Subscriber's Execution

M.

Signature of Subscriber

*Total Subscription Payment*:

$500,000.00 Capital Contribution
$ 50,000.00 Expense Amount
**$550,000.00 Total Subscription Payment**

3116 VIRGINIA AVE SE,

Principal Residential Street Address
CHARLESTON, WV, 25304

USA

Country of Residence

443 823 5315

Telephone Number

—

Fax Number

Sravanthy_marella@yahoo.com

E-mail Address

**CUSTODIAN/GUARDIAN:**

To the extent that the Subscriber is a minor child under applicable law (usually 18 years old), including the applicable jurisdiction provided for in the offering documents, a signature of the Subscriber's Custodian/Guardian must accompany the signature of the minor in order to validate this subscription.

The below Custodian/Guardian hereby acknowledges that, on behalf of the minor Subscriber, he or she certifies that he or she has read and understands the Odlum Equestrian Lenders, LLC Subscription Agreement and all other documents referenced therein, and approves the terms and conditions of all such documents referenced therein on behalf of said minor Subscriber and is signing this document as the authorized Custodian/Guardian of the minor Subscriber.

_____, as Custodian/Guardian for _____

under the Delaware Uniform Transfers to Minors Act

_____

Signature of Custodian/Guardian

113600757.5

17

## ACCEPTANCE

By signing below, the undersigned accepts the foregoing subscription for membership interests in ODLUM EQUESTRIAN LENDERS, LLC, in accordance with the terms hereof, for:

Subscriber Name:__Sravanthi Marella_____

ODLUM EQUESTRIAN LENDERS, LLC

By:     ODLUM EQUESTRIAN MANAGER, LLC,
        its Manager

By:_____Andrew B. Dove_____
Name: ___Andrew B. Dove_____
Title: ___Managing Member_____
Dated:3/23/2019

113600757.5                                    18